UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

RAHSON STAPLES,

                                    Plaintiff,

                                                              9:17-cv-0703
v.                                                            (TJM/TWD)

JOE PATANE; COLLEEN COPPOLLA;
PATRICK COLLVER,

                                    Defendants.

———————————————————————————

APPEARANCES:                              OF COUNSEL:

RAHSON STAPLES
   a/k/a Rashon Staples
Plaintiff, *pro se*
681 Albany Avenue
Brooklyn, NY 11203

BARBARA D. UNDERWOOD              SHANNAN C. KRASNOKUTSKI, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

I.      INTRODUCTION

        *Pro se* Plaintiff Rahson Staples, a former inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), has commenced this action

under 42 U.S.C. § 1983 alleging violations of his constitutional rights while incarcerated at

Marcy Correctional Facility ("Marcy").  (Dkt. Nos. 1, 24.)  Remaining Defendants in this action

are Joe Patane, a custodial maintenance instructor; Colleen Coppolla, a nurse administrator; and

Patrick Collver, a senior counselor in the Residential Substance Abuse Treatment ("RSAT") program.  (Dkt. No. 27.)  Plaintiff's remaining claims are for Eighth Amendment conditions of confinement against Patane and Coppolla and First Amendment retaliation against Patane and Collver.  (Dkt. Nos. 24, 27.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust his administrative remedies.  (Dkt. Nos. 46, 46-6.)  Plaintiff, who is no longer incarcerated, has failed to respond to the motion despite having been cautioned by the Court that his failure to respond may result in the motion being granted, and having been granted an unsolicited extension of time to respond by the undersigned.  (Dkt. Nos. 47, 48.[1])  For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.    BACKGROUND

Plaintiff commenced this action on June 29, 2017.  (Dkt. No. 1.)  The initial complaint was dismissed without prejudice on October 17, 2017, following the District Court's initial

---

[1]  According to Defendants' declaration of service, on August 8, 2018, the motion papers were mailed to Plaintiff at the address he had provided to the Clerk for service, 681 Albany Avenue, Brooklyn, New York, 11203.  (Dkt. No. 46-8 at 1; Dkt. No. 41.)  The Clerk's Office mailed a notice to Plaintiff on August 9, 2018.  (Dkt. No. 47.)  On September 18, 2018, after Plaintiff had failed to file papers responding to the summary judgment motion, the Clerk's Office mailed this Court's September 18, 2018, Text Order to Plaintiff giving him additional time to respond to Defendants' summary judgment motion.  (Dkt. No. 48.)  On November 13, 2018, the Text Order (Dkt. No. 48) and notice of motion (Dkt. No. 47) were returned to the Clerk's Office as undeliverable. (Dkt. Nos. 49, 50.)  The Court notes Plaintiff has been advised of his obligation to "promptly notify the Clerk's Office and all parties or their counsel of any change in his address [and that] failure to do will result in the dismissal of this action."  (Dkt. No. 27 at 31.)  Accordingly, **Plaintiff is hereby directed to update his mailing address in accordance with L.R. 10.1(c)(2) within fourteen (14) days from the date of this Order and Report-Recommendation.  Failure to file the change of address will result in a recommendation that the case be dismissed for failure to prosecute, failure to follow Local Rules, and failure to follow a Court order.**

review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915(A)(b).  (Dkt. No. 14.)  Plaintiff's

amended complaint, filed on January 3, 2018, is the operative pleading.  (Dkt. No. 24.)

Following the District Court's initial review of the amended complaint, only the following First

and Eighth Amendment claims remain:

> (1) Plaintiff alleges that in approximately March 2015, Patane forced Plaintiff to work in the custodial maintenance program, despite Plaintiff's possession of a valid medical permit.  Plaintiff alleges Patane took this action in retaliation for Plaintiff's filing of a prior grievance against Patane.  (Dkt. No. 24 at 4-9.[2])

> (2) Plaintiff alleges that in approximately March 2015, at the request of Patane, Coppolla wrongfully "discontinued" Plaintiff's medical permit.  *Id.* at 6-7.

> (3) Plaintiff alleges that on or about July 24, 2016, Collver removed Plaintiff from the RSAT program in retaliation for Plaintiff's filing of a grievance against another RSAT staff member.  *Id.* at 54-60; *see also* Dkt. No. 24-1 at 25, 43, 47.

(Dkt. No. 27 at 5-7, 22-23, 25-26.)  Defendants argue summary judgment must be granted

because Plaintiff has failed to exhaust his administrative remedies.  (Dkt. No. 46-6 at 6-11.)

## III.   LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

---

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[3] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal

---

[3] The Court finds Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 24-4.)

quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[4] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    PLAINTIFF'S FAILURE TO RESPOND

Plaintiff's failure to oppose Defendants' summary judgment motion does not mean the motion is to be granted automatically. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citations and internal quotation marks omitted). An unopposed motion for summary judgment

---

[4]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

may be granted "only if the facts as to which there is no genuine dispute show that the moving

party is entitled to judgment as a matter of law." *Id*. at 486; *see also Vermont Teddy Bear Co. v.*

*1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (where "the nonmoving party 'chooses

the perilous path of failing to submit a response to a summary judgment motion, the district court

may not grant the motion without first examining the moving party's submissions to determine if

it has met its burden of demonstrating that no material issue of fact remains for trial.'")

      Where, as in this case, a party has failed to respond to the movant's statement of material

facts as required by L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be

accepted as true (1) to the extent they are supported by evidence in the record, and (2) the

nonmovant if proceeding *pro se*, has been specifically advised of the possible consequences of

failing to respond to the motion.[5]  *Champion*, 76 F.3d at 486.  In light of Plaintiff's failure to

oppose Defendants' motion, the facts set forth in Defendants' statement of material facts

pursuant to L.R. 7.1(a)(3) (Dkt. No. 46-7) that are supported by record evidence and are

uncontroverted by nonconclusory allegations in Plaintiff's verified amended complaint, will be

accepted as true.  *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3

(N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to

controvert facts in statement of material facts on motion for summary judgment); *Douglas v.*

*Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013)

("Because Plaintiff has failed to raise any question of material fact, the Court will accept the

facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) . . . , supplemented

by Plaintiff's verified complaint . . ., as true.").

---

[5]  *See supra* Section I, fn. 1.

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see*

*also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (quotation marks omitted).

In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). 7 N.Y.C.R.R. § 701.5. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1), (b)(1). An adverse decision of the IGRC may be appealed to the superintendent of the facility. *Id.* § 701.5(c)(1). If the grievant wishes to appeal to the superintendent, "he or she must complete and sign the appeal section on the IGRC response form (form #2131) and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response." *Id.* Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC") within seven days of receipt. *Id.* at § 701.5(d)(1). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii). During the grievance process, "matters not decided within the time limits may be appealed to the next step." *Id.* § 701.6(g)(2).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858.  More specifically, § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted)).  In the PLRA context, the Supreme Court has determined "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*.  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216;

9

*Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds*, *Woodford*,

548 U.S. at 94-95; *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). Plaintiff must

then demonstrate the DOCCS IGP was unavailable. *See Jones*, 549 U.S. at 216.

### A.    Defendants Patane and Coppolla

Plaintiff alleges that in March 2015, Patane retaliated against him in violation of the First

Amendment and that Patane and Coppolla subjected Plaintiff to unsafe or medically

inappropriate working conditions in violation of the Eighth Amendment. (Dkt. No. 24 at 4-9.)

Rachel Seguin, Assistant Director of the DOCCS IGP, states in her declaration that she is

the custodian of records maintained by CORC. (Dkt. No. 46-2 at ¶¶ 1, 2.) DOCCS records

reflect that Plaintiff was incarcerated at Marcy during the time period relevant to this action,

which had a fully functioning inmate grievance process available to inmates. *Id*. at ¶ 13. Seguin

conducted a search of CORC records for determinations upon grievance appeals brought by

Plaintiff. *Id*. at ¶ 12. A copy of the computer printout from the CORC database reflecting the

results of that search is attached to her declaration as Exhibit A. (Dkt. No. 46-3.) Based on her

review of CORC records, Plaintiff did not appeal any grievances to CORC in 2015. (Dkt. No.

46-2 at ¶ 14.) Specifically, Seguin explains Plaintiff filed no grievance appeals regarding the

alleged conduct of Patane and/or Coppolla in February 2015. *Id*. Therefore, Defendants contend

Plaintiff's First Amendment retaliation claim against Patane and Eighth Amendment condition of

confinement claims against Patane and Coppolla should be dismissed for failure to exhaust

administrative remedies. (Dkt. No. 46-6 at 10.)

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including

receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his

administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d

170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits.") (quotations and citations omitted)); *see Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002) (holding exhaustion under the DOCCS IGP is not complete until the grievance has been appealed to CORC and CORC has issued a decision); *Singh v. Goord*, 520 F. Supp. 2d 487, 495 (S.D.N.Y. 2007) (complete exhaustion to CORC, the highest level, is required).

In this case, however, Plaintiff states in his verified amended complaint that he immediately filed a grievance after his February 27, 2015, medical permit was "discontinued" on March 3, 2015, which was assigned grievance number MCY-19016-15. *Id.* at 7. Attached as Exhibit B to Plaintiff's amended complaint is the IGRC's March 12, 2015, response to MCY-19016-15: "The Committee agrees with the inmate. Inmate's valid medical conditions and restriction must be followed by all staff without interference with medical staff." (Dkt. No. 24-1 at 4.) Plaintiff claims "[d]espite this . . . order, Patane . . . contacted and disputed with grievance staff, and . . . ordered Plaintiff to continue 'physical participation' in his class/program[.]" (Dkt. No. 24 at 8.) Plaintiff "further appealed to Superintendent and CORC with no resonses [sic] (staff at Marcy ultimately work together/collusion)." *Id.*

Unfortunately, MCY-19016-15 is not a part of the summary judgment record and Defendants have submitted no evidence whatsoever to refute Plaintiff's claims regarding the grievance he filed at the facility level in March 2015. Further, Defendants' memorandum of law is silent as to exhaustion of administrative remedies when an inmate receives a *favorable* decision at the facility level. "As the Second Circuit has explained, 'it would be counterintuitive to require inmates who win during the grievance process to appeal their victories.'" *Phillip v.*

*Schriro*, No. 12-cv-839-RA, 2014 WL 4184816, at *8 (S.D.N.Y. Aug. 22, 2014) (quoting *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (citing *Sulton v. Wright*, 265 F. Supp. 2d 292, 298-99 (S.D.N.Y. 2003) ("If a prisoner had to grieve non-compliance with favorable decisions under the PLRA, prison officials could keep prisoners out of court indefinitely by saying 'yes' to their grievances and 'no' in practice."))).

Arguably, if Plaintiff's version of the above events is credited, Plaintiff *may* have demonstrated unavailability under *Ross* as to his First Amendment retaliation claim against Patane and Eighth Amendment conditions of confinement claims against Patane and Coppolla. Alternatively, a more developed summary judgment record *may* demonstrate Plaintiff failed to avail himself of available administrative remedies. Simply put, based on the existing record, the Court finds a material question of fact as to whether Plaintiff exhausted his administrative remedies regarding his claims against Patane and Coppolla.

Therefore, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied as to Patane and Coppolla without prejudice and with the opportunity to renew by way of a second motion for summary judgment or exhaustion hearing.

### B.    Defendant Collver

Plaintiff claims that on July 24, 2016, Collver removed him from the RSAT program in retaliation for Plaintiff's filing of a grievance against another RSAT staff member. (Dkt. No. 24 at 54-60.) Then in September 2016, Plaintiff claims he was arbitrarily deprived of good time credits because he was removed from the RSAT program. *Id*. at 58-60. Defendants argue Plaintiff's removal from the RSAT program by Collver was never the source of a filed grievance by Plaintiff and, therefore, remains unexhausted. (Dkt. No. 46-6 at 10-11.)

Based on her review of CORC records, Seguin states Plaintiff filed six grievance appeals to CORC in 2016, two of which appear to relate to the RSAT program. (Dkt. No. 46-2 at ¶ 15.) Copies of the grievance packages for grievance appeal MCY-20615-16, titled "Unfair RSAT Practice" and MCY-21185-16, titled "Restore Good Time" are attached as Exhibits B and C to Seguin's declaration, respectively. (Dkt. Nos. 46-4, 46-5.)

On June 22, 2016, Plaintiff filed a grievance claiming "Counselor (RSAT) Violating HIPPA [sic] & Confidentially." (Dkt. No. 46-4 at 4.) The grievance was designated MCY-20615-16, and titled "Unfair RSAT Practice." *Id.* The grievance challenged certain conduct by RSAT counselor Williamson.[6] *Id.* On December 14, 2016, CORC issued its decision. *Id.* at 1. Defendants argue Plaintiff's June 22, 2016, grievance "did not challenge Defendant Collver's alleged conduct in removing Plaintiff from the RSAT program—nor could it have, since Plaintiff alleges that his removal from the RSAT program occurred on or about July 24, 2016." (Dkt. No. 46-6 at 10.) The Court agrees.

However, Plaintiff also filed a grievance on November 20, 2016, designated MCY-21185-16, claiming "Retaliation: Good Time Loss." (Dkt. No. 46-5 at 4.) In relevant part, Plaintiff states:

> Previously there was some very inappropriate issues I was subjected to in RSAT (F-2) which I believed was resolved (amicably). This allegation stems from prior incidents of discrimination, harassment, and malfeasance by counselors' illegal interest in my confidential/private medical issue. **Furthermore, I was "capriciously" terminated from Program (July 2016) only for simply stating my legal awareness of constitutional right regarding medical confidentiality.** Civilian (non-medical) counselor were even "at odds" with security regarding this matter! I was Senior Leader of the Program (4 months). No infractions, issues or violations and was deprived of my due process rights

---

[6] Plaintiff's claims against Williamson were dismissed on initial review without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 1915A(b)(1). (Dkt. No. 27.)

> before and after my unwarranted termination & never supplied
> with a reason why!  Now I received notification they have taken all
> my good time.

*Id*. (emphasis added).  As part of the investigation, Collver submitted a report dated December 2,

2016, explaining:

> [Plaintiff] was removed from RSAT according to Program Manual
> Guidelines.  As a result, [Time Allowance Committee ("TAC")] is
> withholding his good time until he completes RSAT.  This is also
> in accordance with published guidelines.  [Plaintiff] may apply for
> withheld good time upon completion of recommended programs.

*Id*. at 6; *see also id*. at 3, 17.  On December 6, 2016, the IGRC issued its decision:

> After receiving and reviewing the investigation report which states
> that grievant can apply for withheld good time once he has
> completed recommended programs.  The Committee advises
> grievant that he may do so upon completion of those said
> programs.  **However grievant feels that he was wrongfully
> removed from his RSAT program which was the cause of the
> grievant good time being withheld.**  Therefore Committee is at a
> Deadlock on this issue and passes it through for further review.

*Id*. at 12 (emphasis added).  On December 12, 2016, the Superintendent denied Plaintiff's

grievance:

> Subject states that his Good Time has been unfairly taken from
> him.  Grievant is requesting that his Good Time be restored.
> **Investigation returned by [Collver] reveals that the grievant
> was removed from RSAT according to Program Manual
> guidelines.**  As a result, TAC is withholding his Good Time until
> he completes RSAT.

*Id*. at 5 (emphasis added).  Plaintiff appealed to CORC on December 14, 2016.  *Id*.  On

November 1, 2017, CORC issued its decision:

> **<u>Grievant Request Unanimously Accepted in Part</u>**
>
> Upon full hearing of the facts and circumstances in the instant
> case, the action requested herein is hereby accepted only to the
> extent that CORC upholds the determination of the Superintendent
> for the reasons stated.

> **CORC notes that the grievant was removed from RSAT on 7/24/16 for poor participation and programming, and that his Good Time was subsequently withheld.  CORC also notes that his Good Time was restored on 12/30/16, he completed RSAT on 1/8/17, and was released to Community Supervision on 1/9/17.**  It is further noted that the medical confidentiality issue was addressed in MCY-20615-16, which was answered by CORC on 12/14/16.
>
> With respect to grievant's appeal, CORC asserts that the instant complaint was properly investigated and finds insufficient evidence of malfeasance by staff or a violation of his rights.

*Id*. at 1 (emphasis added).

According to Defendants, MCY-21185-16 *only* challenged the Time Allowance Committee's decision to withhold Plaintiff's good time based upon his failure to complete the RSAT program.  (Dkt. No. 46-2 at ¶ 17.)  The Court disagrees and finds the information contained in this grievance was sufficient to place Marcy officials on notice of Plaintiff's claims regarding his removal from the RSAT program.

The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Porter*, 534 U.S. at 524-25.  In this regard, exhaustion serves two major purposes.  *Woodford*, 548 U.S. at 89.  First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures."  *Id*.  Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative

review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.* Such is the case here.

Turning to Defendants' next argument, Defendants contend this "grievance did not challenge Defendant Collver's alleged conduct in removing him from the RSAT program—nor could it have, since a grievance based upon Defendant Collver's alleged conduct in July 2016[,] would have been untimely in November 2016[,] under DOCCS Directive 4040." (Dkt. No. 46-6 at 10-11.) The Court finds Defendants' untimeliness argument unpersuasive. *See Hill v. Curcione*, 657 F.3d 116, 125 (2d Cir. 2011) ("[T]he exhaustion requirement of the PLRA is satisfied by an untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority."); *see, e.g.*, *Povoski v. Lacy*, No. 9:14-CV-0097 (BKS/CFH), 2017 WL 9511094, at *13 (N.D.N.Y. Dec. 13, 2017) (finding post *Ross* that the plaintiff properly exhausted his administrative remedies despite filing his grievance thirteen days past the initial time limitation because it "was not so egregious as to constitute an unreasonable attempt to avail himself of the grievance process, as the IGRC accepted the grievance, and both the Superintendent and CORC issued decisions on the merits"), *report-recommendation adopted by* 2018 WL 547392, at *1 (N.D.Y.Y. Jan. 17, 2018).

Nonetheless, Plaintiff filed his original complaint on June 29, 2017, four months *before* CORC issued its decision on MCY-21185-16. (Dkt. No. 1.) Pursuant to the PLRA, a prisoner must exhaust available administrative remedies before he files a lawsuit. *Neal*, 267 F.3d at 121-22. Indeed, it is well settled that "[r]eceiving a determination from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and that any claim not exhausted prior to commencement of the suit must be dismissed without prejudice." *Id.*; *Berkley v. Ware*, No. 9:16-CV-1326 (LEK/CFH), 2018 WL

3736791, at *5 (N.D.N.Y. July 6, 2018) (plaintiff must exhaust administrative remedies, including receipt of a response from CORC, prior to filing a federal lawsuit); *Couvertier v. Jackson*, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *4 (N.D.N.Y. June 19, 2014) (dismissing the case because the plaintiff inmate received response from CORC after commencing the suit); *White v. Drake*, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

The record demonstrates CORC failed to respond to Plaintiff's December 14, 2016, appeal until November 1, 2017, more than ten months beyond the thirty days required under the IGP. 7 NYCRR § 701.8(i). Courts in this Circuit have been split as to whether a delay by CORC in responding to an appeal constitutes unavailability that would excuse a plaintiff's failure to exhaust. *Compare Berkley*, 2018 WL 3736791, at *6 (finding five month delay by CORC in rendering decision on appeal did not excuse the plaintiff from exhaustion requirement); *Couvertier*, 2014 WL 2781011, at *5 (holding that waiting five months for a decision from CORC does not constitute a special circumstance that would justify the plaintiff filing a lawsuit before fully exhausting all available remedies); *Loccenitt v. Labrake*, No. 14-CV-6703-FPG, 2018 WL 826850, at *3 (W.D.N.Y. Feb. 12, 2018) (finding that a delay by CORC in rendering a decision on a plaintiff's appeal is not a defense to the exhaustion requirement) *with Henderson Annucci*, No. 140CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance, . . . such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA."). *But see Rossi v. Fischer*, No. 13-CV-3167 (PKC) (DF), 2015

WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) (finding administrative remedies not available where CORC did not decide the plaintiff's appeal until more than four months after it was filed).

In this case, CORC's response was late by more than ten months, significantly more than the five month delay found insufficient for a finding of unavailability in *Berkley*, 2018 WL 3736791, at *6, but far less than the two years which resulted in a finding of unavailability in *Henderson*, 2016 WL 3039687, at *1. Furthermore, Plaintiff has not proffered evidence that he wrote to CORC or contacted the facility inquiring as to the status of his appeal before commencing this lawsuit. *See Berkley*, 2018 WL 3736791, at *6. Given the foregoing, the Court finds that the delay by CORC in issuing its decision to Plaintiff's appeal does not excuse Plaintiff's failure to exhaust before commencing this action. Therefore, the Court recommends granting summary judgment to Collver on exhaustion grounds.

This Circuit has recognized that failure to exhaust administrative remedies is usually a "curable, procedural flaw" that can be fixed by exhausting those remedies and then reinstituting the suit. *Neal*, 267 F.3d at 123 (quoting *Snider v. Melindez*, 199 F.3d 108, 111-12 (2d Cir. 1999)). Requiring Plaintiff to initiate a new suit may seem judicially inefficient. However, the Second Circuit has specifically stated that allowing this type of suit to move forward "undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court." *Neal*, 267 F.3d at 123; *see also Rodriguez v. Rosner*, No. 9:12-CV-958 (TJM/ATB), 2012 WL 7160117, at *4-5 (N.D.N.Y. Dec. 5, 2012), *report and recommendation adopted by*, 2013 WL 614360 (N.D.N.Y. Feb. 19, 2013).

## VI.    CONCLUSION

Based upon the foregoing, the Court recommends that Patane and Coppola be denied summary judgment and that Collver be granted summary judgment.

**ACCORDINLGY**, it is hereby

**ORDERED** that **Plaintiff shall file a change of address in accordance with L.R. 10.1(c)(2) within fourteen (14) days from the date of this Order and Report-Recommendation; failure to file the change of address will result in a recommendation that the case be dismissed for failure to prosecute, failure to follow Local Rules, and failure to follow a Court order**; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment for failure to exhaust administrative remedies (Dkt. No. 46) be **GRANTED in part and DENIED in part** as follows: (1) **DENIED** as to Defendants Patane and Coppolla without prejudice and with the opportunity to renew by way of a second summary judgment motion or exhaustion hearing and (2) **GRANTED** as to Defendant Collver and that Plaintiff's First Amendment retaliation claim against Collver be dismissed without prejudice; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated: December 7, 2018
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Richard K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]      Given my duty to liberally construe a *pro se*
        plaintiff's civil rights complaint, I construe Plaintiff's
        Amended Complaint as including a claim that
        various Defendants violated Plaintiff's rights under
        the Fourth Amendment to be free from unreasonable
        searches and seizures. See *Phillips v. Girdich,* 408
        F.3d 124, 130 (2d Cir.2005) ("We leave it for the
        district court to determine what other claims, if any,
        [the plaintiff] has raised. In so doing, the court's
        imagination should be limited only by [the plaintiff's]
        factual allegations, not by the legal claims set out
        in his pleadings.") [citations omitted]. *(See also*
        Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
        Defendants Woods and Holt "violat[ed] plaintiff's
        4th ... Amendment[ ] rights"], ¶ 15 [alleging that

Defendant Belarge "had plaintiff's personal property
searched by three officers, one of whom was Holt"];
Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz
Decl., attaching transcript of deposition of Plaintiff,
in which he explains his claim under the Fourth
Amendment based on the alleged unjustified search
and seizure of his property].)

Currently before the Court is Defendants' motion for
summary judgment (Dkt. No. 37), and Plaintiff's
motion for partial summary judgment (Dkt. No. 38), both
brought pursuant to Rule 56 of the Federal Rules of Civil
Procedure. Because both motions were filed on the same
day (February 11, 2005), and neither was filed in response
to the other, I construe each motion as a "motion"
and neither motion as a "cross-motion." Both Plaintiff
and Defendants have responded to each other's motion
(Dkt.Nos.42, 45), and replied to the other's response
(Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1)
whether Plaintiff has failed to establish (or even state) a
First Amendment retaliation claim; (2) whether Plaintiff
has failed to state a Fourth Amendment claim, (3)
whether Plaintiff has failed to establish (or even state)
an Eighth Amendment claim; (4) whether Plaintiff has
failed to exhaust his available administrative remedies
regarding his Eighth Amendment claim; (5) whether
Plaintiff has failed to establish (or even state) a Fourteenth
Amendment due process claim; (6) whether Plaintiff has
failed to establish (or properly state) a conspiracy claim;
and (7) whether Defendants are protected by qualified
immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1)
whether Plaintiff is entitled to judgment as a matter of
law on his First Amendment retaliation claim; (2) whether
Plaintiff is entitled to judgment as a matter of law on
his Eighth Amendment claim; and (3) whether Plaintiff is
entitled to judgment as a matter of law on his Fourteenth
Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s
Mem. of Law].) Although I liberally construe Plaintiff's
Amended Complaint as containing a Fourth Amendment
claim, I do not liberally construe his motion as requesting
judgment as a matter of law on his Fourth Amendment
claim, especially given the burden on a movant under
the Federal Rules of Civil Procedure. See Fed.R.Civ.P.
7(b)(1) (requiring that movants "shall set forth the relief
or order sought," and "shall state with particularity the
grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six
questions posed in Defendants' motion in the affirmative,
and I answer each of the three questions posed in Plaintiff's
motion in the negative. As a result, I recommend that
Defendants' motion for summary judgment be granted
and that Plaintiff's motion for partial summary judgment
be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure,
summary judgment is warranted if "the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56(c). In determining whether a genuine
issue of material [2] fact exists, the Court must resolve all
ambiguities and draw all reasonable inferences against the
moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110
(2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896
F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]      A fact is "material" only if it would have some effect
         on the outcome of the suit. Anderson v. Liberty Lobby,
         477 U.S. 242, 248 (1986).

However, when the moving party has met its initial
burden of establishing the absence of any genuine issue
of material fact, the nonmoving party must come forward
with "specific facts showing that there is a genuine issue
for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric
Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,
585-87 (1986). The nonmoving party must do more than
"simply show that there is some metaphysical doubt as
to the material facts." Matsushita Elec. Indus. Co., Ltd.
v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see
also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48
(1986). "A dispute regarding a material fact is genuine if
the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." Ross v. McGinnis, 00-
CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29,
2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is
the generous perspective with which the Court must view
a *pro se* plaintiff's pleadings. "[I]n actions in which one
of the parties appears *pro se,* this Court is faced with
the ... responsibility of granting significant liberality in

2006 WL 1133247

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS
The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[8]

[6]   *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P.* 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

[7]   *Fed.R.Civ.P.* 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

[8]   *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory.[9] Of course, an affidavit may be conclusory because its assertions are too general.[10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

[9]   *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[10]   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." 12  However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. 13

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1133247

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"]*; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]    (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

*5 At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]    (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar
and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]    (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]    (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

2006 WL 1133247

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]    (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[22]

[22]    (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[23] In pertinent part, the letter stated,

[23]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already tied both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him.[24]

[24]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[25]

[25]    (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[27] In addition, the last page of the letter states:

[26]    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

27
    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. 28

28
    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. 29 In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

29
    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

### Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. 30 The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." 31

30
    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31
    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. 32 The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." 33

32
    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33
    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." 34

34
    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "cryic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. 35 The note stated, in pertinent part:

35
    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself.[36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

*7  14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff.[37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately.[38]

[38]    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum.[39]

[39]    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents.[40] Plaintiff denied having such documents.[41]

[40]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note.[42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers).[43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters).[44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45]    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47]    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

49     (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) See also 7 N.Y.C.R.R. § 270.02[B][26][vii].

50     (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) See also 7 N.Y.C.R.R. § 270.02[B][14] [v].

51     (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) See also 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

52     (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53     (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54     (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

55     (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56     (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

57     (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

2006 WL 1133247

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58   (*Id.*)

59   (*Id.*)

### Meetings Between Defendants Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60   (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61   (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62   (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63   (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64   (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65   (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty

right to make an oral and written complaint about Defendant Antonelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of

the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]    *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks

before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without

providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73  (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74  (*See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75  (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense

counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in *Paragraph 15* of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." 78

76  (*See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77  (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites

the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and

seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU

Case 9:17-cv-00703-TJM-TWD    Document 51    Filed 12/07/18    Page 37 of 157
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

85    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456[25th ed.1990] ).

86    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87    *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he

2006 WL 1133247

suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]  (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]  (*See, supra,* Statement of Fact No. 29.)

**\*13**  More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]  (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]  (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]  (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]  *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at \*3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at \*5 (D.D.C. Feb. 24, 1993) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

### 2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]   (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]   (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]   (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]   (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]   (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]   (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

#### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

#### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question.[103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any

prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[105]

[104]    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17**  In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S.

477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109]    See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    See *Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    (See, e.g., Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect

Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, see, e.g., Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. See Webb v. Goord, 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end." Webb, 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. Id. (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); Boddie v. Schneider, 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. ( See, supra, Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result,

I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995)

(citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]    *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]    *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter"

regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20**  As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt.

No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

**Cole v. Artuz, Not Reported in F.Supp.2d (1999)**

1999 WL 983876

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State Attorney General, The Capitol, Keith J. Starlin, AAG, of Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order, *see* Dkt. No. 81, and Plaintiffs objections thereto, *see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision, commenced this action pursuant to 42 U.S.C. § 1983. In his original complaint, Plaintiff asserted claims against Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. *See* Dkt. No. 49. By Report–Recommendation and Order dated July 6, 2012, Magistrate Judge Homer recommended that this Court dismiss all claims against the named individuals and direct Plaintiff to join Harold Call as a Defendant. *See* Dkt. No. 55. This Court accepted

the Report and Recommendation and Order in its entirety and directed Plaintiff to file an amended complaint to "include only one cause of action a procedural due process claim in connection with his disciplinary hearing and one Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and requested compensatory and punitive damages. *See* Dkt. No. 64, Amended Complaint at 4. In this amended complaint, Plaintiff alleged that Defendant violated his constitutional rights under the First, Eighth and Fourteenth Amendments. *See* Dkt. No. 64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 74. In a Report–Recommendation and Order dated October 9, 2014, Magistrate Judge Hummel recommended that this Court grant Defendant's motion in part and deny his motion in part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to Magistrate Judge Hummel's recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a magistrate judge's report and recommendation, the court conducts a *de novo* review of those recommendations. *See Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781, *2 (N.D.N.Y. Nov. 23, 2011)* (citing Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no objections or makes only conclusory or general objections, however, the court reviews the report and recommendation for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–458, 2009 WL 1794741, *1 (N.D.N.Y. June 23, 2009)* (quotation omitted). After conducting the appropriate review, a district court may decide to accept, reject, or modify those recommendations. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009)* (quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general or conclusory, given his *pro se* status, the Court has conducted a *de novo* review of Magistrate Judge Hummel's Report–Recommendation and Order. Having completed its review, the Court hereby

**\*2** **ORDERS** that Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order is

**ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor,

Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action —a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2]     McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

**I. Failure to Respond**

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c).

"A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]     Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]     Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]    All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

#### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470

F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

**B. Eleventh Amendment**

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity

can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

**C. Personal Involvement**

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]     Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the

reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse

action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he

suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d

19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general

prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564).

"[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

ii. **Hearing Officer Bias/Pre-determination of Guilt**

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at *11 (N.D.N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at * 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at *8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence

that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. **Failure to Investigate**

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did

not demonstrate that his testimony would be relevant —does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, \*5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

**\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court

action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied

upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at *3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at *4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating

rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir.

13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."));  *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is

hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." See *Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue

was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon —the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986; see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. Cf. *Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing,

it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

   a. plaintiff's Fourteenth Amendment procedural due process claims;

   b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00703-TJM-TWD    Document 51    Filed 12/07/18    Page 65 of 157
Douglas v. Perrara, Not Reported in F.Supp.2d (2013)
2013 WL 5437617

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corrr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Colleen D. Galligan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against
the six above-captioned New York State correctional
employees, are the following: (1) Defendants' motion
for partial summary judgment (requesting the dismissal
of Plaintiff's claims against Defendant Russell, and
his claims against the remaining Defendants in their
official capacities); and (2) United States Magistrate
Judge Randolph F. Treece's Report–Recommendation
recommending that Defendants' motion be granted.
(Dkt.Nos.70, 80.) Neither party filed an objection to
the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.)
After carefully reviewing the relevant filings in this
action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Treece employed

the proper standards, accurately recited the facts, and
reasonably applied the law to those facts. As a result, the
Court accepts and adopts the Report–Recommendation
for the reasons stated therein. (Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED***
from this action: (a) all claims asserted against Defendant
Russell, and (b) all claims asserted against Defendants
in their official capacities only. The Clerk is directed to
terminate Defendant Russell from this action; and it is
further

**ORDERED** that the following claims ***REMAIN
PENDING*** in this action: (a) Plaintiff's claim that
Defendants Whittier, Mulligan, Perrara and/or Lawrence
subjected him to inadequate prison conditions by
depriving him of his meals for approximately five consecutive
days in December 2009, in violation of the Eighth
Amendment; (b) Plaintiff's claim that Defendants
Whittier, Mulligan, Perrara and Lawrence used excessive
force against him, and that Defendant Deluca failed
to protect him from the use of that excessive force, in
violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant
Deluca was deliberately indifferent to Plaintiff's serious
medical needs (following the assaults) in violation of the
Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel,
a final pretrial conference with counsel will be scheduled
in this action before the undersigned, at which time the
Court will schedule a jury trial for Plaintiff's remaining
claims as set forth above against Defendants Whittier,
Mulligan, Perrara, Lawrence and DeLuca. Counsel are

directed to appear at the final pretrial conference with settlement authority from the parties.

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2**  *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]     Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

## I. DISCUSSION

### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3**  When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential*

*Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Personal Involvement**

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him

to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]   Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

 *4 With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior*

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz, 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997)* (citing *Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir.1995)* & *Wright v. Smith, 21 F.3d at 501*) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)*.

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin, 58 F.3d at 873* (citations omitted); *Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir.1986)* (citations omitted).

[3]     The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal, 556 U.S. 662 (2009)*, upon the categories of supervisory liability under *Colon v. Coughlin, 58 F.3d 865 (2d Cir.1995)*. See *Grullon v. City of New Haven, 720 F.3d 133 (2d Cir.2013)* (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* four-part test for supervisory liability. See, e.g., *Sash v. United States, 674 F.Supp.2d 531, 543 (S.D.N.Y.2009)*. While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, see, e.g., *Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at \*6 (S.D.N.Y. June 26, 2009), aff'd, *387 F. App'x 55 (2d Cir.2010)*, others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's

participatory role, see, e.g., *D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y.2010)*. Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. See *Wright v. Smith, 21 F.3d at 501* (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. See Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. Id.

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana, 134 U.S. 1 (1890)*. "The Eleventh Amendment

thus 'affirm[s]' that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court

finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,

v.

City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City
Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently
incarcerated and proceeding *pro se*, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983") against
Correction Officer Benjamin Eason ("Defendant"),
alleging violations of the Eighth Amendment. Now before
the Court is Defendant's motion for summary judgment.
For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

[1]    The following facts are drawn from Defendant's
unopposed Local Civil Rule 56.1 Statement. (Doc.
No. 55 ("56.1 Statement" or "56.1 Stmt.").) In
deciding Defendant's motion for summary judgment,
the Court has also considered Plaintiff's submission
in opposition to summary judgment (Doc. No. 58
("Opp'n")), and has conducted an independent review
of the record, notwithstanding Plaintiff's failure to
submit a statement compliant with Local Civil Rule
56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73
(2d. Cir. 2001) (noting that district court "may in its

discretion opt to conduct an assiduous review of the
record even when" a party has failed to comply with
Local Civil Rule 56.1 (citations and quotation marks
omitted)).

On September 9, 2012, while incarcerated at the Otis
Bantum Correctional Center ("OBCC") on Rikers Island,
Plaintiff was placed in an intake cell in the OBCC's
receiving area, which he shared with two other individuals.
(56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell
was extremely cold, vermin-infested, and too small to
accommodate three men. (*See* Doc. No. 54-1 ("Compl.")
4, 8.) Plaintiff further alleges that these conditions,
coupled with the constant noise made by the two other
inmates, prevented him from sleeping for the entire 60-
hour period that he was held in the cell. (*See id.* at 4.)
Consequently, he asked Defendant, who was on duty,
to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.)
According to Plaintiff, Defendant responded that there
was "nothing he could do" about the situation. (*Id.* ¶ 9; *see
also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC
to complain about his experience in the cell. (*See* Compl.
at 7.) The New York City Department of Correction
("DOC") has an administrative grievance procedure,
known as the Inmate Grievance and Request Program
("IGRP"), for inmates housed at facilities such as the
OBCC. The IGRP, which was available and in effect at all
times relevant to this lawsuit, requires that inmates first
file a complaint with the Inmate Grievance Resolution
Committee ("IGRC") within ten days of the complained-
of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP
Directive") § IV(D)(1).) The IGRC then attempts to
resolve the grievance informally within five days, and if the
grievance is not informally resolved, then the inmate may
request a formal hearing before the IGRC. (56.1 Stmt. ¶
12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may
appeal the IGRC's decision to the commanding officer, or
her designee, and subsequent appeals may be taken to the
Central Office Review Committee ("CORC"). (56.1 Stmt.
¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's
decision is the final and binding decision of the DOC; if
an inmate disputes the decision of the CORC, he may
independently appeal to the Board of Correction. (IGRP
Directive at 47.) Finally, if an inmate does not receive a
timely disposition at any point throughout the grievance
process, he has the option of either granting an extension
of time to the relevant decisionmaker (i.e., the IGRC,
the commanding officer, or the CORC) or appealing and

proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled

to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question,"

Case 9:17-cv-00703-TJM-TWD    Document 51    Filed 12/07/18    Page 73 of 157
Mena v. City of New York, Not Reported in F.Supp.3d (2016)
2016 WL 3948100

but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier

'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that

the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g., Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3948100

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4184816
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kevin PHILLIP, Plaintiff,

v.

Dora B. SCHRIRO, Commissioner of the
New York City Department of Corrections,
Warden Cripps and Warden Rivera, of Amkc,
NYC Department of Corrections, Defendants.

No. 12–cv–8349–RA.
|
Signed Aug. 22, 2014.

*OPINION AND ORDER*

RONNIE ABRAMS, District Judge.

**\*1** Plaintiff Kevin Phillip brings this action against
now former New York Department of Correction
Commissioner Dora B. Schriro and "Warden Cripps"
and "Warden Rivera" of the Anna M. Kross Center
("AMKC") on Rikers Island. Plaintiff, who was
previously incarcerated at AMKC but has since been
transferred to a state correctional facility, asserts claims
under the First Amendment. He alleges that he was
prevented from attending Friday Islamic prayer services,
called Jumu'ah, while being held in punitive segregation
at AMKC. On July 31, 2013, the Court granted the first
motion to dismiss for failure to state a claim pursuant to
Federal Rule of Civil Procedure 12(b)(6) and dismissed
Plaintiff's Complaint without prejudice. [1] After Plaintiff
filed an Amended Complaint, Defendants again moved to
dismiss. For the reasons stated below, Defendants' motion
is granted in part and denied in part.

[1]     The defendants named in the original complaint were
        the City of New York, Warden Cripps, and Warden
        Rivera. (*See* Dkt. 2, 7.)

## BACKGROUND

Plaintiff alleges that he was sentenced to punitive
segregation at AMKC on two different occasions and

that he was denied the right to attend Jumu'ah services
during these periods. For purposes of this motion, the
Court accepts as true all facts alleged by Plaintiff, *See
Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237
(2d Cir.2007).* The Court considers the allegations in the
Amended Complaint, as well as documents attached to
it or incorporated by reference, including the letters and
grievance records submitted as exhibits by Plaintiff. *See
Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102
F.3d 660, 662 (2d Cir.1996).*

*First Period of Punitive Segregation*

Plaintiff was first placed in a punitive segregation unit for
thirty-six days on November 22, 2011. (Am.Compl.¶¶ 8,
12, 28.) He asserts that he asked the housing unit officer
on Friday November 26, 2011 [2] and Friday December 2,
2011 if he could attend Jumu'ah services, but each time the
officer told him that he was not allowed to attend while he
was in punitive segregation, (*Id.* ¶ 13.)

[2]     The Court notes that November 26, 2011 was a
        Saturday, not a Friday, as Plaintiff alleges

Plaintiff submitted a grievance on December 3, 2011 and
sent a letter to Commissioner Schriro on December 9,
2011. (*Id.* ¶¶ 14, 18, Exs. A, C.) Commissioner Schriro
forwarded Plaintiff's letter "to the appropriate unit for
investigation." (*Id.* ¶¶ 21–22, Ex. D.) In response to his
grievance, a grievance representative notified Plaintiff in
writing on December 12, 2011 that "due to his BING
Housing classification he is allowed to attend Jumu[']ah
with general services." (*Id.* ¶ 15, Ex, B.) According
to Plaintiff, Warden Cripps and Warden Rivera "were
contacted by [a grievance representative] concerning the
alleged violation of Plaintiff's religious rights and stated
a resolution to correct the violation." (*Id.* ¶ 16, Ex. B.)
They were also "informed of Plaintiff's allegation[ ]s of
religious violations by [Commissioner Schriro]." (*Id.* ¶
24.) On December 22, 2011, "Inspector Johnson from
the Commissioner's office" and a grievance representative
visited Plaintiff and told him that "arrangements were
being made for inmates to observe religious services in the
segregation day-room." (*Id.* ¶ 23.)

**\*2** According to Plaintiff, however, he continued to
be denied the opportunity to attend Jumu'ah services
throughout the rest of his term in punitive segregation. (*Id.*
¶¶ 17, 20, 25.) As a result, Plaintiff missed Jumu'ah services
on the following dates: November 26, 2011, December

2, 2011, December 9, 2011, December 16, 2011, and December 23, 2011. (*Id.* ¶¶ 13, 17, 20, 25.) On December 23, 2011, Plaintiff sent a second letter to Commissioner Schriro and filed a second grievance. (*Id.* ¶¶ 26–27, Exs. E, F.) On January 25, 2012, Plaintiff filed a Notice of Claim with the Comptroller of the City of New York asserting a violation of his religious rights. (*Id.* ¶ 29, Ex. G.)[3]

[3]    Although the Amended Complaint alleges this date to be February 25, 2012 (Am.Compl.¶ 29), Plaintiff's Exhibit G indicates that it was January 25, 2012.

*Second Period of Punitive Segregation*

Plaintiff was again placed in punitive segregation on or about April 2, 2012 for forty-five days. (*Id.* ¶¶ 30, 37.) He alleges that, on April 6th and 13th, he again asked the housing unit officer if he could attend Jumu'ah services and was again told he could not. (*Id.* ¶ 31.)

Plaintiff filed a third grievance on April 17, 2012 and sent a third letter to Commissioner Schriro on April 23, 2012. (*Id.* ¶¶ 32, 34, Exs. H, I.) An AMKC Captain and "Mr. Durisch from the NYC Dept. of Corrections" visited Plaintiff on May 4, 2012 to ask if he was still being denied the right to attend religious services. (*Id.* ¶ 36.) Plaintiff said that he was, and also told them about the denials of the previous November and December. (*Id.*)

During Plaintiff's second period in punitive segregation, he asserts that he was prevented from attending Jumu'ah services on five Fridays: April 6, 2012, April 13, 2012, April 20, 2012, April 27, 2012, and May 4, 2012. (*Id.* ¶¶ 31, 33, 35–36.)

On May 26, 2012, Plaintiff sent a third letter to Commissioner Schriro describing these events. (*Id.* ¶ 38, Ex. J.) In this letter, Plaintiff reviews all of the occasions on which he was allegedly denied the right to attend Jumu'ah services. (*Id.* Ex. J.) He also asserts that he is being harassed. (*Id.* at 4.) The letter claims that Plaintiff was "transferred [from] one punitive segregation unit to another ... with only seven days left on [his] sentence" and that this was "obvious harassment." (*Id.*) It also asserts that Plaintiff was sentenced to punitive segregation for only forty days, but that he was kept in punitive segregation an additional five days as a "reprisal[ ] because of his complaints" about Jumu'ah services. (*Id.* at 5.)

Plaintiff seeks punitive and compensatory damages and a "declaration that the acts and [omissions] described ... violate his rights under the Constitution and laws of the United States."[4] (*Id.* ¶¶ 42–44.)

[4]    The declaratory judgment claim is moot as to the Wardens, because Plaintiff is no longer incarcerated at AMKC, and so it must be dismissed for lack of subject matter jurisdiction. *See Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (dismissing prisoner's declaratory judgment claim as to defendants employed by correctional facilities where he was no longer being held, but not as to the other defendants employed by the DOCCS); *see also Coll. Standard Magazine v. Student Ass'n of the State Univ. of N.Y. at Albany,* 610 F.3d 33, 35 (2d Cir.2010) (the Court has an obligation to consider mootness *sua sponte* ).

## APPLICABLE LEGAL STANDARD

"In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint .... [and] draw all reasonable inferences in favor of the plaintiff." *Kassner,* 496 F.3d at 237 (citation omitted). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). The Court inquires whether the Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. A *pro se* complaint "must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests. Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir.2013) (internal quotation marks and citation omitted).

## DISCUSSION

**A. Free Exercise Claim**[5]

5    The Court also construes the Amended Complaint to be raising a First Amendment retaliation claim. In a letter addressed to the Commissioner, which is attached as Exhibit J to the Amended Complaint and thus incorporated therein, he alleges that he was kept in punitive segregation an additional four days and "transferred [from] one punitive segregation unit to another ... with only seven days left on [his] sentence" in retaliation for his complaints about attending Jumu'ah services. (Am. Compl., Ex. J at 4–5.) Defendants have not moved to dismiss that claim, and so the Court does not discuss it herein.

**\*3** Plaintiff alleges that Defendants violated his right to freely exercise his religion under the First Amendment by preventing him from attending Jumu'ah services while he was in punitive segregation. Defendants argue that "[P]laintiff has failed to allege any facts showing that he was unable to practice his religion in a meaningful way." (Defs.' Mem. of Law 13.) They also assert that his claim fails because he has not alleged "that attending Jumu'ah services is a sincerely held religious belief." (*Id.*)

"It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord,* No. 13–2694–PR, 2014 WL 3360615, at \*4 (2d Cir. July 10, 2014) (internal quotation marks omitted). Because Plaintiff, however, has adequately alleged that Defendants imposed a substantial burden on his religious practice, the Court need not determine whether a less rigorous test should be applied. *See, e.g., id.* at \*4 (declining to decide this question because the plaintiff had established a substantial burden); *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004) (same).

Demonstrating a substantial burden on one's sincerely held religious beliefs "is not a particularly onerous task." *McEachin,* 357 F.3d at 202. One aspect of the inquiry is whether Plaintiff's beliefs "are 'sincerely held' and in [his] 'own scheme of things, religious.' " *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (quoting *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002)). Although Plaintiff does not explicitly allege that his religious believes are sincerely held, his allegations, reflecting his steadfast determination to attend the Jumu'ah services in observance of his "Islamic duties and practice," (Am.Compl.Ex.F), are

more than sufficient "to establish that [his] claim is based upon a sincerely held religious belief," *Meadows v. Lesh,* No. 10 Civ. 00223(JJM), 2010 WL 3730105, at \*3 (W.D.N.Y. Sept. 17, 2010).

Plaintiff's assertion that he was denied the right to attend Jumu'ah services on ten occasions adequately alleges that his practice of Islam was substantially burdened. Courts have held that similar allegations, if true, would establish a substantial burden under the Free Exercise Clause. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (reversing district court's grant of summary judgment for the defendants where Muslim prisoner in disciplinary keeplock was prevented from attending Jumu'ah services on three occasions and from celebrating Eid ul Adha); *Young v. Coughlin,* 866 F.2d 567, 568–69 (2d Cir.1989) (same where prisoner had been prevented from attending religious services for approximately five months while he was in disciplinary confinement); *Covington v. Mountries,* No. 13 Civ. 343(VEC), 2014 WL 2095159, at \*4–5 (S.D.N.Y. May 20, 2014) (finding Muslim prisoner who claimed that he was prevented from attending Jumu'ah services twice had alleged a substantial burden). Although Plaintiff does not explicitly allege that attending Jumu'ah services is "central" to his practice of Islam, *Ford,* 352 F.3d at 594–95, this assertion is readily inferable from the complaint and attached exhibits. (*See* Am. Compl. Ex. F ("[I]nmate has not seen any concrete actions being taken to allow this inmate to observe his Islamic duties and practice."), Ex. I ("Islam is my religion and when I am in general population I regularly attend.").) Indeed, the Supreme Court has observed that Jumu'ah, in particular, "is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 345 (1987). Additionally, the Second Circuit has "long held that prisoners should be afforded every reasonable opportunity to attend religious services" and noted that it is "error to assume that prison officials [are] justified in limiting [an inmate's] free exercise rights simply because [he is] in disciplinary confinement." *Young,* 866 F.2d at 570. Accordingly, Plaintiff's allegations are sufficient to state a claim for a violation of the Free Exercise Clause.

### B. Personal Involvement of Defendants

**\*4** Defendants also argue that the Amended Complaint must be dismissed because Plaintiff has failed to allege their personal involvement. "A defendant's supervisory

authority is insufficient in itself to demonstrate liability under § 1983." *LaMagna v. Brown,* 474 F. App'x 788, 789 (2d Cir.2012). Rather, the defendant must have been personally involved in the alleged violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Personal involvement can be established by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* The Court construes Plaintiff's complaint as implicating the second element of the *Colon* test since his allegation, broadly speaking, is that the Commissioner and Wardens knew that Plaintiff was continuously being denied his constitutional right yet failed to implement a change.

Defendants assert that *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), invalidated the *Colon* factors regarding supervisory liability and that "to adequately allege personal involvement, a plaintiff must demonstrate that the defendant, through his or her own conduct, violated the Constitution." (Defs.' Mem. of Law 7.) Although the Second Circuit has explicitly declined to resolve this issue, *see Hogan,* 738 F.3d at 519 n. 3; *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013), numerous district courts have confronted the question, and the Court is persuaded by the majority view that *Colon* remains good law. *See Vazquez–Mentado v. Buitron,* No. 12 Civ. 0797(LEK)(ATB), 2014 WL 318329, at *2 (N.D.N.Y. Jan. 29, 2014) ("The majority of district courts ... have held that, absent any contrary directive from the Second Circuit, all five *Colon* factors survive ....);

*see also, e.g., Zappula v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013); *Liner v. Fischer,* No. 11 Civ. 6711(PAC)(JLC), 2013 WL 3168660, at *7–8 (June 24, 2013). *But see Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd.* 387 F. App'x 55 (2d Cir.2010). While it is true that *Iqbal* reinforces the well-established rule in this Circuit that *respondeat superior* does not apply to § 1983 claims, *see* 556 U.S. at 676, "*Colon'* s bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that personal involvement of defendants in alleged constitutional deprivation can be shown by nonfeasance as well as misfeasance." *Qasem v. Toro,* 737 F.Supp.2d 147, 151–52 (S.D.N.Y.2010) (internal quotation marks omitted). Therefore, unless or until the Second Circuit or Supreme Court rule otherwise, this Court agrees with the courts that have held that the *Colon* factors "still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated." *Id.* at 152.

### 1. Allegations Against Warden Cripps and Warden Rivera in their Individual Capacities

**\*5** Plaintiff has pled sufficient facts to plausibly allege the personal involvement of the Wardens. He alleges that he was denied his constitutional right to attend religious services on ten different occasions and that the Wardens were contacted by a grievance representative concerning these violations. (Am.Compl.¶ 16). Plaintiff also claims that the Wardens were informed of the violations by the Commissioner. (*Id.* ¶ 24).

These "allegations fall squarely within the second *Colon* category." *Zappulla,* 2013 WL 1387033, at *10. Under the second *Colon* factor, "if a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against the defendant should not [be] dismissed under Rule 12(b)(6)." *Id.* at *9; *see also Wright v.. Smith,* 21 F.3d 496, 497–98, No (2d Cir.1994) (inmate alleged personal involvement of Attica superintendent where the inmate's habeas corpus petition had notified the superintendent of the alleged violation while it was still ongoing); *Rahman v. Fisher,* 607 F.Supp.2d 580, 585 (S.D.N.Y.2009) ("After the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation .... [unless] the violation is ongoing and the

defendant has an opportunity to stop the violation after being informed of it."); *Burton v. Lynch,* 664 F.Supp.2d 349, 361–62 (S.D.N.Y.2009).

This is not a case where it is clear that the Wardens had no "genuine" or "realistic" opportunity to intervene in the alleged violations of Plaintiff's rights. *See Sash v. United States,* 674 F.Supp.2d 531, 545 (S.D.N.Y.2009) (granting defendants' motion for summary judgment based on the fact that they had no opportunity to intervene when the Plaintiff claimed he was beaten by an officer since the incident lasted less than thirty seconds). Accordingly, because there has been no "discovery in this case, this Court will not dismiss Plaintiff's claims ... at this time. Discovery ... will reveal whether the [Wardens] were in a position to remedy the alleged ongoing constitutional violation Plaintiff complains of." *Braxton v. Nichols,* No. 08 Civ. 08568(PGG), 2010 WL 1010001, at *9 (S.D.N.Y. Mar. 18, 2010).

*2. Allegations Against Commissioner Schriro in her Individual Capacity*

Plaintiff's allegations against Commissioner Schriro, by contrast, must be dismissed for lack of personal involvement. A supervisory official is not deemed to have been personally involved solely by virtue of having received a letter or complaint from a prisoner and having referred it to the appropriate department for investigation, which is what Plaintiff alleges here. (Am.Compl.¶ 21, Exs, C, D.) *See, e.g., Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010) (affirming dismissal on summary judgment for lack of personal involvement where the deputy commissioner received letters from the plaintiff and forwarded them to others for investigation); *Rush v. Fischer,* 923 F.Supp.2d 545, 552 (S.D.N .Y.2013) ("[P]ersonal involvement has not been shown where a supervisor's only response to an inmate's complaint is to refer the complaint to the appropriate staff for investigation."); *Mateo v. Fischer,* 682 F.Supp.2d 423, 431 (S.D.N.Y.2010) (dismissing where the Commissioner received plaintiff's letters, forwarded them to subordinates and sent the plaintiff a response because these allegations "prove only the scantest awareness of [Plaintiff's] claims"). Courts have so held, because "commissioners and prison superintendents receive large numbers of letters from inmates, and they delegate subordinates to handle them. If courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the requirement would lose all meaning." *Mateo,* 682 F.Supp.2d at 430

(citation and internal quotation marks omitted). For the same reason, Plaintiff's contention that the Wardens were informed of the alleged violation by Commissioner Schriro does not establish her personal involvement. (Am.Compl. ¶ 24.)

**\*6** Indeed, the letter attached to the Amended Complaint is signed by someone other than Commissioner Schriro, presumably someone working in the Office of the Commissioner. (Am.Compl.Ex.D.) This makes the connection between the alleged constitutional violation and Commissioner Schriro even more attenuated. *See Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) (plaintiff failed to allege personal involvement where the Commissioner "never saw any of [Plaintiff's] letters," but rather "the letters addressed to and received by [the Commissioner's] office were reviewed by his staff and forwarded ... for investigation and response"). Plaintiff's claim against Commissioner Schriro in her individual capacity is therefore dismissed.

**C. Municipal Policy or Custom**
Defendants also argue that Plaintiff "fails to allege the existence of a municipal policy or custom" under *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978). (Defs.' Mem. of Law 10–11.) Although Plaintiff did name the City in his original Complaint, for unknown reasons he did not name the City as a defendant in his Amended Complaint. In any event, Plaintiff seeks to name Defendants in their official capacities, and that is equivalent to bringing a claim against the City itself. *See Jackler v. Byrne,* 658 F.3d 225, 244 (2d Cir.2011) ("[A] claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself."); *Crown v. Wagenstein,* No. 96 Civ. 3895(MGC), 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) ("[P]ro se complaints, if possible, should be construed as asserting" claims against defendants in their official and individual capacities).

To make out a claim against a municipality, a plaintiff must plead: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir.2007) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)). "[A]n 'official policy' within the meaning of *Monell* can[ ] be inferred from informal acts or omissions of supervisory municipal officials." *Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir.1980), *cert. denied,* 449

U.S. 1016 (1980). "*Monell*' s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007).

Plaintiff's assertion that he was denied the opportunity to attend Jumu'ah services on each of the ten Fridays that he spent in punitive segregation over a five-month period supports a conclusion that the denial was pursuant to a policy or custom. *Compare Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 420, 439–40 (2d Cir.2009) (evidence of "more than a dozen" incidents over fifteen months was adequate to survive summary judgment under *Monell* ), *with Jones v. Town of East Haven,* 691 F.3d 72, 85 (2d Cir.2012), *cert. denied,* 134 S.Ct. 125 (U.S.2013) (allegation of two or three instances over a period of several years was insufficient), *Tanzi v. Town of Marlborough,* No. 13 Civ. 1113(GTS)(RFT), 2014 WL 2815777, at *8 (N.D.N.Y. June 23, 2014) (allegation of "three separate instances over an unspecified period of time" was insufficient), *and Chepilko v. City of New York,* No. 06 Civ. 5491(ARR)(LB), 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012) (allegation of "[five] isolated instances over a two year period" was insufficient). The consistent, repeated nature of Plaintiff's complaints and the fact that eight of the denials occurred after Plaintiff's first grievance was allegedly resolved in his favor further bolster this conclusion.

**\*7** In addition, the grievance resolution attached to the Amended Complaint indicates that the AMKC administration was aware of the issue and purportedly working to find a way for Plaintiff to attend religious services. It states:

> On 12/3/11 IGRP advised the grievant that due to his BING Housing classification he is allowed to attend Jumu[']ah with general services. AMKC Ima[m] and administration was contacted and advised IGRP staff that options are currently being explored to meet religious requirements. IGRP will monitor. The Grievant[ ]'s action requested is modified.

(Am.Compl.Ex.B.) Plaintiff also alleges that he filed two additional grievances and submitted three letters to the Commissioner's office, and that, in response, he received two in-person visits from high-ranking AMKC and Department of Correction officials, who told him that arrangements were being made for him to attend Jumu'ah. (*Id.* ¶¶ 23, 36.) All told, Plaintiff alleges that at least nine employees had actual knowledge that he was being denied the right to attend Jumu'ah services, and that at least three of them reached out to contact him about it. (*Id.* ¶¶ 16–17, 24 (Warden Cripps and Warden Rivera), ¶ 23 ("Inspector Johnson from the Commissioner's office"), ¶ 36 ("AMKC Captain Irwin" and "Mr. Durisch from the NYC Dept. of Corrections"), Ex. I ("Officer Bussin," "Captain Dawkins," and "Dept. Jamison"), Ex. J at 4 ("[Off]icer Kong").) Nonetheless, he continued to be denied access to services.

Considering the liberal pleading standards applicable to a *pro se* complaint, Plaintiff has plausibly alleged that municipal officials were faced with a pattern of misconduct and did nothing, and thus "acquiesced in or tacitly authorized" a policy or custom of not allowing Plaintiff to attend Jumu'ah services while in punitive segregation. *See, e.g., Okin,* 577 F.3d at 440 (deeming it significant that a sergeant and a captain were aware of the repeated complaints and concluding that more than twelve incidents "suggest[ed] a consistent pattern of failing to adequately respond to [the plaintiff's] complaints...."); *King v. Morris,* No. 86 Civ. 2829(CSH), 1989 WL 49380, at *4 (S.D.N.Y. May 3, 1989) (plaintiff established a policy or custom where he "complained on numerous occasions" about brutality in his housing unit and none of the captains or other officials did anything); *Rudow v. City of New York,* 642 F.Supp. 1456, 1468 (S.D.N.Y.1986), *aff'd,* 822 F .2d 324 (2d Cir.1987) (plaintiff who alleged that "the City Defendants were put on notice of [the wrongdoer's] conduct on numerous separate occasions, and took absolutely no steps to remedy this problem until public pressure came to bear" had alleged a municipal policy or custom). Because Plaintiff has adequately alleged a *Monell* claim, and because the Court construes him to have named Defendants in their official capacities, such claim shall proceed.

### D. Exhaustion of Administrative Remedies

**\*8** Lastly, Defendants argue that it is clear from the Amended Complaint that Plaintiff failed to exhaust the

2014 WL 4184816

available administrative remedies. (Defs.' Mem, of Law 15.) They assert that "Plaintiff's allegations demonstrate that, at most, he [submitted] three initial grievances, ... then abandoned all further compliance with the [Inmate Grievance Resolution Program (IGRP) ]" and therefore his complaint should be dismissed for failure to exhaust. (*Id.* at 18.) This argument is unavailing.

The Prison Litigation Reform Act provides that no action may be brought by a prisoner under § 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Where failure to exhaust is not clear from the face of the complaint, courts are hesitant to grant a motion to dismiss on that basis. *See Pratt v. City of New York,* 929 F.Supp.2d 314, 318–19 (S.D.N.Y.2013); *Leak v. Schriro,* No. 11 Civ. 8023(PAE) (JCF), 2013 WL 1234945, at *3–4 (S.D.N.Y. Feb. 20, 2013). Indeed, the Supreme Court has cautioned against requiring plaintiffs to plead exhaustion, holding that "[f]ailure to exhaust is an affirmative defense under the PLRA, and ... inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 202–03, 216 (2007).

Following *Jones,* courts in this district have concluded that "plaintiffs cannot be penalized for what they do not say in their pleadings about their efforts to exhaust," *McNair v. Rivera,* No. 12 Civ. 06212(ALC)(SN), 2013 WL 4779033, at *5 (S.D.N.Y. Sep. 6, 2013), and that "[w]here a prisoner indicates that he has taken *some* steps toward exhaustion, district courts will not normally infer from his silence as to any remaining steps that he has not fully exhausted," *Groenow v. Williams,* No. 13 Civ. 3961(PAC) (JLC), 2014 WL 941276, at *3 (S.D.N.Y. Mar. 11, 2014). *See also Randolph v. City of N.Y. Dep't of Correction,* No. 05 Civ. 8820(GEL)(MHD), 2007 WL 2660282, at *8 (S.D.N.Y. Sept. 7, 2007). Here, nonexhaustion is not clear from the face of the Amended Complaint. Moreover, a grievance representative appears to have resolved Plaintiff's first grievance in his favor, stating that Plaintiff could attend Jumu'ah services and that the IGRP would "monitor." (Am.Compl.Ex.B.) As the Second Circuit has explained, "it would be counterintuitive to require inmates who win during the grievance process to appeal their victories." *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (citing *Sulton v. Wright,* 265 F.Supp.2d 292, 298–99 (S.D.N.Y.2003) ("If a prisoner had to grieve non-compliance with favorable decisions under the PLRA, prison officials could keep prisoners out

of court indefinitely by saying 'yes' to their grievances and 'no' in practice.")).

Defendants also argue that Plaintiff "admits that he abandoned the grievance process when he was released from the punitive segregation unit on December 28, 2011," (Defs.' Reply 4–5), relying on the statement in Plaintiff's Opposition that once he "was released from the punitive segregation unit back into the general population where he was no longer affected by the existing violation in the punitive segregation unit, ... any further complaint could not cure the violation already suffered by the plaintiff," (Pl.'s Opp'n 5). Plaintiff's Opposition is too ambiguous for the Court to conclude that he concedes nonexhaustion, especially in light of his assertion that he "further appealed to the Dept. of Corrections-the highest administrative agency over-seeing the entire matter ...." and that "[i]n this respect, [he] has exhausted his administrative remedies." (*Id.* at 4–5.)

**\*9** Finally, Plaintiff's "allegations do not rule out the possibility that an exception to the exhaustion requirement may apply." *Groenow,* 2014 WL 941276, at *5. The Second Circuit has held that the exhaustion requirement may be excused if (1) administrative remedies were not in fact available to him, (2) the defendant or defendants inhibited his exhaustion, or (3) the Court should consider any other "special circumstances" that might justify his failure to exhaust. *See Hemphill v. New York,* 380 F .3d 680, 685 (2d Cir.2004). [6] For this reason as well, the Court will not dismiss based on nonexhaustion at this time.

6    "Although the Supreme Court held in *Woodford v. Ngo,* 548 U . S. 81, 90 (2006), that prisoners must exhaust administrative remedies by 'using all steps that the agency holds out, and doing so *properly,*' courts within this Circuit have concluded that at least some of the exceptions recognized in *Hemphill* survive *Woodford." White v. Schriro,* No. 11 Civ. 5285(GBD) (MHD), 2012 WL 1414450, at *6 (S.D.N.Y. Mar. 7, 2012), *report and recommendation adopted,* No. 11 Civ. 5285(GBD), 2012 WL 1450422 (S.D.N.Y. Apr. 23, 2012) (citing cases).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to Plaintiff's claims against Commissioner

2014 WL 4184816

Schriro in her individual capacity. The motion is denied, however, as to Plaintiff's Free Exercise claims against Warden Cripps and Warden Rivera in their official and individual capacities and against the Commissioner in her official capacity. Plaintiff's claims for declaratory relief are dismissed as moot as to the Wardens. The City shall notify the Court by September 5, 2014 if referral for a settlement conference with Magistrate Judge Netburn would be productive at this time. The Clerk of Court is respectfully directed to substitute the new Commissioner, Joseph Ponte, in his official capacity, for former Commissioner Schriro, [7] and to close the motion at docket number 36.

7       Federal Rule of Civil Procedure 25(d) provides that "when a public officer who is a party in an official capacity ... ceases to hold office while the action is pending .... [t]he officer's successor is automatically substituted as a party."

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4184816

---

**End of Document**                               © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 9511094
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Frank J. POVOSKI, Jr., Plaintiff,
v.
Steven LACY, et al., Defendants.

No. 9:14-CV-97 (BKS/CFH)
|
Signed 12/13/2017

**Attorneys and Law Firms**

Frank J. Povoski, Jr., 161 Hillview Drive, Rochester, New York 14622, Plaintiff pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**CHRISTIAN F. HUMMEL**, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Frank J. Povoski, Jr. ("plaintiff"), a former inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants Corrections Captain ("Capt.") Steven Lacy, Corrections Officer ("C.O.") Patrick Summo, C.O. Brian Kelly, C.O. John Cruise, C.O. Richard Mahuta, C.O. Thomas Tamer, C.O. James Pray, Director of Special Housing ("Dir.") Albert Prack, Lieutenant ("Lieut.") William Allan, Superintendent ("Supt.") Thomas LaValley, and Sergeant ("Sgt.") James Archambault – who, at all relevant times, were employed at Clinton Correctional Facility ("CCF") – violated his rights under the First, Eighth, and Fourteenth Amendments. Dkt. No. 106 ("Sec. Am. Compl."). At all relevant times, plaintiff was incarcerated at CCF. Presently pending is defendants' Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 132. Plaintiff did not oppose the motion. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to the plaintiff as the nonmoving party. See subsection II (B) infra. In his Second Amended Complaint, plaintiff alleges that in May 2010, he was elected to the Inmate Liaison Committee ("ILC") [2] at CCF. Sec. Am. Comp. at ¶ 9. The ILC "investigate[s] and facilitate[s] facility-wide grievances that effect the inmate population as a whole or part, and communicate[s] those grievances to administration...." Id. That year, the ILC's investigations included the misappropriation of funds obtained through vending machine sales in the visiting room; assaults by staff members; and the death of an inmate, Leonard Strickland, that occurred in October 2010. Id. ¶ 10. In preparation for the November 2010 meeting, the ILC prepared eleven grievances for the Executive Team at CCF, which included Supt. LaValley and Capt. Lacy. Id. ¶ 11. On November 22, 2010, the ILC met with the Executive Team to discuss the grievances, which included the death of Strickland, the misappropriation of vending machine funds, and the failure to receive inmate account statements. Id. ¶ 12. Plaintiff led the discussion on these topics, stating that Supt. LaValley and Capt. Lacy were "doing little to curtail the numerous assaults that were being committed on inmates by staff." Id. Plaintiff stated that requests to inspect the records from the vending machines were being ignored, and asked to inspect those records. Id. Plaintiff also complained that inmate account statements had not been received and were being discarded prior to distribution. Id. ¶ 15. Plaintiff requested the reissuance of those statements. Id. In response, Supt. LaValley told plaintiff that each inmate would need to request the reissuance of their Inmate Account Statement, and authorized plaintiff to draft a prototype letter to assist inmates in making those requests.

Id. On November 23, 2010, plaintiff drafted the prototype letter and sent it to Supt. LaValley. Id. ¶ 16.

[2]    The ILC is a "group of inmates elected to communicate grievances to officials." Meriwether v. Coughlin, 879 F.2d 1037, 1039 (2d Cir. 1989).

**\*2** On November 24, 2010, plaintiff provided the prototype letter to three inmates. Sec. Am. Compl. ¶ 17. C.O. Mahuta observed plaintiff distributing the letter, and approached plaintiff. Id. ¶ 18. After plaintiff explained the contents of the letter, C.O. Mahuta confiscated the remaining prototype letters. Id. ¶¶ 18-19. Plaintiff alleges that C.O. Mahuta contacted defendant Sgt. Tamer and proceeded to the disciplinary office to inquire what charges could be brought against plaintiff regarding the prototype letter, and a non-party employee told C.O. Mahuta that plaintiff had not violated any standards of inmate behavior. Id. ¶ 20-21. C.O. Tamer informed C.O. Mahuta of plaintiff's statements at the November 22 ILC meeting, and of Supt. LaValley and Capt. Lacy's desire to issue plaintiff a Tier III misbehavior report to insure his confinement in the Special Housing Unit ("SHU")[3] and remove him from the ILC. Id. ¶¶ 22-23. C.O. Mahuta and C.O. Tamer planned to issue plaintiff a misbehavior report, charging him with solicitation and organization of an action detrimental to the order of the facility, despite knowing that the charges were false. Id. ¶¶ 24-25.

[3]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

Following the confiscation of plaintiff's prototype letters, plaintiff proceeded to the scheduled inmate ILC meeting. Sec. Am. Compl. ¶ 28. At that meeting, plaintiff received a letter, sent to non-party inmate Hector Torres from a civilian, claiming that Capt. Lacy was an active member and the "Grand Wizard" in the local chapter of the Ku Klux Klan ("KKK"). Id. Officers confiscated plaintiff's ILC folder and legal notebook while he was picking up his medication, including the KKK letter. Id. ¶ 31. Plaintiff was keeplocked[4] in his cell. Id.

[4]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

Plaintiff contends that, after inspection of the KKK letter, Supt. LaValley, Capt. Lacy, C.O. Tamer, and C.O. Mahuta mutually agreed to search plaintiff's cell, and if no contraband was found, they would plant contraband.[5] Id. ¶ 32-33. C.O. Tamer instructed C.O. Kelly and C.O. Crusie to conduct a search of plaintiff's cell and to make sure they found "something substantial" that would result in plaintiff receiving a Tier III misbehavior report and SHU placement. Id. ¶ 34. C.O. Tamer then told C.O. Kelly and C.O. Crusie that "if they could not find any contraband to come see him ... [because] he had 'something' they could justify the misbehavior report with." Id. C.O. Kelly and C.O. Crusie agreed to search plaintiff's cell. Id.

[5]    Plaintiff also alleges that on November 22, 2010, Supt. LaValley, Capt. Lacey, and Lieut. Allan mutually agreed to open and read plaintiff's incoming and outgoing mail which included correspondence with plaintiff's then attorney Neil Bubel and plaintiff's sister Sheila Povoski-Butler. Sec. Am. Compl. ¶¶ 64, 69, 70. These letters contained plaintiff's allegations of wrongdoing by staff members. Id. ¶ 70. Plaintiff alleges these letters were the bases for defendants' plan to issue false misbehavior reports and punish plaintiff for his complaints and grievances at the November 22, 2010 ILC Executive Team meeting. Id. ¶¶ 71, 73.

On November 24, 2010, plaintiff was instructed to wait in the "slop sink" area while C.O. Kelly and C.O. Crusie searched his cell. Sec. Am. Compl. ¶ 35. During the search, plaintiff watched C.O. Crusie leave his cell and return a short time later. Id. ¶ 36. C.O. Kelly then exited plaintiff's cell and returned approximately fifteen minutes later carrying rolled up papers. Id. Both officers then exited the cell carrying items in a box. Id. Plaintiff returned to his cell and noticed that two legal notebooks were missing. Id. C.O. Kelly and C.O. Crusie issued plaintiff a misbehavior report for his possession of escape paraphernalia, stating that they had found a detailed, five-page pamphlet on how to pick locks in plaintiff's cell. Id. ¶ 37.

**\*3** Later that day, C.O. Tamer and non-party C.O. Trombley escorted plaintiff to SHU. Sec. Am. Compl. ¶ 41. During the escort, Sgt. Tamer said to plaintiff: "This is what you get for suing me and sticking your nose into things where it doesn't belong.... Lacy is going to give you two years. I've already talked to him about it." Id. The next day, plaintiff was served with two misbehavior reports stemming from the events of the previous day. Id. ¶ 45. C.O. Summo was assigned to provide assistance to plaintiff in his upcoming disciplinary hearing. Id. ¶ 46. Plaintiff provided C.O. Summo with two lists of requests for assistance, which Summo failed to complete. Id.

On December 6, 2010, Capt. Lacy sentenced plaintiff to twenty-four months of SHU confinement. Sec. Am. Compl. ¶¶ 49, 50. On December 17, 2010, plaintiff mailed a request for a thirty-day extension to file his administrative appeal. Id. ¶ 51. On or about January 3, 2011, plaintiff mailed his administrative appeal to Dir. Prack, raising violations of New York State law and procedural due process rights. Id. ¶ 52. On January 26, 2011, Dir. Prack affirmed the disposition and modified plaintiff's SHU confinement to eighteen months. Id. ¶ 54.

On December 22, 2010, Lieut. Allan and three unidentified non-party officers escorted plaintiff to the hospital for "special watch" following his hunger strike. Sec. Am. Compl. ¶ 136. During that escort, the non-party officers punched plaintiff multiple times on his head and face, and pushed him into a concrete wall. Id. Plaintiff was handcuffed and waist-chained throughout the assault. Id. Plaintiff suffered bruising, contusions, and "other painful physical injuries." Id. After failing to intervene in the assault, Lieut. Allan stated: "that will teach you for opening your mouth ... and writing grievances." Id. ¶ 137.

In March 2011, Supt. LaValley denied plaintiff transport to attend his father's funeral in retaliation for plaintiff's prior speech. Sec. Am. Compl. ¶ 61. On March 16, 2011, plaintiff mailed Supt. LaValley an appeal of the December 6, 2010 disciplinary hearing, raising various violations of New York State law and state procedural due process rights. Id. ¶ 62. Supt. LaValley failed to review the hearing. Id.

On January 26, 2011, defendant Sgt. Archambault and defendant C.O. Pray escorted plaintiff to a teleconference pursuant to a pending case in the New York State Court of Claims. Sec. Am. Compl. ¶ 139. Plaintiff was handcuffed

and waist-chained during the escort. Id. Prior to leaving the SHU, C.O. Pray ordered plaintiff to hand him his legal papers for inspection. Id. ¶ 140. C.O. Pray read plaintiff's Court of Claims petition out loud to the officers present. Id. C.O. Pray stated: "So you are suing my buddy Kevin, we know how to fix inmates like you." Id. C.O. Pray and Sgt. Archambault escorted plaintiff to the teleconference without physical incident, but taunted plaintiff, stating that they would assault him after the appearance, and that they knew the "ideal place to assault inmates." Id. On the return escort, upon entering the Lower A/B Block corridor, Sgt. Archambault told C.O. Pray: "Go ahead, the hallway's clear." Id. ¶ 141. C.O. Pray pushed plaintiff into a brick wall and punched him multiple times on the head and neck while plaintiff was restrained. Id. ¶ 139. Plaintiff suffered bruising and contusions as a result. Id.

Plaintiff was confined in the SHU for three hundred and thirty eight days before being released to the general prison population on or about October 27, 2011,[6] after being credited a "time cut" for good behavior and cooperation. Sec. Am. Compl. ¶ 95. Plaintiff challenged Capt. Lacy's December 6, 2010 determination upon his transfer to Great Meadows Correctional Facility and was determined not guilty of all charges. Id. ¶ 98.

6        In his Second Amended Complaint, plaintiff alleges that he was released to the general prison population on or about October 27, 2011. Sec. Am. Compl. ¶ 95. This statement is at odds with plaintiff's "Affidavit in Opposition of Request for Re-Hearing," in which he states he was released from SHU on May 8, 2011 to the general population, but remained under keeplock confinement until October 24, 2011. See Dkt. No. 132-9 at 3.

## B. Defendants' Recitation of the Facts

**\*4** In support of this motion, defendants filed a Statement of Material Facts.[7] On November 25, 2010, C.O. Mahuta and C.O. Kelly each issued plaintiff misbehavior reports charging him with (1) solicitation, (2) conduct detrimental to the order of the facility, and (3) possession of escape paraphernalia. Id. ¶ 45. Dkt. No. 132-2 ¶ 1. A disciplinary hearing commenced on November 30, 2010, was adjourned to December 3, 2010, and completed on December 6, 2010. Id. ¶ 2. Plaintiff identified three inmate witnesses and two corrections officers that he wanted examined during the hearing. Id. ¶

3. Plaintiff provided questions to the hearing officer to ask of the witnesses. Id. ¶ 4. The hearing officer told plaintiff that inmate witnesses could not testify in his presence because of security reasons. Id. ¶ 5. The hearing officer informed plaintiff that certain inmate witnesses and family members he requested were not relevant to the issues, and, therefore, would not be called. Id. ¶¶ 6, 7. The hearing officer based his hearing determination on a November 24 misbehavior report that alleged a pamphlet on how to "pick" or "bump" a lock was found in plaintiff's cell. Id. ¶¶ 8, 9. The hearing officer also took into account plaintiff's previous involvement in a conspiracy to escape plot. Id. ¶ 10.

[7]    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

On December 6, 2010, plaintiff was found not guilty of the solicitation charges set forth in the C.O. Mahuta's November 24 misbehavior report. Dkt. No. 132-2 ¶ 11. Plaintiff was found guilty of possession of escape paraphernalia, and Capt. Lacy sentenced him to twenty-two months in SHU. Id. ¶ 12. Capt. Lacy issued a written disposition which set forth the basis for his determination, together with the evidence relied upon. Id. ¶ 13.

On January 3, 2011, plaintiff appealed the hearing determination to Dir. Prack, and on January 26, his sentence was reduced to eighteen months. Dkt. No. 132-2 ¶¶ 14, 15. In April 2011, plaintiff's sentence was further reduced to eleven months after entering into a confidential agreement with C.O. Allan and facility administrators allowing plaintiff to act as an informant for CCF. Id. ¶ 16. On May 8, 2011, plaintiff transferred out of SHU confinement after serving 152 days. Id. ¶¶ 17,18. In connection with the December 6, 2010 sentence, plaintiff spent a total of ninety days in SHU. Id. ¶ 20.

Plaintiff initiated an Article 78 proceeding in state court challenging the November 2010 hearing and the December 6, 2010 decision. Dkt. No. 132-2 ¶ 21. Due to technical problems with the tape recording at plaintiff's initial disciplinary hearing, DOCCS requested that plaintiff's hearing and disciplinary decision be annulled, and the state court ordered plaintiff a de novo hearing concerning the charges. Dkt. No. 132-2 ¶ 21. Pursuant to this re-hearing, the charges against plaintiff were determined to be unsubstantiated, and the entire matter was stricken from plaintiff's record. Id. ¶ 22.

As to plaintiff's December 22, 2010 and January 26, 2011 claims of excessive force, plaintiff first raised these claims in the Amended Complaint filed on August 1, 2014. Id. ¶¶ 29, 30. In the grievances regarding these claims, plaintiff failed to reference retaliation or his protected speech. Id. ¶¶ 34, 37.

## II. Discussion [8]

[8]    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Failure to Respond

**\*5** Plaintiff failed to oppose defendants' Motion for Summary Judgment. Plaintiff requested two extensions of time to file his response to the present motion, which the Court granted. Dkt. Nos. 135, 136, 137, 138. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 134. Given this notice and the two extensions for plaintiff to file opposition papers, plaintiff was adequately apprised of

the pendency of defendants' motion and the consequences of failing to respond.

"Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding *pro se.*" Jackson v. Onondaga Cty., 549 F.Supp.2d 204, 209 (N.D.N.Y. 2008) (footnotes omitted). However, if "the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit." Id. at 210. "[T]o be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory." Id. Even if a verified complaint is deemed nonconclusory, "it may be insufficient to create a factual issue where it is (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Id. Plaintiff's Second Amended Complaint states on its final page, "I certify under penalty of perjury that the foregoing is true and correct." Sec. Am. Compl. at 74. Therefore, as plaintiff's complaint is verified, [9] the undersigned will accept plaintiff's Second Amended Complaint to the extent that the statements are based on the plaintiff's personal knowledge or are supported by the record. See Berry v. Marchinkowski, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider an unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

[9]     The fact that plaintiff's Second Amended Complaint is not notarized is immaterial under 28 U.S.C. § 1746. See Hameed v. Pundt, 964 F.Supp. 836, 840-41 (S.D.N.Y. 1997) (deeming an unnotarized document admissible in support of a summary judgment motion so long as that document contains the statement "I declare under penalty of perjury that the foregoing is true and correct.").

## B. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*6** To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not

exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).


### C. Statute of Limitations

Defendants argue that plaintiff's claims are barred by the applicable statute of limitations. See Dkt. No. 132-1. Although there is no statute of limitations provision in § 1983, 25 U.S.C. § 1988 provides that state law may apply if it is consistent with the Constitution or federal law. 42 U.S.C. § 1988(a); Moor v. Cnty. of Alameda, 411 U.S. 693, 702-03, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). In New York State, the applicable statute of limitations for a § 1983 suit is three years, derived from the general or residual personal injury laws of the forum state. See N.Y. C.P.L.R. § 214(5) (MCKINNEY 2017); Owens v. Okure, 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); Romer v. Leary, 425 F.2d 186, 187 (2d Cir. 1970); Lugo v. Senkowski, 114 F.Supp.2d 111, 113 (N.D.N.Y. 2000) (applying Owens in establishing a three-year statute of limitation for § 1983 claims). Thus, plaintiff's claims are subject to New York's three-year statute of limitations.

Federal law governs the determination of the accrual date for purposes of a § 1983 claim. Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002). A claim accrues "when the plaintiff knows or has reason to know" of the harm. Id. (citations and internal quotation marks omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980). Additionally, "a pro se prisoner's § 1983 complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials." Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (citing Houston v. Lack, 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993) ).

*7 However, the Second Circuit has held that equitable tolling is applicable to claims brought under the PLRA, otherwise a prisoner would risk the dismissal of his or her complaint based on untimeliness if he or she were to wait for a final administrative decision before filing suit. Gonzalez v. Hasty, 651 F.3d 318, 323-24 (2d Cir. 2011) (noting that the Ninth, Fifth, Seventh, and Sixth Circuits have all held that equitable tolling applies during the time in which a prisoner is exhausting his or her administrative remedies). Under the Second Circuit's rule, the equitable tolling period begins when a plaintiff first raises his administrative claim, and ends when the plaintiff's administrative remedies are deemed exhausted. Id. at 324. The statute of limitations, however, is only tolled during the period in which a prisoner is "actively exhausting" his administrative remedies. See id. at 322 n.2. The statute of limitations is not tolled during the period between the accrual of the claims and when the plaintiff began the administrative remedy process. Id. at 324.

Further, the "continuing violation doctrine" delays the accrual date for a claim challenging a discriminatory policy " 'until the last discriminatory act in furtherance of [the discriminatory policy.]' ". Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) (quoting Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994) ) (additional citation omitted). Thus, "the continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date.' " Id. (quoting Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999) ).

Plaintiff filed his initial complaint in this action on January 16, 2014. Dkt. No. 1 ("Compl."). Therefore, absent exceptions, claims arising before January 16, 2011 are barred under the three-year statute of limitations.


### 1. Fourteenth Amendment Due Process

Plaintiff asserts due process violations related to his disciplinary hearing and confinement in SHU. See Sec. Am. Compl ¶¶ 96, 97, 164-165. Plaintiff's claim accrued on December 6, 2010 – when plaintiff received the hearing officer's determination sentencing him to SHU confinement. Id. ¶ 50. On or about January 3, 2011, plaintiff appealed his disciplinary hearing by mailing the administrative appeal to the Dir. of Special Housing. Id. ¶ 52. On January 26, 2011,[10] Dir. Prack affirmed the hearing judgment, and plaintiff's confinement was continued; however, Dir. Prack modified plaintiff's confinement to eighteen months. Id. ¶ 53. Defendants further argue that the defense of equitable tolling is inapplicable. Dkt. No. 132-1 at 7.

2017 WL 9511094

10   Plaintiff alleges he was not immediately notified of the January 24, 2011 appeal disposition. Sec. Am. Compl. ¶ 54. Plaintiff mailed the Dir. of Special Housing to inquire whether the hearing disposition had been reviewed. Id. ¶ 56. On or about February 15, 2011, plaintiff received a letter from the Dir. dated February 11, 2011, indicating that the hearing had been reviewed and the disposition affirmed on January 26, 2011. Id. ¶ 57.

Here, the statute of limitations was tolled for a total of twenty-three days, from January 3, 2011 until January 26, 2011, while plaintiff appealed his disciplinary proceeding. As plaintiff did not appeal his disciplinary hearing disposition until January 3, which is twenty-eight days after the December 6, 2010 hearing, the statute of limitations was not tolled between December 6, 2010 and January 3, 2011. See Trapani v. Coryer, No. 14-CV-683 (GTS/CFH), 2016 WL 8732638, at *6 (N.D.N.Y. June 6, 2016) (citing Gonzalez, 651 F.3d at 322 n.2) ("[I]f an inmate's claim accrues on January 1, 2010, and the inmate does not begin pursuing administrative remedies until December 1, 2010, any subsequent tolling that may be applicable would not include this eleven month period."). Therefore, the statute of limitations on plaintiff's Fourteenth Amendment claim arising out of his December 6, 2010 disciplinary hearing disposition began to run on December 6, 2010 and expired on December 29, 2013. Plaintiff signed the initial complaint in this action on January 16, 2014, eighteen days after the statute of limitations expired. See Compl. at 34.

**\*8** The continuing violation doctrine does not apply to plaintiff's Fourteenth Amendment due process claims because " 'each decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing he was entitled to.' " Crichlow v. Fischer, No. 6:15-CV-06252 EAW, 2017 WL 920753, at *5 (W.D.N.Y. Mar. 7, 2016) (quoting Bunting v. Fischer, No. 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y. Aug. 4, 2016) ). Thus, although plaintiff exhausted his administrative remedies from January 3, 2011 until January 26, 2011, defendants' last discriminatory act was the December 6, 2010 disciplinary hearing, during which plaintiff claims that Capt. Lacy, C.O. Summo, Dir. Prack, and Supt. LaValley denied him a full and fair hearing. Id.; Shomo, 579 F.3d at 181. A "discrete violation" may accrue under the Fourteenth Amendment "each time that a defendant fails to provide an inmate

with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches." Id. at 223. Plaintiff alleges that the defendants denied him a full and fair hearing at the December 6, 2010 disciplinary, which constitutes a discrete act that starts the running of the statute of limitations. Id. Therefore, because "each decision made without due process is a discrete act," plaintiff cannot benefit from the continuing violation doctrine. Crichlow, 2017 WL 920753, at *5. Accordingly, plaintiff's Fourteenth Amendment claim is time-barred.

### 2. First Amendment Retaliation

Plaintiff claims that Capt. Lacy, Supt, LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, Lieut. Allan, C.O. Pray, and Sgt. Archambault denied him "his right to be free of retaliation for exercising his right to free speech." Sec. Am. Compl. ¶¶ 166-67.

### a. Defendants Capt. Lacy, Supt., LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan

Plaintiff contends that Capt. Lacy, Supt. LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan subjected him to retaliation for his protected speech. The accrual dates for these claims are: November 24, 2010, November 25, 2010, and December 6, 2010. See Sec. Am. Compl. ¶¶ 27, 39, 70, 75.

The Second Circuit has held that "[t]he mere fact that the effects of retaliation are continuing does not make the retaliatory act itself a continuing one." Gonzalez, 802 F.3d at 222. "First Amendment retaliation claims typically accrue at the time that the allegedly wrongful conduct occurred." Albritton v. Morris, No. 13-CV-3708 (KMK), 2016 WL 1267799, at *10 (S.D.N.Y. Mar. 30, 2016) (citing Smith v. Campbell, 782 F.3d 93, 101 (2d Cir. 2015) ) (additional citation omitted). Therefore, the statute of limitations "begins to run when the defendant has 'engaged in enough activity to make out an actionable claim.' " Gonzalez, 802 F.3d at 22 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ). By contrast, the continuing violation doctrine only applies "to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of discrimination." Id. (citing Morgan, 536 U.S. at 114-15, 122 S.Ct. 2061).

The continuing violation doctrine does not apply to "discrete unlawful acts." Albritton, 2016 WL 1267799, at *10 (quoting Gonzalez, 802 F.3d at 220).

Plaintiff claims that on November 24, 2010, Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan orchestrated an elaborate conspiracy to cause his wrongful confinement in SHU, including issuing retaliatory cell searches, false misbehavior reports, and tampering with his mail — all in retaliation for plaintiff's protected speech at the ILC Executive Board meeting. Sec. Am. Compl. ¶¶ 27, 39, 70, 75. On November 25, 2010, C.O. Mahuta and C.O. Kelly issued plaintiff two misbehavior reports charging him with (1) solicitation, (2) organization of an action detrimental to the order of the facility, and (3) possession of escape paraphernalia. Id. ¶ 40. On December 6, 2010, Capt. Lacy found plaintiff guilty of possession of escape paraphernalia and sentenced plaintiff to twenty-four months of SHU confinement. Id. ¶¶ 11, 49. The next day, Lieut. Allan issued plaintiff a false misbehavior report charging him with solicitation, stemming from a letter plaintiff wrote to his sister attempting to obtain the "personal identifying information" of two former DOCCS employees. Id. ¶¶ 73-75. On December 7, 2010, plaintiff drafted a grievance alleging that defendants had issued false misbehavior reports "in retaliation for lawsuits, and investigations of deaths and assaults and fraud that was occurring at C.C.F., perpetrated by staff and executive team.... Also grieving the practices of executive staff promoting and condoning these transgressions" and the "reputed involvement" of CCF staff members, including Capt. Lacy, in "racially motivated hate groups" such as the KKK. Dkt. No. 132-4 ("Pl. Dep.") at 232. Plaintiff also filed a separate grievance on December 7, 2010 against C.O. Mahuta alleging retaliation. Id. at 233-34. The Inmate Grievance Program Committee responded on December 23, 2010 to both grievances. Id. Plaintiff alleges that he mailed appeals to the Superintendent on December 27, 2010, and never received a response.

**\*9** Affording plaintiff special solicitude, [11] the statute of limitations was tolled for a total of twenty days, from December 7, 2010 until December 27, 2010 while plaintiff exhausted his administrative remedies. Therefore, the statute of limitations on plaintiff's First Amendment retaliation claim expired on December 27, 2013. Plaintiff signed the initial complaint in this action on January

16, 2014, twenty-one days after the statute of limitations expired. See Compl. at 34. Moreover, plaintiff has not pleaded facts sufficient to show that he was suffering an ongoing wrong – i.e., " 'the existence of an ongoing policy ... and some non-time barred acts taken in the furtherance of that policy.' " Shomo, 579 F.3d at 182 (quoting Harris, 186 F.3d at 250). Accordingly, plaintiff's First Amendment claim, insofar as it relates to defendants Capt. Lacy, Supt. LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan, is time-barred.

[11]    DOCCS records confirm plaintiff's filing of a grievance and the administrative denial of that grievance, but fail to show that plaintiff filed an appeal. Dkt. No. 132-1 at 23. There is no evidence, other than plaintiff's own testimony, to establish whether he appealed to the Superintendent.

### b. Defendants C.O. Pray and Sgt. Archambault [12]

[12]    Defendants' motion does not address the retaliation claim insofar as it applies to C.O. Pray and Sgt. Archambault.

Plaintiff's retaliation claim against C.O. Pray and Sgt. Archambault accrued on January 26, 2011, when plaintiff claims he was subjected to excessive force in retaliation for his complaints against other officers. Sec. Am. Compl. ¶¶ 139-41. Although there is some discrepancy whether plaintiff properly exhausted his administrative remedies, [13] plaintiff filed a grievance against C.O. Pray and Sgt. Archambault on March 1, 2011. Pl. Dep. at 221. [14] The IGRC received this grievance on March 15, 2011. Dkt. No. 123-15 at 1. The Superintendent issued a decision on April 18, 2011, finding no staff malfeasance. Id. at 5. On April 25, 2011, plaintiff appealed the decision to CORC. Id. On July 20, 2011, CORC unanimously denied plaintiff's grievance. Id. at 8. Plaintiff contends that he did not receive the CORC decision until August 8, 2011. Dkt. No. 103 at 22. Thus, affording plaintiff special solicitude, the statute of limitations was tolled for 153 days while plaintiff attempted to exhaust his administrative remedies. The statute of limitations on plaintiff's First Amendment retaliation claim against C.O. Pray and Sgt. Archambault expired on June 28, 2014. Plaintiff first raised this claim in his amended complaint, filed on June 16, 2014. See Dkt. No. 42. Because plaintiff was actively pursuing his administrative remedies during this period, the excessive force claim that arose from the January 26,

2011 incident is timely, as plaintiff raised this claim before the statute of limitations expired. Accordingly, plaintiff's First Amendment claim, insofar as it relates to defendants C.O. Pray and Sgt. Archambault, is not time-barred.

13    Plaintiff's exhaustion of his administrative remedies will be further discussed. See subsection III.D.1. infra.

14    At various points in his second amended complaint, plaintiff alleges that CCF had a policy of obstructing the mailing of grievances. See Pl. Dep. at 194-96. In calculating the equitable tolling period, the use of either March 1, 2011 or January 26, 2011 would deem plaintiff's claims regarding the January 26 incident timely under the statute of limitations. See subsection III.D.1. infra.

### 3. Conspiracy to Discipline and Confine

#### a. Capt. Lacy, Supt. LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan

Plaintiff claims that on November 24, 2010, Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, and C.O. Crusie entered into an agreement to write false misbehavior reports against plaintiff with the intent confine plaintiff to SHU in retaliation for his protected speech at the November 22, 2010 ILC Executive Team meeting. Sec. Am. Compl. ¶ 40. On November 25, 2010, plaintiff received two misbehavior reports charging him with (1) solicitation, (2) conduct detrimental to the order of the facility, and (3) possession of escape paraphernalia. Id. ¶ 45. Plaintiff further claims that on December 6, 2010, Lieut. Allan entered into an agreement with Capt. Lacy and Supt. LaValley to punish plaintiff for his protected speech, and pursuant to this agreement, Lieut. Allan read plaintiff's outgoing mail and issued a misbehavior report charging plaintiff with solicitation for attempting to obtain the "personal identifying information" of two former DOCCS employees. Id. ¶¶ 73, 74, 76. Plaintiff was served a misbehavior report in connection with this charge on December 7, 2010. Id. ¶ 77. However, plaintiff contends that he did not become aware of defendants' alleged agreement until sometime in "late 2011" when "unnamed individuals" informed plaintiff of the conspiracy. See Pl. Dep. at 72, 96-97.

**\*10** In Dory v. Ryan, the Second Circuit held that in assessing conspiracy claims, the doctrine of equitable estoppel extends the statute of limitations until the time when the plaintiff could have reasonably found out about the conspiracy. Dory, 999 F.2d at 681 (citing Keating v. Carey, 706 F.2d 377, 381, 382 (2d Cir. 1983) ) ("[W]hen the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.").

Here, following plaintiff's timeline of events, it does not appear that he, as an inmate, could have known about the alleged conspiracy prior to someone telling him. See Dory, 999 F.2d at 681. Pursuant to plaintiff's allegations, the statute of limitations on plaintiff's conspiracy claim accrued sometime in "late 2011" when he found out about the alleged conspiracy. See Pl. Dep. at 72, 96-97. However, "on a motion for summary judgment, [the Court] cannot rely on an unsupported inference ... to resolve disputed issues of fact." Keating, 706 F.2d at 383. Plaintiff has not offered evidence other than his self-serving testimony to demonstrate that unnamed individuals told him the conspiracy occurred. See Pl. Dep. at 72, 96-97. Moreover, plaintiff acknowledged that he did not have direct knowledge whether such conversations or agreements between defendants even occurred. Id. at 96-97. Therefore, because plaintiff has not offered any evidence to support his allegation that learned of the conspiracy in "late 2011," equitable estoppel does not apply/Thus, plaintiff's conspiracy claim, insofar as it relates to Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan, is time-barred. See Howard v. Cherish, 575 F.Supp. 34, 35 (S.D.N.Y. 1983) (internal citation and quotation marks omitted) ("[S]ince summary judgment is designed to quickly end frivolous or meritless claims, the opposing party may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial."); Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1157-58 (2d Cir. 1995) (holding, on review of a motion for summary judgment, "[t]o take advantage of [the doctrine of equitable estoppel], ... a plaintiff must submit non-conclusory evidence of a conspiracy or other fraudulent wrong which precluded his possible discovery of the harms that he suffered."); Konovalchuk v. Cerminaro, No. 9:11-CV-01344 (MAD/CFH), 2014 WL 272428, at *14 (N.D.N.Y. Jan. 24, 2014) (citing Matsushita Elec. Indus. Co., 475 U.S. 574, 586 (1986) ) ("[S]peculative and conclusory allegations are insufficient to withstand a summary judgment motion.")

#### b. Defendants C.O. Pray and Sgt. Archambault

Plaintiff claims that on January 26, 2011, C.O. Pray and Sgt. Archambault reached an agreement "as to the place to commit misuse of force" motivated by plaintiff's verbal complaint prior to his escort from SHU. Sec. Am. Compl. ¶¶ 139, 142. Although plaintiff filed a grievance against C.O. Pray and Sgt. Archambault regarding alleged excessive force, that grievance does not mention an alleged conspiracy. See Dkt. No. 132-15. Thus, plaintiff is not afforded the benefit of equitable tolling.

Plaintiff first initiated his conspiracy claims against defendants C.O. Pray and Sgt. Archambault in his amended complaint on June 16, 2014. Dkt. No. 42. Therefore, any wrongs that occurred before June 16, 2011 are time-barred under the three-year statute of limitations. Plaintiff has failed to allege that C.O. Pray or Sgt. Archambault committed at least one wrongful act within the statutory time period to invoke the continuing violation doctrine, as his conspiracy claims center on the January 26, 2011 transport from SHU to a teleconference. See Gonzalez v. Wright, 665 F.Supp.2d 334, 350 (S.D.N.Y. 2009) ("[I]n order for the continuing violation doctrine to apply, plaintiff needed to show that those specific individuals committed at least one wrongful act within the statutory time period"). Therefore, plaintiff's conspiracy claim, insofar as it relates to defendants C.O. Pray and Sgt. Archambault, is time-barred.

#### 4. Access to the Courts

**\*11** Plaintiff alleges that Capt. Lacy, Supt. LaValley, and Lieut. Allan [15] interfered with his "constitutional right of access to the courts under Article IV, First Amendment, Fifth Amendment and Fourteenth Amendment of the United States Constitution." Sec. Am. Compl. ¶ 171. Plaintiff contends that on November 24, 2010, November 27, 2010, and December 9, 2010, defendants caused a search of plaintiff's cell and hindered his access to the courts by confiscating his legal papers. Pl. Dep. at 210, 212. The latest possible date of accrual for plaintiff's claim is on December 9, 2010 – when plaintiff became aware that he may be "suffering from a wrong for which damages may be recovered." Singleton, 632 F.2d at 192. Plaintiff claims that he submitted a grievance to the Inmate Grievance Review Committee ("IGRC")

with regard to "legal materials taken and moved to the SHU, legal materials confiscated." See id. at 237, 109 S.Ct. 573. The DOCCS' database shows that plaintiff appealed a grievance for "missing items after cell search" on December 8, 2010, but it is unclear if that grievance relates to the instant claim. See Dkt. No. 132-13 at 3.

[15]    Plaintiff's claims against C.O. Mahuta, C.O. Crusie, C.O. Kelly and Sgt. Tamer were terminated by the Court's March 9, 2016 Memorandum-Decision and Order, adopting and incorporating the undersigned's February 8, 2016 Report-Recommendation and Order. Dkt. Nos. 105, 107.

Because the December 8, 2010 grievance for "legal materials confiscated" pre-dates the December 9, 2010 search, plaintiff cannot benefit from equitable tolling. Therefore, the statute of limitations on plaintiff's denial of access to the courts claim expired on December 9, 2013. Plaintiff signed the initial complaint in this action on January 16, 2014. See Compl. All of the alleged acts constituting interference with plaintiff's access to the courts occurred before January 16, 2011, and are outside of either of the three-year statutory windows. Therefore, plaintiff's denial of access to the courts claim against Capt. Lacy, Supt. LaValley, and Lieut. Allan is time-barred.

#### 5. Improper SHU Conditions

Plaintiff alleges that Supt. LaValley, Capt. Lacy, and Lieut. Allan violated his Eighth Amendment right to be free from cruel and unusual punishment "when the defendants acted with deliberate indifference or with malice, in deprivation of the Plaintiff's basic human needs, and conduct which amount to calculated harassment unrelated to penological interests, causing unconstitutional, actual and physical injuries to the Plaintiff." Sec. Am. Compl. ¶ 173. Plaintiff was confined in SHU from November 25, 2010 until May 8, 2011. See Dkt. No. 132-9 at 3. Plaintiff failed to specifically name Supt. LaValley, Capt. Lacy, or Lieut. Allan in any grievances he may have filed relating to improper SHU conditions. See Pl. Dep. at 228-29. Thus, plaintiff is not afforded the benefit of equitable tolling.

Plaintiff first raised claims against defendants Supt. LaValley, Capt. Lacy, and Lieut. Allan in his amended complaint, filed on June 16, 2014. Dkt. No. 42. Therefore, any claims that occurred before June 16, 2011 are

time-barred under the three-year statute of limitations. Plaintiff has not alleged that Supt. LaValley, Capt. Lacy, and Lieut. Allan committed at least one wrongful act within the statutory time period to invoke the continuing violation doctrine, as any violation committed due to improper SHU conditions ceased on his release from SHU on May 8, 2011. See Wright, 665 F.Supp.2d at 350 ("[I]n order for the continuing violation doctrine to apply, plaintiff needed to show that those specific individuals committed at least one wrongful act within the statutory time period"). Accordingly, because plaintiff did not allege a constitutional violation within the statutory period, plaintiff's Eighth Amendment improper SHU conditions claim is time-barred.

### 6. Eighth Amendment Excessive Force/Failure to Intervene

Plaintiff asserts two Eighth Amendment excessive force claims relating to incidents on December 22, 2010 and January 26, 2011. Sec. Am. Compl. ¶ 175. The undersigned addressed the timeliness of plaintiff's excessive force claims in the February 8, 2016 Report-Recommendation and Order, concluding that plaintiff's excessive force claims were timely because the statute of limitations was tolled while plaintiff actively pursued his administrative appeals. Dkt. No. 105 at 10. On March 9, 2016, the Court adopted the undersigned's Report-Recommendation and Order. Dkt. No. 107.[16]

[16] The undersigned decided the timeliness of plaintiff's Eighth Amendment claims in the February 8, 2016 Report-Recommendation and Order. However, were the undersigned to address again the timeliness of those claims, the undersigned would still find the claims timely based on the copies of plaintiff's grievance submissions submitted pursuant to defendants' Motion for Summary Judgment.

### D. Exhaustion of Administrative Remedies

 **\*12** Defendants contend that plaintiff failed to exhaust his administrative remedies through the available grievance procedures. See Dkt. No. 132-1 at 16, 24, 33. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S.

516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) to determine exhaustion. Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court of the United States recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). As such, the special circumstances exception Hemphill, is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved

inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. Here, although plaintiff identifies consistent troubles with CCF's Inmate Grievance Program, [17] it is no dispute that, at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). [18]

[17]    Plaintiff details obstruction by DOCCS employees of delivery of grievances. See Sec. Am. Compl. ¶ 177; Pl. Dep. at 194-97.

[18]    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. § 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Retaliation/Excessive Force [19]

[19]    Exhaustion of plaintiff's retaliation claim is discussed in conjunction with plaintiff's excessive force claim, as they were grieved together.

**\*13**  Defendant argues that plaintiff failed to exhaust his administrative remedies as to his excessive force claims

against C.O. Pray and Sgt. Archambault. Dkt. No. 132-1 at 19. Defendants do not address plaintiff's retaliation claim against C.O. Pray and Sgt. Archambault. Plaintiff contends that, on January 26, 2011, C.O. Pray and Sgt. Archambault subjected him to excessive force in retaliation for his complaints against fellow officers. Sec. Am. Compl. ¶ 140-141. Plaintiff claims that he filed a grievance on January 26, 2011, but that the IGRC failed to respond. See Dkt. No. 132-15 at 1; Pl. Dep. at 220-21. On March 1, 2011, plaintiff filed a second grievance regarding the January 26, 2011 incident. Pl. Dep. at 211. The IGRC received this grievance on March 15, 2011, but no decision is available. Dkt. No. 123-15 at 1, 7. The Superintendent issued a decision on April 18, 2011 finding no staff malfeasance. Id. at 5. On April 25, 2011, plaintiff appealed the decision to CORC. Id. On July 20, 2011, CORC unanimously denied plaintiff's appeal. Id. at 8. Plaintiff contends that he did not receive the CORC decision until August 8, 2018. Dkt. No. 103 at 22.

Even assuming that plaintiff first filed his grievance on March 1, 2011, the undersigned finds that plaintiff's filing his grievance thirteen days past the thirty-day time limitation was not so egregious as to constitute an unreasonable attempt to avail himself of the grievance process, as the IGRC accepted the grievance, and both the Superintendent and CORC issued decisions on the merits. See Hill v. Curcione, 657 F.3d 116, 125 (2d Cir. 2011) ("[T]he exhaustion requirement of the PLRA is satisfied by an untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority."). Thus, plaintiff has properly exhausted his administrative remedies. Defendants have not met their burden of showing that plaintiff failed to exhaust his administrative remedies as to his retaliation claim. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### 2. Excessive Force/Failure to Intervene

#### a. December 22, 2010 incident – Lieut. Allan

Plaintiff claims that, during an escort, three unidentified, non-party corrections officers punched him on the head, face, and body, and pushed him into a concrete wall. Sec. Am. Compl. ¶ 136. Plaintiff further argues that Lieut. Allan, as the ranking officer in the escort, failed to intervene and prevent the non-party officers' excessive

force. Id. ¶¶ 137, 175. Plaintiff filed a grievance on December 26, 2010 concerning the December 22 incident, which states that he was "assaulted by staff," but fails to name the staff members present. Dkt. No. 132-14. Defendants argue that plaintiff "readily acknowledges" the vagueness of his grievance, which lacks not only the officers' names, but the location of the assault, any mention of Lieut. Allan's involvement, or notice of the underlying facts. Dkt. No. 132-1 at 33. Defendants further contend that plaintiff's "obstructionist actions during the investigation completely defeated the purpose of the grievance process" and that "plaintiff should not be considered to have properly exhausted his administrative remedies." Id.

In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending corrections officer. Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009). "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' ... and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted). Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id.

Plaintiff's December 26, 2010 grievance states: "Assaulted by staff on December 22, 2010 causing various injuries. This violated my 8th Amendment rights." Dkt. No.132-14 at 1. On April 14, 2011, the Superintendent affirmed the IGRC's denial of plaintiff's grievance, finding that there was no staff malfeasance. Id. at 2. Three days later, plaintiff appealed to CORC. Id. On July 13, 2011, CORC upheld the Superintendent's determination. Id. at 3.

*14 Plaintiff's December 22, 2010 grievance, as written, fails to give adequate notice of his failure to protect claim against Lieut. Allan in order "to allow prison officials to take appropriate responsive measures." PLRA's exhaustion requirement is "not dissimilar to the rules of notice pleading." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004). It requires that prison officials be afforded the time and opportunity to address a complaint internally, "[i]n order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Id. The December 22 grievance only alleges an assault claim. Dkt. No. 132-14. Plaintiff

testified that he first mentioned Lieut. Allan as one of the officers present during the incident in the IGRC interview, but there is no indication that plaintiff mentioned Lieut. Allan's failure to intervene on his behalf. Pl. Dep. at 206. Moreover, neither the Superintendent's decision nor the CORC decision mention Lieut. Allan or a failure to protect claim. Dkt. No. 132-14 at 2-3. There is nothing in plaintiff's grievance that would alert prison officials to investigate a subsequent failure to intervene claim against Lieut. Allan; thus, such claim was not properly grieved. See Luckerson v. Gooard, No. 00 Civ. 9508(JSR), 2002 WL 1628550, at *2 (S.D.N.Y. July 22, 2002) (determining the plaintiff's claim to be unexhausted and stating, "[f]or [the defendants] now to have to litigate a federal lawsuit premised on allegations that ... they had no reason to address [in the IGRC] would make a mockery of the exhaustion requirement."). Indeed, "the mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance." Turner v. Goord, 376 F.Supp.2d 321, 324 (W.D.N.Y. 2005). Thus, plaintiff has failed to properly exhaust his administrative remedies regarding his failure to intervene claim against Lieut. Allan. Therefore, defendants have met their burden in showing that plaintiff failed to exhaust administrative remedies. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be granted.

### E. First Amendment

Plaintiff contends that C.O. Pray and Sgt. Archambault "denied [him] his right to be free of retaliation for exercising his right to free speech ... when the defendants took ... adverse actions solely motivated by the Plaintiff's protected speech, causing actual physical and unconstitutional injuries to the Plaintiff." Sec. Am. Compl. ¶ 167. Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct.

1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal, 558 F.3d at 128 (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 992).

### 1. Protected Conduct

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. "Reporting the wrongdoing of corrections officers and other prison officials ... qualifies as protected speech under the First Amendment." Moore v. Peters, 92 F.Supp.3d 109, 120 (W.D.N.Y. 2015) (citing Ahlers v. Grygo, No. 02-CV-3256 (JG)(LB), 2009 WL 3587483, at *4 (E.D.N.Y. Oct. 27, 2009) ). Plaintiff claims that C.O. Pray and Sgt. Archambault retaliated against him based on his complaints of wrongdoing at the November 22, 2010 ILC Executive Team meeting, as well as for "exercising his right of access to the courts and for [plaintiff's] complaint related to [C.O. Pray's] reading of his legal paper[s]." Sec. Am. Compl. ¶ 139. At the time, plaintiff was engaged in a lawsuit against C.O. Pray's "buddy Kevin," a non-party corrections officer. Id. ¶ 140.

To the extent that plaintiff bases his retaliation claim against C.O. Pray and Sgt. Archambault on verbal complaints he made at the November 22, 2010 ILC Executive Team meeting, such statements amount to protected conduct. Dolan v. Connolly, 794 F.3d 290, 292 (2d Cir. 2015) (finding that "action as a member of an ILC, i.e. the filing or voicing grievances on behalf of a prison population, qualifies as constitutionally protected conduct under the First and Fourteenth Amendments."). Moreover, plaintiff's lawsuit against a corrections officer qualifies as protected conduct. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); Smith v. Kelly, 985 F.Supp.2d 275, 279 (N.D.N.Y. 2013) (assessing a First

Amendment retaliation claim where the plaintiff claimed that his complaints against a non-party corrections officer constituted protected conduct). As plaintiff alleged that defendants retaliated against him due to his protected conduct of voicing grievances as a member of the ILC and filing a lawsuit against a fellow officer, he has established the first prong of the retaliation analysis.

### 2. Adverse Action

**\*15** "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Moore, 92 F.Supp.3d at 120 (internal quotation marks and citation omitted). It is well-settled that excessive force constitutes adverse action for the purposes of a retaliation analysis. Baskerville v. Blot, 224 F.Supp.2d 723, 731-32 (S.D.N.Y. 2002) ("[The plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); see Flemming v. King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis."). Therefore, plaintiff's allegation of excessive force constitutes adverse action.

### 3. Causal Connection

In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville, 224 F.Supp.2d at 732. "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." Id. The Second Circuit has established that no more than six months between the protected activity and the adverse action establishes the temporal proximity sufficient to support an inference of causal connection. Espinal, 558 F.3d at 129.

Plaintiff has plausibly suggested facts supporting two of the factors. Prior to the escort to the Court of Claims teleconference, plaintiff and C.O. Pray were discussing the basis for plaintiff's ongoing lawsuit, and it was determined that plaintiff had sued a fellow non-party corrections officer who was C.O. Pray's friend. Pl. Dep. at 216-17. During the escort back to SHU, C.O. Pray assaulted plaintiff. Id. C.O. Pray learned of plaintiff's lawsuit on the same day that he assaulted plaintiff; therefore, the temporal proximity between is well-within the Second Circuit's six-month time frame to sufficiently support an inference of causal connection. See Flemming, 2016 WL 5219995, at *5 (finding the fact that assault occurred on the same day that the plaintiff threatened to file a lawsuit against the defendants sufficed to establish temporal proximity); Jordan v. Garvin, No. 01CIV4393LTS/GWG, 2004 WL 302361, at *6 (S.D.N.Y. Feb. 17, 2004) ("[T]he existence of a temporal connection as close as the one present here – just two days – is sufficient by itself to establish the requisite inference of a causal connection."). Moreover, upon learning that plaintiff had sued the non-party corrections officer, C.O. Pray allegedly stated, "[s]o you are suing my buddy Kevin, [sic] we know how to fix inmates like you, Povoski," and then proceed to joke with Sgt. Archambault "about their intent to physically [injure him] on his return from the video court appearance." Sec. Am. Compl. at 57. Defendants' statements suggest a retaliatory motive and signify that plaintiff's lawsuit may have been a "substantial or motivating factor" in the defendants' alleged decision to assault plaintiff. Baskerville, 224 F.Supp.2d at 732. Although plaintiff's comments at the November 22, 2010 ILC meeting constitute protected conduct and fall within the Second Circuit's six-month time frame, there is no indication that C.O. Pray or Sgt. Archambault attended that meeting – in fact, the minutes confirm that neither defendant was present. Dkt. No. 132-5 at 1. Moreover, neither C.O. Pray nor Sgt. Archambault mentioned plaintiff's November 22, 2010 comments prior to the assault. Therefore, defendants have not met their burden of showing that there is no genuine issue of material fact as to plaintiff's

retaliation claim against C.O. Pray and Sgt. Archambault. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### F. Eighth Amendment

**\*16** Plaintiff claims that on January 26, 2011, C.O. Pray assaulted him during an escort to a Court of Claims teleconference. Sec. Am. Compl. ¶ 142. Plaintiff further contends that Sgt. Archambault, the ranking supervisor, failed to intervene to prevent the assault. Id. Defendants argue that plaintiff "has failed to provide any corroborating evidence of any assault on January 26, 2011." Dkt. No. 132-1 at 37. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) ). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)

The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21

2017 WL 9511094

(internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

### 1. Excessive Force

Viewing the evidence in the light most favorable to plaintiff, the undersigned declines to recommend dismissal of plaintiff's excessive force claim because there exists a genuine issue of material fact whether C.O. Pray used excessive force, and whether that force was malicious. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (internal quotation marks and citation omitted) ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se ... whether or not significant injury is evident."). Plaintiff testified that on the return escort, C.O. Pray led him to the secluded A-B corridor, and, after ensuring that the area was clear, "struck [him] ... three times ... [i]n the face and head." Pl. Dep. at 217. Plaintiff contends that he suffered bruising and swelling that lasted approximately one week. Id. at 219-20, 127 S.Ct. 910. However, plaintiff's medical records do not reference any injury he allegedly sustained during the assault. Dkt. No. 132-16 at 3-4. Still, "certain actions, including malicious use of force to cause harm, constitute Eighth Amendment violations per se." Blyden, 186 F.3d at 263 (emphasis in original). Although plaintiff's medical records do not support the injuries plaintiff purports to have incurred, "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005) ); Tafari v. McCarthy, 714 F.Supp.2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted)

(denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.")

**\*17** Assessing the subjective prong of the analysis, plaintiff testified that C.O. Pray assaulted him after learning that plaintiff had commenced a lawsuit against his friend, and that the assault was otherwise unprovoked. Pl. Dep. at 215, 217. A reasonable factfinder could find plaintiff's testimony credible and determine that C.O. Pray's actions were wanton and malicious. See Bylden, 196 F.3d at 263 ("[T]he malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se."). Further, plaintiff testified that he was restrained in a waist chain and handcuffs, weighing against the notion that C.O. Pray could have reasonably perceived plaintiff to be a threat. Scott, 344 F.3d at 291. Such testimony could establish that C.O. Pray used force not to restore or maintain order, rather, in retaliation for filing suit against a fellow corrections officer. See Sims, 230 F.3d at 21.

As the governing law dictates that the evidence must be viewed in the light most favorable to plaintiff, the undersigned must credit plaintiff's version of events for purposes of this motion. In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) ("In [reviewing all of the evidence in the record], the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."). Defendants have not met their burden of showing that there is no genuine issue of material fact as to plaintiff's excessive force claim. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### 2. Failure to Intervene

Plaintiff claims that during the January 26, 2011 escort to a Court of Claims video conference, Sgt. Archambault, the ranking supervisor, failed to intervene when C.O. Pray assaulted him. Sec. Am. Compl. ¶ 142. "A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless

bear responsibility for any resulting constitutional deprivation." Lewis v. Mollette, 752 F.Supp.2d 233, 244 (N.D.N.Y. 2010).

> In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: (1) possessed actual knowledge of the use by another corrections officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.

Id. (internal citation and quotation marks omitted). Viewing the facts in the light most favorable to plaintiff, Sgt. Archambault alerted C.O. Pray that no one was around, stood close enough to C.O. Pray to be able to intervene, and failed to intervene to prevent C.O. Pray from striking plaintiff. Pl. Dep. at 217. Based on these facts, a fact-finder could conclude that Sgt. Archambault had the ability to intervene. Therefore, defendants have not met their burden of showing that there is no genuine issue of material fact as to plaintiff's failure to intervene claim. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### III. Conclusion

For the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment (Dkt. No. 132) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against Capt. Lacy, C.O. Summo, Dir. Prack, and Supt. LaValley,

(2) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against Capt. Lacy, Supt.

LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan,

(3) Insofar as it seeks dismissal of plaintiff's First Amendment access to the courts claim against Capt. Lacy, C.O. Kelly, C.O. Crusie, C.O. Mahuta, Supt. LaValley, and Lieut. Allan,

**\*18** (4) Insofar as it seeks dismissal of plaintiff's § 1983 conspiracy claims Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, Lieut. Allan, C.O. Pray, and Sgt. Archambault,

(5) Insofar as it seeks dismissal of plaintiff's Eighth Amendment claim against Capt. Lacy, Lieut. Allan, and Supt. LaValley for improper SHU conditions,

(6) Insofar as it seeks dismissal of plaintiff's Eighth Amendment failure to intervene claim against Lieut. Allan,

the motion be **GRANTED**, and the claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 132) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against C.O. Pray and Sgt. Archambault,

(2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment excessive force claim against C.O. Pray,

(3) Insofar as it seeks dismissal of plaintiff's Eighth Amendment failure to intervene claim against Sgt. Archambault,

the motion be **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

Povoski v. Lacy, Slip Copy (2017)

2017 WL 9511094

**(14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e). [20]

[20]   If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2017 WL 9511094

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 547392
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frank J. POVOSKI, Jr., Plaintiff,
v.
Steven LACY, et al., Defendants.

9:14-CV-0097 (BKS/CFH)
|
Signed 01/17/2018

**Attorneys and Law Firms**

Frank J. Povoski, Jr. Rochester, NY 14622 Plaintiff, pro se

Brian W. Matula, Esq. Hon. Eric T. Schneiderman Office of New York State Attorney General The Capitol Albany, NY 12224 Attorney for Defendants

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, U.S. District Judge

**\*1** Plaintiff Frank Povoski, Jr., a former New York State inmate, commenced this action under 42 U.S.C. § 1983 alleging that the Defendants violated his constitutional rights under the First, Eighth, and Fourteenth Amendments during his confinement at the Clinton Correctional Facility. Dkt. No. 106. On April 7, 2017, Defendants filed a motion for summary judgment, seeking dismissal of the entirety of the Plaintiff's Second Amended Complaint. Dkt. No. 132. Plaintiff did not respond to the motion even though he filed two requests for extensions of time, which were granted. Dkt. Nos. 136 and 138. This matter was referred to United States Magistrate Judge Christian F. Hummel who, on December 13, 2017, issued a Report-Recommendation and Order recommending that Defendants' motion for summary judgment be granted in part and denied in part. Dkt. No. 139. Magistrate Judge Hummel advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the Report, and that the failure to object to the Report within fourteen days would preclude appellate review.

Dkt. No. 139, pp. 42-43. No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 139) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 132) is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 132) is **GRANTED** with respect to the following claims, and that the following claims are **DISMISSED WITH PREJUDICE**:

(1) Plaintiff's Fourteenth Amendment due process claim against Capt. Lacy, C.O. Summo, Dir. Prack, and Supt. LaValley;

(2) Plaintiff's First Amendment retaliation claim against Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan;

(3) Plaintiff's First Amendment access to the courts claim against Capt. Lacy, C.O. Kelly, C.O. Crusie, C.O. Mahuta, Supt. LaValley, and Lieut. Allan;

(4) Plaintiff's § 1983 conspiracy claims against Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, Lieut. Allan, C.O. Pray, and Sgt. Archambault;

(5) Plaintiff's Eighth Amendment claim against Capt. Lacy, Lieut. Allan, and Supt. LaValley for improper SHU conditions; and

(6) Plaintiff's Eighth Amendment failure to intervene claim against Lieut. Allan; and it is further

2018 WL 547392

**ORDERED** that the Defendants' motion for summary judgment is **DENIED** as to the following claims, which will be scheduled for trial:

> **\*2** (1) Plaintiff's First Amendment retaliation claim against C.O. Pray and Sgt. Archambault;

> (2) Plaintiff's Eighth Amendment excessive force claim against C.O. Pray; and

> (3) Plaintiff's Eighth Amendment failure to intervene claim against Sgt. Archambault; and it is further

**ORDERED** that the Clerk is directed to terminate Capt. Lacy, C.O. Summo, Dir. Prack, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan as Defendants in this case; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 547392

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3736791
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher BERKLEY, Plaintiff,
v.
H. WARE, Defendant.

No. 9:16-CV-1326 (LEK/CFH)
|
Signed 07/06/2018

**Attorneys and Law Firms**

Christopher Berkley, 15-R-1631, Mid-State Correctional
Facility, P.O. Box 2500, Marcy, New York 13403, pro se.

Attorney General for the State of New York, OF
COUNSEL: HELENA O. PEDERSON, ESQ., Assistant
Attorney General, The Capitol, Albany, New York 12224,
Attorney for Defendant.

## REPORT-RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for
        Report-Recommendation and Order pursuant to 28
        U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se Christopher Berkley ("plaintiff"), an
inmate who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS") brings this action pursuant to 42
U.S.C. § 1983, alleging that corrections officer ("C.O.")
Helen Ware—who, at all relevant times, was employed
at Franklin Correctional Facility ("Franklin")—violated
his constitutional rights under the Eighth Amendment.
See Dkt. No. 1 ("Compl."). Presently pending before
the Court is defendant's Motion for Summary Judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Fed. R. Civ. P."). Dkt. No. 21. Plaintiff did
not oppose the motion. For the following reasons, it is
recommended that defendant's motion be granted.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable
to plaintiff as the nonmoving party. See subsection II.B.
infra. Plaintiff contends that on May 20, 2016, he injured
his right hand playing basketball. Compl. at 5. The
infirmary nurses issued him a hand brace to prevent
further injury. Id. On May 25, 2016, plaintiff's vocational
teacher informed him that he could not attend the class
because he had a hand brace on, and that he could not
participate in any activities. Id. The teacher sent plaintiff
into the hallway to return to his dorm. Id. On entering
the hallway, C.O. Ware questioned plaintiff as to why he
was not in class. Id. at 5-6. Plaintiff informed C.O. Ware
that he could not participate in class due to his sprained
wrist, and C.O. Ware instructed him to return to class. Id.
at 6. Plaintiff complied, and the vocational teacher again
"kicked [plaintiff] out of the classroom." Id. Once in the
hallway, C.O. Ware instructed plaintiff to return to class.
Id. Plaintiff informed his teacher that C.O. Ware ordered
his return, and that he "didn't want any problems[.]" Id.
Plaintiff asked his teacher if he could speak with C.O.
Ware, but the teacher told him to leave the classroom. Id.

After plaintiff entered the hallway for the third time,
C.O. Ware "threw [him] against the wall" and "bumped
[his right] hand against the wall[.]" Compl. at 6. Plaintiff
informed C.O. Ware that his hand hurt, and she "grabbed
[his] hand and slammed it against the wall," stating, "I said
to keep your fucking hands on the wall" and "shut the fuck
up." Id. She further stated, "as a matter of fact [sic] give
me this fucking brace [sic] there's nothing wrong with your
fucking hand." Id. C.O. Ware removed plaintiff's brace
and handcuffed him, further injuring his hand. Id. at 7.
On June 9, 2016, plaintiff received a hard cast for his right
hand. Id. at 7.

### B. Defendant's Recitation of the Facts

In support of this motion, defendant filed a Statement of
Material Facts. [2] On May 20, 2016, plaintiff injured his
right hand and wrist while playing basketball. Dkt. No.
21-3 ¶ 4. Plaintiff informed the Franklin medical staff that
he heard a "popping sound" after he ran into the wall and

Case 9:17-cv-00703-TJM-TWD   Document 51   Filed 12/07/18   Page 104 of 157

"rolled" his wrist. Id. ¶ 7. The medical staff noted that plaintiff had limited range of motion and could not make a complete fist. Id. Plaintiff was referred to the Emergency Room at Alice Hyde Memorial Center ("AHMC") for further evaluation. Id. ¶ 8. X-ray results indicated that plaintiff did not sustain a fracture or dislocation to his hand or wrist, and that he only suffered a sprain. Id. ¶ 10. Plaintiff received a splint, a soft sleeve with a hard insert at the underside of the wrist—also known as a brace—as well as ibuprofen, and was discharged. Id. ¶¶ 11, 12. Plaintiff also received a work release form, which indicated that he would be able to return to programming on May 24, 2016. Id. ¶ 12. A follow-up appointment was recommended with an orthopedist to rule out any hidden fractures or ligamentous injuries to plaintiff's hand and/or wrist. Id. ¶ 13.

2    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

**\*2** On his return to Franklin, the medical staff prescribed plaintiff a medical pass excusing him from work. Dkt. No. 21-3 ¶ 14. The pass expired on May 25, 2016. Id. On May 25, 2016, plaintiff went to the commissary before reporting to the Vocational School, which caused him to be late for his Building Maintenance class. Id. ¶ 23. Plaintiff had previously been late for class, and had been

given direct orders to be on time in the future. Id. ¶ 24. When he reported to class plaintiff was wearing a brace on his right hand/wrist, but did not have a valid medical excuse pass. Id. ¶ 25. Because he did not have a valid medical excuse pass, C.O. Ware instructed plaintiff that he had to attend class even if he could not participate. Id. ¶ 26. Plaintiff refused to remain in the classroom; instead, he asked to go to the infirmary to renew his medical excuse pass. Id. ¶¶ 27, 28. C.O. Ware called the infirmary regarding plaintiff's medical excuse pass, and the nurse on duty informed her that plaintiff could attend class even though he could not participate. Id. ¶¶ 29, 30. The nurse also stated that because plaintiff only had a sprain, the situation was not an emergency and plaintiff did not need to visit the infirmary. Id. ¶ 30. C.O. Ware relayed this information to plaintiff. Id. ¶ 31.

Later that day, plaintiff's vocational class instructor informed C.O. Ware that plaintiff wanted to go to emergency sick call. Dkt. No. 21-3 ¶ 32. As nothing had changed since the first time plaintiff attempted to leave the classroom, C.O. Ware did not believe that this was an emergency situation. Id. C.O. Ware called the infirmary to explain that plaintiff felt it was an emergency. Id. The nurse stated that because this was not an emergency and did not require urgent care, plaintiff would be written up for abusing emergency sick call if he went just to get a new medical excuse pass. Id. ¶ 33. C.O. Ware reiterated this information to plaintiff, but he insisted on going to the infirmary. Id. ¶¶ 34, 35. Pursuant to DOCCS Directive 4910, C.O. Ware pat-frisked plaintiff before allowing him to leave the Vocational School. Id. ¶ 36. C.O. Ware pat-frisked plaintiff in the hallway outside of the Building Maintenance classroom. Id. ¶ 37. C.O. Ware directed plaintiff to put his hands against the wall and spread his feet apart. Id. ¶ 38. She patted down his neck, chest, back, arms, and legs on the outside of his clothing. Id. C.O. Ware did not remove plaintiff's brace, nor did she throw plaintiff against the wall or attempt to choke him. Id. ¶¶ 39, 40. C.O. Ware did not "slam" plaintiff's right hand and/or wrist against the wall during the pat-frisk. Id. ¶ 41. C.O. Ware did not yell at plaintiff, threaten him, use racial slurs, or handcuff plaintiff during the pat-frisk. Id. ¶¶ 42, 43. During the pat-frisk, C.O. Ware informed plaintiff that if he went to emergency sick call to ask for a new permit, he would be written up as that did not qualify as an emergency. Id. ¶ 44. C.O. Ware sent plaintiff to the infirmary after the pat-frisk. Id. ¶ 45.

At the infirmary, the medical staff observed that plaintiff only had minimal swelling, and that his splint was still in place. Dkt. No. 21-3 ¶ 46. The medical staff informed plaintiff that there was "nothing wrong" with his hand and/or wrist, and that he could attend class. Id. ¶ 47. As such, the medical staff did not treat plaintiff at that time. Id. ¶ 48. On May 31, 2016, Franklin medical staff examined plaintiff in conjunction with a grievance he filed concerning the alleged May 25, 2016 incident. Id. ¶ 50. Plaintiff reported pain in his right thumb, but the medical staff did not observe swelling or bruising. Id. ¶ 51. Plaintiff did not request pain medication. Id. ¶ 52. On June 9, 2016, plaintiff attended a follow-up appointment with nonparty orthopedist Dr. Macelaru, who confirmed that plaintiff suffered a sprain, and that there were no hidden fractures or torn ligaments. Id. ¶¶ 15, 16. Dr. Cahill, Facility Health Services Director at Franklin, determined that the sprain diagnosed on June 9, 2016 was the same injury as the sprain diagnosed on May 20, 2016 because there were no new injuries to plaintiff's right hand and/or wrist. Id. ¶ 17. As a result of plaintiff's appointment with Dr. Macelaru, plaintiff's right hand and wrist were placed in a hard cast to prevent further injury and allow for quicker healing. Id. ¶¶ 18, 19. Plaintiff's cast was removed on or around July 15, 2016.

## II. Discussion [3]

All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Failure to Respond

**\*3** Plaintiff failed to oppose defendant's Motion for Summary Judgment. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 23. Given this notice, plaintiff was adequately apprised of the pendency of defendant's motion and the consequences of failing to respond. "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding *pro se*." Jackson v. Onondaga Cty., 549 F.Supp.2d 204, 209 (N.D.N.Y. 2008) (footnotes omitted). However, if "the

district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit." Id. at 210. "[T]o be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory." Id. Even if a verified complaint is deemed nonconclusory, "it may be insufficient to create a factual issue where it is (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Id. Plaintiff's complaint states, "I declare under penalty of perjury that the foregoing is true and correct." Compl. at 9. Therefore, as plaintiff's complaint is verified, [4] the undersigned will accept plaintiff's complaint as an affidavit to the extent that the statements are based on plaintiff's personal knowledge or are supported by the record. See Berry v. Marchinkowski, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider an unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

The fact that plaintiff's complaint is not notarized is immaterial under 28 U.S.C. § 1746. See Hameed v. Pundt, 964 F.Supp. 836, 840-41 (S.D.N.Y. 1997) (deeming an unnotarized document admissible in support of a summary judgment motion so long as that document contains the statement "I declare under penalty of perjury that the foregoing is true and correct.").

### B. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law"....

**\*4** Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## C. Exhaustion

As a threshold matter, defendant argues that plaintiff has failed to exhaust his administrative remedies prior to filing this lawsuit. See Dkt. No. 21-1 ("Def. Mem. of Law") at 9-11. On May 27, 2016, plaintiff filed a grievance (FKN-12752-16) alleging that C.O. Ware assaulted him during the May 25, 2016 pat-frisk and injured his right hand. Dkt. No. 21-3 ¶¶ 49, 64; Dkt. No. 21-5 at 20-21. On June 3, 2016, the Superintendent denied plaintiff's grievance. Id. ¶ 65; Dkt. No. 21-5 at 17. Plaintiff appealed the Superintendent's determination on or about June 8, 2016. Id. ¶ 66; Dkt. No. 21-5 at 7. The Central Office Review Committee ("CORC") mailed the determination of plaintiff's grievance to Franklin on November 2, 2016. Id. ¶ 67. Plaintiff filed the complaint in the underlying action on October 27, 2016. Id. ¶ 68.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of

the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [5]

[5]    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

**1. Did Plaintiff Exhaust his Administrative Remedies?** [6]

[6]    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the

superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**\*5**    It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F.Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *3 (N.D.N.Y. June 19, 2014) ("In the event the defendant establishes that the inmate plaintiff failed to fully complete [ ] the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal.") (internal citation and quotation marks omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

Here, the record is clear that plaintiff filed this action on October 27, 2016, and at that time CORC had yet to issue a decision on plaintiff's appeal. [7] DOCCS IGP Assistant Director Rachael Seguin declared that based on her review of DOCCS records, CORC mailed their determination on plaintiff's grievance to the Franklin Inmate Grievance Review Committee ("IGRC"), for transmittal to plaintiff, on November 2, 2016—six days after plaintiff commenced this action. Dkt. No. 21-11 ("Seguin Decl.") ¶¶ 15, 16. Moreover, plaintiff's complaint makes clear on two occasions that he was aware he had not fully exhausted his administrative remedies prior to commencing suit: (1) "my grievance was denied by Superintendent D. LaClair and

now my appeal to the CORC is pending"; and (2) "[t]hus I am still waiting for a result from the C.O.R.C. in this matter[.]" Compl. at 8. Thus, plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit because CORC's decision was outstanding. See Peoples, 212 F.Supp.2d at 142; McMillian, 2017 WL 8894737, at *2; Couvertier, 2014 WL 2781011, at *3; White, 2011 WL 4478988, at * 3.

7    Plaintiff's complaint is considered filed as of the date it was given to the prison official for forwarding. See Johnson v. Coombe, 156 F.Supp.2d 273, 277 (S.D.N.Y. 2001). "Although it is not clear when the plaintiff gave his complaint to prison officials, [a]bsent evidence to the contrary, the Court assumes that [the prisoner] gave his petition to prison officials for mailing on the date he signed it." Id. (internal quotation marks and citation omitted). Because plaintiff signed his complaint on October 27, 2016, the undersigned deems that the date of filing. See Compl.

**2. Availability of Administrative Remedies**

Read broadly, plaintiff seems to suggest that the grievance process was unavailable to him because of CORC's "absurd" delay in rendering their final determination. See Dkt. No. 1-1 at 27 (setting forth a memorandum from IGP Director Karen Bellamy regarding receipt of plaintiff's appeal). First, although plaintiff claims that CORC did not receive his appeal until September 14, 2016, the plain text of the memorandum seems to suggest that CORC received the appeal on June 14, 2016; rather, the memorandum sent to plaintiff was dated September 14, 2016. See id. ("Your grievance FNK-12752-16 entitled Assaulted by C.O. was rec'd by CORC on 6/14/2016.").

Second, courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did

not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination").

**\*6** Here, there is no dispute that plaintiff filed a grievance with the Franklin IGRC on May 27, 2016; received the Superintendent's determination on June 3, 2016; and appealed that determination to CORC on or about June 8, 2016. See Dkt. No. 21-5 at 2-7. CORC received plaintiff's appeal on June 14, 2016; sent him a receipt of that appeal on September 14, 2016; and ultimately issued their determination on November 2, 2016. See id. at 1; Dkt. No. 1-1 at 27. Plaintiff has not proffered evidence that he wrote to the Franklin IGRC or CORC inquiring as to the status of his appeal. The letters plaintiff does provide predate plaintiff's appeal to CORC and do not reference any unavailability in the grievance process. See Dkt. No. 1-1 at 18-26; see also 7 N.Y.C.R.R § 701.5(d) (3)(i) ("If a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC."). Thus, the undersigned finds that CORC's approximately five month delay in rendering a decision did not excuse plaintiff from the exhaustion requirement. Cf. Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA.").

Thus, as plaintiff failed to exhaust his administrative remedies prior to commencing this action, it is recommended that defendant's motion be granted. 8

[8]    "Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint." Brown v. Napoli, 687 F.Supp.2d 295, 298 (W.D.N.Y. 2009); see also Morales v. Mackalm, 278 F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion). However, because the undersigned recommends that plaintiff's Eighth Amendment claim against defendant be dismissed on the merits, the dismissal is with prejudice. See Ferrer v. Racette, No. 9:14-CV-1370 (GTS/DJS), 2017 WL 6459525, at *13 n.18 (N.D.N.Y. Dec. 18, 2017) ("Because there is an alternative basis for dismissing the claims against these Defendants that cannot be overcome by allowing Plaintiff a chance to exhaust his administrative remedies, the dismissal is with prejudice.").

**D. Eighth Amendment**

Alternatively, C.O. Ware argues that plaintiff's Eighth Amendment claim must be dismissed "because there is no evidence in the record to suggest that [she] used excessive force against [p]laintiff." Def. Mem. of Law at 11. C.O. Ware also argues that to the extent that any force was used, it was de minimis. See id. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) ). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily

excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

**\*7** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force[;] [3] the correlation between that need and the amount of force used[;] [4] the threat reasonably perceived by the defendants[;] and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

As to the objective element, plaintiff has failed to demonstrate that the his injury was "sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9, 112 S.Ct. 995 (1992) (internal citations omitted). Plaintiff fails to establish, and there is no indication in the record, that the injury to his right wrist/hand changed or worsened as a result of May 25, 2016 pat-frisk; nor is there any support for his claim that he broke and/or fractured his right hand and/or wrist as a result of the alleged assault. See Compl. at 9; Dkt. No. 1-1 at 10. The record is clear that on May 20, 2016 plaintiff sustained a sprain to his right wrist/hand while playing basketball. See Compl. at 5; Dkt. No. 21-3 ¶ 4. Plaintiff's medical records from May 20, 2016 indicate that there were "[n]o signs of fracture or dislocation," and state that plaintiff suffered a right wrist sprain. Dkt. No. 22 ("Pl. Medical Rec.") at 68-69, 97.[9] Plaintiff contends that on May 25, 2016, C.O. Ware "threw [him] against the wall" and "grabbed [his] hand and slammed it against the wall." Compl. at 6. Affording plaintiff special solicitude, even

if the undersigned were to credit plaintiff's allegations, [10] his medical records show that immediately after the pat-frisk, plaintiff exhibited only "minimal swelling" and that his splint was still in place. Pl. Medical Rec. at 63. Non-party Dr. Cahill declared that on May 25, 2016, plaintiff reported "[n]o new injuries" to the medical staff after the alleged assault, and, therefore, it was unnecessary for the medical staff to provide treatment. Dkt. No. 21-10 ("Cahill Decl.") ¶ 18. Medical staff examined plaintiff again on May 31, 2016 following the filing of his grievance. See Pl. Medical Rec. at 60. Although plaintiff reported pain in his right thumb, the medical records note that there was no swelling or bruising. Id. On June 9, 2016, non-party orthopedist Dr. Macelaru confirmed that plaintiff had sustained a sprain, and that there were no other fractures or torn ligaments. Id. at 59. [11] Dr. Cahill declared that in his professional medical opinion, "the sprain diagnosed on June 9, 2016 was from the same injury as the sprain diagnosed on May 20, 2016 because there were no new injuries to [plaintiff's] right hand and/or wrist between May 20, 2016 and June 9, 2016." Cahill Decl. ¶ 22. Further, Dr. Cahill stated that plaintiff's hand and wrist were placed in a hard cast "to fully immobilize and protect the wrist. Because it is hard and cannot be removed by the wearer, a cast is better than a splint to prevent further injury and allow for quicker healing." Id. ¶ 25. Moreover, plaintiff's medical records reference the May 20, 2016 basketball injury as the source of plaintiff's hand/wrist injury. See Pl. Medical Rec. at 60 (detailing May 31, 2016 appointment: "Inmate has a splint for rt wrist that he received for a wrist sprain on 5/[20] from AHMC."); 95 (detailing June 9, 2016 orthopedic appointment: "Inmate injured [rt] wrist when he fell while playing basketball."). Thus, as defendant has proffered evidence that any injury plaintiff sustained to his right hand/wrist occurred as a result of the May 20, 2016 basketball injury, and plaintiff has not provided evidence to the contrary, the undersigned finds that plaintiff has failed to demonstrate a sufficiently serious injury attributable to C.O. Ware's pat-frisk for the purposes of an Eighth Amendment analysis. See Henry v. Brown, No.14-CV-2828 (LDH)(LB), 2016 WL 3079798, at *2 (E.D.N.Y. May 27, 2016) ("[W]here undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries attributed to an alleged use of excessive force, no reasonable jury could credit plaintiff's account of the happening.") (internal citation and quotation marks omitted).

9    AHMC documents incorrectly note that plaintiff sprained his left wrist. See Pl. Medical Rec. at 97.

10   C.O. Ware maintains that she did not use excessive force during the pat-frisk, nor did she use force maliciously or sadistically to cause plaintiff harm. See Dkt. No. 21-8 ("Ware Decl.") ¶¶ 32, 38.

11   Dr. Cahill declared that, in his professional opinion, it was reasonable to schedule plaintiff's follow-up appointment with the orthopedist for two to three weeks of from the date of the injury, instead of the two to three days recommended on his discharge papers, as "the [AHMC] radiology department indicated that [plaintiff] did not sustain any fractures or tears." Cahill Decl. ¶ 21 n.5.

*8   To the extent that plaintiff's discomfort or swelling can be attributed to the May 25, 2016 pat-frisk, it has been held that a plaintiff's minor injuries or discomfort are de minimis and do not constitute a sufficiently serious injury under the objective element of the analysis. See White v. Williams, No. 9:12-CV-1775 NAM/DJS, 2016 WL 4006461, at *9 (N.D.N.Y. June 22, 2016) ("Reviewing the record as a whole, and drawing all inferences in favor of Plaintiff, the Court finds that the de minimis use of force alleged by Plaintiff, and the resultant minor injuries or discomfort, are insufficient as a matter of law to satisfy the objective prong of an excessive force claim."); James v. Phillips, No. 05 Civ. 1539(PKC)(KNF), 2008 WL 1700125, at *4 (S.D.N.Y. Apr. 9, 2008) ("True, plaintiff need not show a significant injury but he must come forward with more than a de minimis use of force. In this case, there was nothing more than a shove of an inmate who was not then handcuffed. The swelling to the chin did not amount to much.").

As to the subjective element, there is no indication in the record that C.O. Ware acted "maliciously and sadistically to cause harm." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). Absent his conclusory allegations, plaintiff has failed to proffer evidence as to C.O. Ware's mental state sufficient to demonstrate that she maliciously or sadistically caused him harm. See id. C.O. Ware declared that she pat-frisked plaintiff pursuant to DOCCS Directive 4910, which allows for an inmate to be pat-frisked when going to and from program areas like the Vocational School. Ware Decl. ¶ 23. C.O. Ware further declared that because plaintiff had repeatedly refused to return to class, she performed the pat-frisk before allowing

him to leave for the infirmary in an effort to "maintain order and control." Id. ¶ 25.

Thus, in viewing the record in a light most favorable to plaintiff, the lack of evidence with respect to C.O. Ware's conduct, coupled with the absence of any injury attributable to the May 25, 2016 pat-frisk, fails to present a triable issue of fact for a jury to resolve. Accordingly, the undersigned recommends that defendant's Motion for Summary Judgment on this ground be granted. See Applegate v. Annucci, No. 9:02-CV-0276 (LEK/DEP), 2008 WL 2725087, at *18 (N.D.N.Y. July 10, 2008) (awarding summary judgment on excessive force claim where the plaintiff failed to file any response to the defendant's motion and the record lacked any evidence from which a reasonable juror could conclude that the defendant used excessive force).

**E. Qualified Immunity**

Defendants argue that, even if plaintiff's Eighth Amendment claim is substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 17-19. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F.Supp.2d 211, 230 (N.D.N.Y. 2002).

*9 Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection II.D supra, at 16-21. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F.Supp.2d at 230. Accordingly, it is recommended that defendants' motion on this ground be granted.

**III. Conclusion**

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 21) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [12]

[12]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

2018 WL 3736791

**All Citations**

Slip Copy, 2018 WL 3736791

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 2781011
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eli Pagan COUVERTIER, also
known as Eli Pagan, Plaintiff,
v.
Julie JACKSON, et al., Defendants.

No. 9:12–CV–1282 (DNH/DEP).
|
Signed June 19, 2014.

**Attorneys and Law Firms**

Eli Pagan Couvertier, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Christopher W. Hall, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Eli Pagan Couvertier brought this
action pursuant to 42 U.S.C. §§ 1983, 2000cc et seq.,
alleging deprivations of his civil rights. On May 22,
2014, the Honorable David E. Peebles, United States
Magistrate Judge, advised by Report–Recommendation
that defendants' motion for summary judgment be
granted. No objections to the Report–Recommendation
were filed.

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report–
Recommendation is accepted in whole. See 28 U.S.C. §
636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED; and

2. Plaintiff's complaint is DISMISSED in its entirety.

The Clerk is directed to serve a copy of this Decision and
Order upon plaintiff in accordance with the Local Rules
and close the file.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Eli Pagan Couvertier, a former New York
State prison inmate, commenced this action against the
State of New York, as well as individuals employed by
the state's Department of Corrections and Community
Supervision ("DOCCS"), pursuant to 42 U.S.C. §§ 1983,
2000cc et seq., alleging deprivation of his civil rights.
Plaintiff's claims stem from allegations that defendants
denied him the right to practice his chosen religion.

Currently pending before the court is a motion brought
by the defendants requesting the entry of summary
judgment dismissing all or portions of plaintiff's complaint
on three grounds, including for failure to fully exhaust
administrative remedies before filing suit. For the reasons
set forth below, I recommend that the motion be granted.

### I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case, the
    following recitation is derived from the record now
    before the court, with all inferences drawn and
    ambiguities resolved in plaintiff's favor. *Terry v.
    Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Although plaintiff has since been released from prison, at
the time of commencement of this action, on August 9,
2012, he was an inmate in the custody of the DOCCS. Dkt.
No. 1 at 1; Dkt. No. 14. At all times relevant to the events
giving rise to this action Couvertier was confined at the
Watertown Correctional Facility ("Watertown") located
in Watertown, New York. *See generally* Dkt. No. 1.

In his complaint, plaintiff alleges that while he was
incarcerated, defendants deprived him of his right to
practice his chosen religion in violation of the First
Amendment to the United States Constitution and the
Religious Land Use and Institutionalized Persons Act
("RLUIPA"). Dkt. No. 1 at 1, 4–5. Specifically, he
alleges that, although he notified corrections officers,
corrections counselors, and the Chaplain at Watertown
that he practices Taino, a Native American religion,

he was not permitted to participate in any religious observances before proving his Native American ancestry. *See generally* Dkt. No. 1. He further alleges that he was sent to a different prison facility for a mental health observation in retaliation for complaining about his religious needs, and additionally that he was verbally harassed by corrections officers. *Id.* at 4–5.

**\*2** On May 22, 2012, in accordance with the DOCCS Inmate Grievance Program ("IGP"),[2] plaintiff filed a grievance regarding his alleged religious deprivations. Dkt. No. 1 at 3; Dkt. No. 47–2 at 4–5. The Inmate Grievance Resolution Committee ("IGRC") at Watertown denied the grievance at the initial stage of the grievance process. Dkt. No. 1 at 3; Dkt. No. 47–2 at 7. Plaintiff appealed that decision to the superintendent of Watertown on or about June 6, 2012. *Id.* Following the superintendent's denial of that appeal, plaintiff sought review by the Central Office Review Committee ("CORC") on June 14, 2012.[3] Dkt. No. 1 at 3; Dkt. No. 47–2 at 9. The CORC issued its decision upholding the superintendent's determination on February 20, 2013.[4] Dkt. No. 47–3 at 6.

[2]    The IGP will be explained more completely in part III.B. of this report.

[3]    Plaintiff's appeal was received by the CORC on October 30, 2012. Dkt. No. 47–3 at 2, 4.

[4]    The denial of plaintiff's request to practice his chosen religion appears to have been based upon his failure to provide documentation reflecting his membership in the Taino Nation. *See, e.g.,* Dkt. No. 47–2. In its decision, while upholding the superintendent's determination, the CORC noted that plaintiff's request to change his religious designation had been approved, and that verification of his lineage had been properly required. Dkt. No. 47–3. Copies of e-mails between DOCCS officials, provided to the court by the plaintiff in support of his opposition to the pending motion, appear to confirm that he was recognized by the DOCCS as a Native American in or around July, 2012. Dkt. No. 50 at 12.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action with the filing a complaint and accompanying motions to proceed *in forma pauperis* ("IFP") and for a temporary restraining order on or about August 9, 2012. Dkt. Nos. 1, 2, 4. Following an initial review of plaintiff's complaint, District Judge David N. Hurd issued an order on March 8, 2013, *inter alia,* dismissing plaintiff's claims asserted against the State of New York, denying plaintiff's application for a temporary restraining order, and ordering the issuance of summonses for the remaining individual defendants.[5] Dkt. No. 15.

[5]    The individual defendants named in the complaint include the following: (1) Julie Jackson, the deputy superintendent for programs at Watertown; (2) Michael Bocciolatt, plaintiff's A.S.A.T. counselor at Watertown; (3) Kathryn Gascon, the IGP supervisor; (4) M.P. Geoghegan, the deputy superintendent of security at Watertown; (5) S. Thackston, the deputy superintendent of administration at Watertown; (6) Beth Steria, the acting deputy of programs at Watertown; (7) Diane Kogut, a corrections counselor at Watertown; and (8) Ekpe D. Ekpe, the facility superintendent at Watertown. Dkt. No. 1 at 2–3.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 47. Defendants contend that dismissal is appropriate for several reasons, including because plaintiff failed to exhaust the available administrative remedies prior to filing suit in federal court. Dkt. No. 47–4 at 3–5. The motion, to which plaintiff has responded, is now fully briefed and ripe for determination, and has been referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see*

Case 9:17-cv-00703-TJM-TWD    Document 51    Filed 12/07/18    Page 115 of 157
Couverther v. Jackson, Not Reported in F.Supp.3d (2014)

2014 WL 2781011

*also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*3** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass' n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Exhaustion of Available Administrative Remedies*
The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [6] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve

general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

[6]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. [7] *Jones v. Block,* 549 U.S. 199, 212 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete [ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [8]

[7]     In their answers, defendants have asserted failure to exhaust as a defense. *See* Dkt. Nos. 31 at 2; 34 at 2; 36 at 2; and 40 at 2.

[8]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

**\*4** In accordance with the PLRA, the DOCCS has made the IGP available to prison inmates. It is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N .Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at \*4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily

available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's IGRC has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal. [9] *Id.* at § 701.5(c)(i), (ii).

[9]      Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C.R.R. § 701.6(g)(2)). The IGP provides no mechanism for enforcing the requirement that the CORC issue a decision in thirty days. *Torres v. Carry,* 672 F.Supp.2d 338, 345 (S.D.N.Y.2009).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, at the time the plaintiff filed this action, on or about August 9, 2012, the CORC had not yet issued its decision denying plaintiff's grievance, and did not do so until February 2013. Dkt. No. 1; Dkt. No. 47–3 at 6. Thus, plaintiff failed to fully exhaust the available administrative remedies prior to filing this action. *See Partee v. Grood,* No. 06–CV–1552, 2007 WL 2164529, at *3 (S.D.N.Y.2007) ("[A]n inmate/plaintiff's claim is not exhausted until he appeals to the CORC and receives a final decision regarding his grievance."). The fact that complete exhaustion has now occurred does not cure this defect. *See Burgos v. Craig,* 307 F. App'x 469, 471 (2d Cir.2008) ( "Assuming arguendo that Plaintiff–Appellant subsequently exhausted his administrative remedies [after filing suit], that is not enough to save his suit, because he is required to have properly exhausted before he sues."); *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516 (2002), (holding that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA's exhaustion requirement).

**\*5** Plaintiff's failure to exhaust, however, does not warrant dismissal of his complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a threepart test for determining whether dismissal of an inmate-plaintiff's complaint is justified for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F .3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

With respect to the first factor, there is no dispute that the IGP was available to plaintiff in light of the fact that he filed a grievance, received responses from the appropriate officials, and filed his appeals. Dkt. No. 1 at 3; Dkt. No. 47–2 at 4–5, 7,9; Dkt. No. 47–3 at 6. In addition, plaintiff does not allege, and there is nothing in the record suggesting that defendants should be estopped from pursuing the defense of failure to exhaust.

Turning to the third factor, liberally construed, plaintiff argues that the court should conclude that special circumstances exist to excuse him from his failure to exhaust. Dkt. No. 50. More specifically, he contends that DOCCS officials did not comply with the time limitations set forth in the IGP and improperly delayed the filing of his appeal to the CORC. *Id.* at 1. In support of this position, plaintiff has submitted an e-mail dated July 17, 2012, from an individual named Julie A. Dennis, identified as IGP Coordinator, in which Dennis indicated to defendant Gascon that the CORC is "at least five months behind" and that plaintiff's grievance had not yet been "entered into the system." *Id.* at 10. An administrative delay in processing or deciding an inmate's appeal of a grievance, however, does not constitute a special circumstance justifying excusal of the exhaustion requirement. *See Ford v. Smith,* No. 12–CV–1109, 2014 WL 652933, at *3 (N.D.N .Y. Feb. 19, 2014) (McAvoy, J., *adopting report and recommendation by* Dancks, M.J.) ("CORC's failure to act within the time frame set out in the regulations does not constitute special circumstances justifying the failure to exhaust.").

**\*6** In sum, because plaintiff failed to fully exhaust the available administrative remedies prior to filing this action, and there is nothing in the record now before the court to suggest he should be excused from that requirement, I recommend that defendants' motion be granted.[10]

[10] In light of my recommendation that the complaint be dismissed due to plaintiff's failure to exhaust, I

have not considered the other grounds for dismissal contained in defendants' motion.

## IV. *SUMMARY AND RECOMMENDATION*

Despite being aware of the administrative remedies available to him, plaintiff commenced this action before he had fully exhausted them. Because an administrative delay in reviewing a grievance does not eliminate that requirement, I conclude that plaintiff's failure to exhaust the available administrative remedies prior to filing suit cannot be ignored. Based on the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 47) be GRANTED; and it is further

RECOMMENDED that plaintiff's complaint be DISMISSED, without prejudice, based upon his failure to fully exhaust available administrative remedies before commencing this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed May 22, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2781011

---

**End of Document**
© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4478988
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John H. WHITE, Plaintiff,

v.

Raymond DRAKE, Correctional Officer,
Upstate Correctional Facility, Defendant.

No. 10–CV–1034 (GTS/DRH).
|
Aug. 11, 2011.

**Attorneys and Law Firms**

John H. White, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NYk, for Defendant.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

*1  Plaintiff pro se John H. White ("White"), an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Raymond Drake ("Drake"), a corrections officer employed by DOCCS, violated his constitutional rights under the Eighth Amendment when Drake subjected him to excessive force. Compl. (Dkt. No. 1). Presently pending is Drake's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. Nos. 12, 21, 40. White initially opposed the motion, Dkt. Nos. 17, 25, but now appears to agree that this action should be dismissed without prejudice. Dkt. Nos. 41, 42. For the following reasons, it is recommended that Drake's motion be granted and that the complaint be dismissed without prejudice.

**I. Background**

The facts are related in the light most favorable to White as the non-moving party. See Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999).

On June 27, 2010 while incarcerated at Upstate Correctional Facility, White was notified by a corrections officer that he had a visitor. Dkt. No. 1–1 at 1. After waiting for approximately thirty minutes without being summoned for the visit, White asked the other officers why he was not being taken to his visitor. Id. An officer responded that White's visit was cancelled because his visitor was denied entrance. Id. Drake then approached White's cell door and informed him that his visitor was in possession of drugs and had been apprehended by the local police. Id.; Compl. ¶ 6. Drake then walked away from White's cell, as White voiced charges of "official misconduct" while lying on the floor and speaking through the open area of his cell door. Dkt. No. 1–1 at 1. Drake then returned to the cell and "deliberately kicked the [cell] door ... causing injury to [White's] mouth, nose, [and] right jaw." Id.; see also Compl. ¶ (6). White's nose began to bleed and he experienced immediate pain in his jaw. Dkt. No. 1–1 at 1. White then stood up and asked Drake why he would intentionally kick the cell door when he knew that White was lying next to it. Dkt. No. 1–1 at 2. Drake responded that he did so because he was aware that White was making a record of the incident and "could do it." Id.

That same day, White filed a grievance complaining that he had been (1) treated unfairly because he was black; (2) denied notification; (3) misled concerning the details of his visitor; and (4) subjected to excessive force. Dkt. No. 1–1 at 2–4. White's grievance was denied and he appealed administratively. [2] Compl. ¶ 4(b). However, White never received a final determination from DOCCS after his last appeal. Id. ¶ 4(b)(I). White "wr [ote] to the Commissioner concerning the delay ... no one ha[d] responded thus far [and White felt that he was] be[ing] denied any responses." Id. ¶ 4(b)(ii). On August 9, 2010, White filed the present action. Compl. at ¶ 8. On October 7 and November 3, 12, and 20, 2010, White wrote to the undersigned to apprise the court that he had still not received a final determination of his grievance. Dkt. Nos. 10, 11, 13, 22. [3]

2    "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

3    On December 1, 2010, Drake filed a supplemental memorandum of law in this action seeking dismissal of White's claim for White's failure to exhaust his administrative remedies. Dkt. No. 21. On July 25, 2011, the present action was stayed to allow DOCCS or CORC to file a decision regarding White's pending administrative appeal. Dkt. No. 39. On August 1, 2011, Drake responded, providing the Court with a copy of CORC's denial of White's grievance, dated November 24, 2010. Dkt. No. 40.

## II. Discussion

**\*2**  White contends that his constitutional rights were violated when Drake harassed and subjected him to excessive force. Drake moves for dismissal because (1) White has failed to exhaust his administrative remedies, (2) there are no merits to White's constitutional claim, and (3) Drake is entitled to qualified immunity. [4]

4    It is unnecessary to address the second and third grounds of Drake's motion in light of White's acknowledged failure to exhaust administrative remedies and those grounds will not be further addressed herein.

### A. Legal Standard

*Rule 12(b)(6)* authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173

L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Failure to Exhaust

Under *42 U.S.C. § 1997e(a),* an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 83, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for

all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

**\*3** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)).

> A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not actually available; (2) defendants have forfeited their affirmative defense of non-exhaustion or are estopped from raising such a defense because of their own actions; or (3) special circumstances exist, such as a reasonable misinterpretation of [DOCCS] regulations.

*Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009) (citations omitted).

Exhaustion for an inmate in DOCCS custody is generally achieved through the IGP). *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701 .1, *et seq.; see also* n. 2 *supra.* Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit. *Torres,* 672 F.Supp.2d at 344; *see also* N .Y. Comp.Codes R. & Regs. tit. 7 § 701.5(d)(2)(ii) ("The CORC shall review each appeal, render a decision on the grievance, and transmit its decision ... within 30 calendar days").

In this case, the CORC did not render its decision on the final stage of White's appeal until after White had commenced this action. Thus, exhaustion was completed during the pendency, not prior to the commencement of, this action. The facts are clear that White complied with the IGP and filed a final appeal to CORC. The facts also demonstrate that, after White commenced the present action, the final determination was rendered by CORC, thus terminating the administrative process. There are no allegations that White did not know how the grievance process worked or that it was unavailable to him. Accordingly, the question presented by this motion

is whether White satisfied the exhaustion requirement in these circumstances.

"The Courts of Appeals for the First, Second, Third, Seventh, Tenth, Eleventh, and D[istrict of] C[olumia] ... have held that § 1997(e) requires exhaustion before the filing of a complaint and that a prisoner does not comply with this requirement by exhausting available remedies during the course of litigation." *McKinney v. Carey,* 311 F.3d 1198, 1199 (9th Cir.2002); *see also Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) ("Subsequent exhaustion after suit is filed therefore is insufficient.") *abrogated in part on other grounds by Porter,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12. This is because the statutory "language clearly contemplates exhaustion *prior* to the commencement of the action as an indispensable requirement [and e]xhaustion subsequent to the filing of the suit will not suffice." *Medina–Claudio v. Rodriguez–Mateo,* 292 F.3d 31, 36 (1st Cir.2002) (citations omitted); *see also* 42 U.S.C. § 1997(e) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner ... until such administrative remedies as are available are exhausted."); *Perez v. Wisconsin Dep't of Corr.,* 182 F.3d 532, 534–35 (7th Cir.1999) (explaining that "Congress could have written a statute making exhaustion a precondition to judgment, but it did not. The actual statute makes exhaustion a precondition to *suit.*").

**\*4** Where the administrative process has been started, but has yet to conclude, courts have dismissed federal claims without prejudice and granting leave to reopen when the administrative process has ceased and the result is a denial of the inmate's grievance. *Torres,* 672 F.Supp.2d at 345–46; *see also Neal,* 267 F.3d at 123 (explaining that inmates' claims which are "dismissed without prejudice, ... may simply [be] re-file[d] ... after fully complying with the exhaustion requirement."); *Chalif v. Spitzer,* No. 05–CV–1355, 2008 WL 1848650, at \*13 ("The fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing.") (citations omitted). Therefore, it is clear that the case law requires White's complaint to be dismissed without prejudice to filing a new action for a failure to fully exhaust his administrative remedies prior to filing the instant complaint.

Thus, White will be required to re-commence this action and re-serve Drake even though the exhaustion requirement has now been satisfied and where the delay

in completing the administrative process was apparently caused solely by DOCCS delay at the final appeal stage. This inefficiency imposes additional burdens and costs not only on White and Drake but also on the Court. This factor has already been contemplated, and rejected, by various courts, including the Second Circuit.

> While it is true that requiring dismissal may, in some circumstances, occasion the expenditure of additional resources on the part of the parties and the court, it seems apparent that Congress has made a policy judgment that this concern is outweighed by the advantages of requiring exhaustion prior to the filing of suit ... [Therefore r]equiring dismissal without prejudice when there is no presuit exhaustion provides a strong incentive that will further these Congressional objectives; permitting exhaustion *pendente lite* will inevitably undermine attainment of them.

*McKinney,* 311 F.3d at 1200–1201; *Neal,* 267 F.3d at 123 (acknowledging that in an individual case, requiring dismissal for failure to exhaust may be judicially inefficient but ultimately concluding that exhaustion must be mandatory because a policy of generally "allowing prisoner suits to proceed, so long as the inmate eventually fulfils the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court."). Thus, arguments of judicial inefficiency or additional expense do not serve as compelling reasons for denying defendant's present motion.

Accordingly, Drake's motion to dismiss for failure to exhaust should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Drake's motion to dismiss (Dkt. No. 12) be **GRANTED** and the complaint **DISMISSED WITHOUT PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4478988

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 826850
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Kiaza LOCCENITT, Plaintiff,
v.
LABRAKE, et al., Defendants.

14-CV-6703-FPG
|
Signed 02/12/2018

**Attorneys and Law Firms**

Kiaza fLoccenitt, Romulus, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

**\*1** *Pro se* Plaintiff Kiaza Loccenitt brought this 42
U.S.C. § 1983 action against Defendants Corrections
Officers LaBrake, Vankelburg, Sagriff, Maloy, Cook,
Ferguson, Sergeant Brinkerhoff, and Nurse Jones,
alleging that they violated his Eighth Amendment rights.
ECF No. 1. Defendants moved for summary judgment
and to preclude Plaintiff from calling inmate Henry
Benitez as a trial witness. ECF Nos. 37, 39. For the
reasons that follow, Defendants' Motion for Summary
Judgment is GRANTED and this case is dismissed
without prejudice because Plaintiff did not exhaust his
administrative remedies. Plaintiff is directed to re-file
his complaint as a new action. Defendants' Motion to
Preclude is DENIED AS MOOT.

**BACKGROUND**

Plaintiff alleges that Defendants Corrections Officers
LaBrake, Vankelburg, Maloy, Ferguson, Sagriff, and
Cook assaulted him in his SHU cell. Plaintiff claims that
he lost consciousness during the attack and was choked,
kicked, punched, jumped on, slammed into the ground,

and had his eyes gouged. Plaintiff also alleges that he was
denied medical attention for his various injuries, including
vision impairment, impaired ambulation, acute chronic
back pain, bruises, and swelling.

At issue, for purposes of this motion, is what date the
alleged incident occurred and whether Plaintiff followed
the grievance procedure before commencing this action.
Plaintiff's Complaint contains conflicting dates for the
incident—July 27, 2014 and August 27, 2014. ECF No.
1 at 2, 3. Plaintiff claims that he filed a grievance with
the Inmate Grievance Resolution Committee ("IGRC"),
which was denied, and that he appealed that decision
to the Central Office Review Committee ("CORC"). *Id.*
at p. 6. Plaintiff provided the same conflicting dates
in his deposition testimony. Defense counsel repeatedly
asked Plaintiff to confirm that the incident occurred on
August 27, but counsel never pointed out that Plaintiff's
Complaint contained conflicting dates.

Defendants argue that regardless of which date the
alleged incident occurred, Plaintiff failed to exhaust his
administrative remedies—either by failing to file an initial
grievance or by prematurely filing this action before
CORC issued a final decision—and that the Complaint
should be dismissed. In opposition, Plaintiff asserts
that the incident occurred on July 27, and that any
inconsistency regarding the date of the incident is a
harmless error and should be excused. *See* ECF No. 41-1
at 1-2, 5; ECF No. 41-2 at 1-2, 5-6, 16.

**LEGAL STANDARD**

Summary judgment is appropriate when the record shows
that there is "no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a
matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning
material facts are genuine where the evidence is such
that a reasonable jury could return a verdict for the
non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986). In deciding whether genuine issues
of material fact exist, the court construes all facts in
a light most favorable to the non-moving party and
draws all reasonable inferences in the non-moving party's
favor. *See id.* at 255. The moving party "bears the initial
responsibility of informing the district court of the basis
for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. When the moving party has met this initial responsibility, the non-moving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e)(2).

### DISCUSSION

**\*2** Defendants argue that, regardless of whether the incident occurred on July 27 or August 27, Plaintiff failed to exhaust his administrative remedies and therefore the Complaint must be dismissed. They claim that if the incident occurred on August 27, Plaintiff cannot show that he filed a grievance or appealed it. Alternatively, if the incident occurred on July 27 and Plaintiff filed a grievance and appealed it, Plaintiff commenced this action prematurely—*i.e.* before receiving a final determination from CORC—and therefore did not exhaust his administrative remedies.

As an initial matter, the Court finds it more plausible that the incident occurred on July 27, and that Plaintiff filed a grievance and appealed its denial to CORC. While there are inconsistent dates throughout Plaintiff's filings, Plaintiff asserts that the incident occurred on July 27 in his Complaint and that he filed a grievance that was denied and appealed to CORC. ECF No. 1 at 2, 6; ECF No. 41-1 at 18-19, 31. Indeed, Defendant LaBrake filed an inmate misbehavior report for an incident that occurred in Plaintiff's SHU cell on July 27 and this report corroborates certain allegations contained in Plaintiff's Complaint, including the time and date of the incident and that force was used against Plaintiff. ECF No. 41-1 at 27-30. While Defendants dispute that Plaintiff followed the grievance procedure, even their submissions show that Plaintiff filed a grievance for "assault in retaliation" on August 11, 2014 that he appealed to CORC, which issued a final determination on December 17, 2014. *See* ECF No. 39-1 at 2; ECF No. 39-3 at 2, 6.

Plaintiff testified that the incident occurred on August 27, but only after counsel for Defendants "repeatedly asked him to confirm whether the date of the incident was in fact August 27, 2014." ECF No. 39-5 at 1; ECF No. 39-4 at 7, 10, 13. Plaintiff also testified that his Complaint "stems from [Plaintiff], basically, making complaints, grievances of incidents on CO LaBrake" and that when he filled

out his grievance he referred to LaBrake's misbehavior report, which is dated July 27. ECF No. 39-4 at 12. Plaintiff's grievance states that the incident occurred on August 27, however, IGRC stamped the grievance as received on August 11, 2014. ECF No. 41-1 at 18. Plaintiff recognized the inconsistent dates and asserts that the incident occurred July 27. *See* ECF No. 41-1.

A reading of Plaintiff's Complaint, the inmate misbehavior report, Plaintiff's grievance, and CORC's final determination all suggest that the incident likely occurred on July 27, that Plaintiff filed a grievance, and that he appealed the denial to CORC. The parties' submissions make clear, however, that Plaintiff filed his Complaint on December 11, 2014 before CORC issued its final determination on December 17, 2014. Accordingly, Plaintiff's Complaint must be dismissed without prejudice because he did not exhaust his administrative remedies. [1]

[1]    The Court notes that even if the incident occurred on August 27, summary judgment would still be appropriate because Plaintiff did not grieve a use of force or retaliatory incident occurring in August. *See* ECF No. 39-3 at 6.

In New York, prison inmates must follow a three-tiered grievance procedure. An inmate must first file a grievance with the IGRC. *See* N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1), (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the CORC. *Id.* § 701.5(d). Here, Plaintiff filed a grievance and appealed it to CORC.

**\*3** "The Prison Litigation Reform Act of 1995 ("PLRA") mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)). The Supreme Court has interpreted the PLRA to require exhaustion of administrative remedies in all circumstances as long as those remedies were actually available to the inmate. *Id.* at 1856-58. Thus, pursuant to the PLRA, the prisoner must exhaust his administrative remedies before he files a lawsuit, and it is insufficient if he completes the exhaustion process after he files the lawsuit. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001), *abrogated in part on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002). "Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of

the evidence that a plaintiff has failed to exhaust his available administrative remedies." *Casey v. Brockley*, No. 13-CV-01271 DNH/TWD, 2015 WL 8008728, at *4 (N.D.N.Y. Nov. 9, 2015), *report and recommendation adopted*, 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015).

Plaintiff instituted this action six days before CORC issued a final determination. It is well settled that "[r]eceiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies are exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice." *Neal*, 267 F.3d at 116; *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-0124 GTS/DJS, 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016), *aff'd*, 692 Fed.Appx. 668 (2d Cir. 2017) (dismissing complaint filed eight months before CORC decision for failure to exhaust, even where delay in rendering decision was due to clerical error in transmitting appeal to CORC); *Burgos v. Craig*, 307 Fed.Appx. 469, 470-71 (2d Cir. 2008) (noting that "completing the exhaustion requirements only after filing suit is insufficient"); *Casey*, 2015 WL 8008728, at *5 (same); *see also Fofana v. Moss*, No. 15-CV-0188, 2016 WL 1237796, at *3 (N.D.N.Y. Mar. 4, 2016) (holding that claims in complaint received by the Clerk's office one day after CORC issued its decision were properly exhausted).

Plaintiff argues that his Complaint was properly filed after he exhausted his administrative remedies because CORC did not render a decision within 30 days in accordance with the regulations. ECF No. 41-2 at 6. However, a delay in CORC's rendering a decision on Plaintiff's appeal is not a defense to the exhaustion requirement. *Gizewski*, 2016 WL 3661434, at *13 (citing *Casey*, 2015 WL 8008728, at *6). Nor would a post-exhaustion amendment of Plaintiff's Complaint cure the exhaustion defect, which existed when the action was commenced. *Guillory v. Haywood*, No. 13-CV-01564 MAD, 2015 WL 268933, at *10 (N.D.N.Y. Jan. 21, 2015). Accordingly, Plaintiff's Complaint must be dismissed without prejudice because he did not exhaust his administrative remedies.

The Second Circuit "has recognized that failure to exhaust administrative remedies is usually a 'curable procedural flaw' that can be fixed by exhausting those remedies and then reinstituting suit." *Casey*, 2015 WL 8008728, at *6 (quoting *Neal*, 267 F.3d at 123). Indeed, Plaintiff's failure to exhaust "is merely a temporary procedural flaw." *Allah*

*v. Annucci*, No. 16-CV-1841 KMK, 2017 WL 3972517, at *6 (S.D.N.Y. Sept. 7, 2017) (quoting *Wagnoon v. Johnson*, No. 02-CV-10282 RCC/GWG, 2004 WL 583764, at *2 (S.D.N.Y. Mar. 23, 2004) (dismissing plaintiff's case without prejudice so that he could reinstitute suit)). **Thus, Plaintiff is instructed to immediately re-file his complaint as a new action. He must also submit an *in forma pauperis* motion and prison authorization, or pay the filing and administrative fees ($400).** The Court notes that, while the statute of limitations for Section 1983 claims is three years, federal courts borrow and apply the state's tolling rules. *Bd. Of Regents of Univ. of State of New York v. Tomanio*, 446 U.S. 478, 487-491 (1980). Indeed, New York Civil Practice Law and Rules § 205(a) "tolls the statute of limitations during the pendency of an action that has been terminated for what is usually a curable defect." *Allway v. McGinnis*, 362 F. Supp. 2d 390, 393 (W.D.N.Y. 2005) (citing *Cecere v. County of Westchester*, 814 F. Supp. 378, 381 (S.D.N.Y. 1993)); *see also Gashi v. County of Westchester*, No. 02 Civ 6934, 205 WL 195517, *9 (S.D.N.Y. Jan 27, 2005) (finding that dismissal without prejudice for failure to exhaust administrative remedies pursuant to the PLRA "is a manner of termination not listed as excluded from the protection of § 205(a)").

## CONCLUSION

**\*4** For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 39) is GRANTED and their Motion to Preclude (ECF No. 37) is DENIED AS MOOT. The Complaint is dismissed without prejudice, and the Clerk of Court is directed to close this case. Plaintiff is instructed to immediately re-file his complaint as a new action. He must also submit an *in forma pauperis* motion and prison authorization, or pay the filing and administrative fees ($400). These items should be mailed to The United States District Court WDNY, Clerk's Office, US Courthouse, 100 State Street, NY 14614.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and that leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 826850

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3039687
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Thomas Adam Henderson, Plaintiff,

v.

Anthony Annucci, et al., Defendants.

14-CV-445A
|
Signed 03/14/2016

## REPORT, RECOMMENDATION AND ORDER

JEREMIAH J. MCCARTHY, United States Magistrate
Judge

**\*1** This case has been referred to me by Hon. Richard J.
Arcara for supervision of pretrial proceedings, including
the preparation of a Report and Recommendation
on dispositive motions. [23]. [1] Plaintiff Thomas Adam
Henderson brought this action pursuant to 42 U.S.C.
§ 1983 claiming that his civil rights were violated when
the defendants allegedly assaulted him on September 10,
2013, October 22, 2013 and May 16, 2014. Complaint [1],
pp. 11,13. Before me are defendants' motion to dismiss
[22], plaintiff's motion to amend the complaint [31], and
plaintiff's motion for appointment of counsel [32].

[1]    Bracketed references are to the CM/ECF docket
entries.

For the reasons stated below, I recommend that
defendants' motion to dismiss be granted in part and
denied in part, the plaintiff's motion to amend be granted
in part and denied in part, and that plaintiff's motion for
the appointment of counsel be denied.

## BACKGROUND

Plaintiff commenced this civil rights action pursuant to 42
U.S.C. § 1983 alleging that while he was incarcerated at the
Attica Correctional Facility, Correction Officer Dunford
sexually assaulted him during a frisking on September
10, 2013. He asserts that after being cut down from a
suicide attempt, Officer Dunford pulled up the waistband

of his underwear so as to give him a "wedgie", and then
swiped his fingers between plaintiff's butt cheeks "roughly
pressing" against his anus. Complaint [1], p. 11. After
complaining about this conduct, plaintiff states that he
was informed that this procedure is known as a "credit
card check", performed to determine if an inmate is hiding
weapons. Id. at 11, 13, 14, 17. Plaintiff argues that the
procedure constitutes a sexual assault.

He also asserts that the "credit card check" procedure was
performed on him twice during a pat frisk on October
22, 2013 by Corrections Officer J. Hoinski. [2] Id. at p. 13.
Finally, plaintiff alleges that Correction Officer B. Naab
performed the "credit card check" on him on May 16,
2014. Id. at pp. 16-17.

[2]    The allegations in the plaintiff's original complaint
attribute this conduct to "John Doe Number 1". Id. at
13. John Doe Number 1 was later identified as Officer
Hoinski. *See* Decision & Order of Hon. Elizabeth A.
Wolford dated December 29, 2014 [11].

Plaintiff claims that he complained to New York State
Department of Corrections and Community Supervision
("DOCCS") Commissioner Anthony Annucci, DOCCS
Chief Inspector General Vernon J. Fonda, Attica
Correctional Facility Superintendent Mark L. Bradt, and
others about the conduct which he considered to be sexual
assaults. Id. at pp. 12, 15. He argues that these supervisory
defendants failed to properly investigate and respond to
his complaints in violation of his Eighth Amendment
rights. Id. at 12. [3]

[3]    Plaintiff's original complaint asserted various other
claims against numerous defendants which did not
survive the initial screening in this case. Plaintiff's
claims that defendants failed to comply with the
requirements of the Prison Rape Elimination Act of
2003 ("PREA") were dismissed because PREA does
not create a private right of action. Decision and
Order of Hon. Richard J. Arcara filed November
17, 2014 ("November 17, 2014 Decision & Order")
[7], p. 7. Also, plaintiff's claims based upon a
failure to investigate, failure to intercede, harassment,
retaliation, and failure to provide medical treatment
against defendants Superintendent Dale Artus, Capt.
Brown Lieut.Kaczmarek, Sgt.Olles, Sgt. Brown,
Sgt.Diehl, Officer Higgins, Officer Andrews, Officer
Sippel, and Nurse Kekich were all dismissed. Id. at
pp. 11-19.

**\*2** In his original complaint, plaintiff stated that he did not file a grievance as to any of the incidents because he did not believe he had to file a grievance. Instead, he contended that he complied with DOCCS Directive 4028A. Id. at pp. 5, 19. The defendants move to dismiss on the grounds that plaintiff failed to exhaust his administrative remedies. Motion to Dismiss [22-1], p. 4. Subsequently, the plaintiff sought leave to amend his Complaint to allege that he did, in fact, file a grievance regarding one of the three "credit card check" incidents. Plaintiff's Motion to Amend [31], p.3. The defendants oppose that motion.

## DISCUSSION

### A. Standard of Review

The defendants move to dismiss the claims in the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. The court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff and against the defendants. See Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck, 463 F.2d 620 (2d Cir. 1972). The court is required to read the complaint broadly and with great latitude on a motion to dismiss. Yoder v. Orthomolecular Nutrition Institute, 751 F.2d 555, 558 (2d Cir. 1985). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient". Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Supreme Court has clarified the pleading standard required to withstand a motion to dismiss. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its experience and common sense". Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (internal citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief". Id.; see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565-66 (2007) (factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)). Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions. Iqbal, 556 U.S. at 680-81. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth' ". Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). The court must then consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief. Iqbal, 556 U.S. at 681; see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

Thus, while the pleading standard under Fed. R. Civ. P. ("Rule") 8 does not require detailed factual allegations, it demands more than unadorned, conclusory accusations. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action is not sufficient. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility requirement is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Iqbal, 556 U.S. at 681.

### B. Exhaustion of Administrative Remedies

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states in relevant part, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted". 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong". Porter v. Nussle, 534 U.S. 516, 532 (2002).

"Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case". Nussle, 534 U.S. at 524-25. The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court" (id. at 528), and clarify the contours of the controversy once it is litigated. Id. at 525. In Woodford v. Ngo, 548 U.S. 81, 83-84, 90, 126 (2006), the Court held that the exhaustion requirement of the PLRA cannot be satisfied by an "untimely or otherwise procedurally defective administrative grievance or appeal", and that the PLRA requires "proper exhaustion", which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)".

Although exhaustion under the PLRA is an affirmative defense, not a jurisdictional requirement, see Jones v. Bock, 549 U.S. 199, 211 (2007), a demonstrated failure to exhaust warrants dismissal of the plaintiff's claims. Jones, 549 U.S. at 216; see also Wilson v. Yussuff, 2015 WL 77433, *5 (E.D.N.Y. 2015) (holding that court must dismiss action where inmate did not exhaust administrative remedies).

However, the exhaustion requirement may be excused under the following circumstances: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement". Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).

**C. Available Grievance Procedure**

DOCCS maintains a three-tiered administrative review and appeals system for prisoner grievances. See N.Y. Comp. Codes R. & Regs. § 701.5. Prior to pursuing a § 1983 action in federal court, a prisoner in the DOCCS system must exhaust all three levels. See Porter, 534 U.S. at 524. First, an inmate may file an inmate grievance complaint form or a written grievance (if forms are not available) with the Inmate Grievance Resolution Committee ("IGRC"). See 7 N.Y.C.R.R. § 701.5(a). Second, if the inmate is dissatisfied with the IGRC

decision, he may appeal to the prison superintendent. Id., § 701.5(c). Finally, DOCCS permits an inmate to appeal the superintendent's written decision to the Central Office Review Committee ("CORC"). Id., § 701.5(d).

On May 15, 2014, DOCCS amended Directive 4040, relating to sexual abuse and sexual harassment complaints. As revised, Directive 4040 states:

> "The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below."

**\*4** See DOCCS Directive 4040, Plaintiff's Opposition to Motion to Dismiss, [27], Exhibit B, p.1.

Under the revised procedure, an allegation of sexual abuse shall be deemed exhausted for purposes of the PLRA "if official documentation confirms that:

(1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or

(2) A third-party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation."

Id.

**D. Plaintiff's Efforts to Exhaust as to Defendants Dunford, Hoinski and Nabb**

The defendants' motion to dismiss is based entirely on the argument that plaintiff failed to exhaust his administrative remedies by filing grievances relating to the three "credit card check" incidents set forth in the complaint. Defendants' Motion to Dismiss [22]. As noted above, plaintiff's original complaint states that he did not utilize the three-tiered administrative grievance procedure to complain about the September 10, 2013, October 22, 2013 and May 16, 2014 incidents. Complaint [1], pp. 5, 19. Instead, plaintiff argued that he was not required to utilize the grievance procedure because of Directive 4028A. Id. In response to the motion to dismiss, plaintiff also points to the revised language of Directive 4040 as eliminating the need to follow the inmate grievance procedure. Plaintiff's Opposition to Motion to Dismiss [27], p. 5.

Directive 4028A addresses sexual abuse prevention and intervention (staff on inmate). The argument that Directive 4028A eliminated the need to utilize the inmate grievance procedure was asserted, but rejected, in Omaro v. Annucci, 68 F. Supp.3d 359 (W.D.N.Y. 2014).[4] In that case, Omaro's claim that he was sexually assaulted in connection with the pat-frisk procedure was remarkably similar to the claims asserted in this case. Id. at p. 361. In response to the defendant's motion that plaintiff failed to exhaust his administrative remedies, Omaro argued that pursuant to PREA and Directive 4028A, he was not required to utilize the grievance procedure with respect to his sexual assault claim. Id. at 364-65. The court held that nothing in the text or legislative history of PREA suggested that it was intended to abrogate the PLRA's exhaustion requirement. Id. at 364 citing Porter v. Howard, 531 Fed. Appx. 792, 793 (9th Cir. 2013) (plaintiff provides no support for his contention that he was excused from the requirement that he file an administrative grievance by operation of PREA).

[4]    The plaintiff in Omaro was an Attica inmate Derrick R. Omaro, 92A0608. Omaro, 68 F. Supp. 3d. at 359. Henderson, identifies inmate Omaro as one of his witnesses in this case. Complaint [1], p. 19.

Similarly, the court in Omaro determined that nothing in the text of Directive 4028A suggested that it was intended to limit or abrogate the administrative remedies available to an inmate who alleged sexual misconduct by a staff member. Omaro, 68 F. Supp. 3d at 365. The court found that Directive 4028A addressed the manner in which a complaint of staff-on-inmate sexual misconduct may be initiated and obligations of the staff following

such a complaint, but did not establish or address an inmate's administrative remedies once such a complaint has been made. Id. at p. 366.[5] Thus, the court held that the plaintiff's unexhausted claims were precluded by the PLRA. Id. at p. 368.

[5]    Plaintiff argues that because claims of sexual abuse are sensitive and should be dealt with confidentially, he should be excused from the exhaustion requirement. Plaintiff's Memorandum of Law [27], pp. 4-6. He provides no authority in support of this proposition. While the interests of confidentiality may have motivated the revision of Directive 4040, as discussed in Omaro, prior to the May 15, 2014 revision the plaintiff was required to utilize the inmate grievance process. Omaro, 68 F. Supp. 3d. at p. 367.

*5    Unlike Omaro, however, this case involves the application of the revised language in Directive 4040, and to that extent, appears to be a case of first impression. Omaro did not discuss the revised language of Directive 4040, which was raised for the first time in this case by the plaintiff in response to the defendants' motion to dismiss. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Neither party has presented authority interpreting the revised language of Directive 4040. In their reply, defendants do not dispute that Directive 4040, as revised, alleviates an inmate's need to exhaust the normal grievance procedure with respect to sexual assault and sexual harassment claims. Instead, the defendants argue that the revised language of Directive 4040 does not apply here because the plaintiff's allegations are insufficient to constitute a sexual assault under PREA. Defendants Reply in support of Motion to Dismiss [28], pp. 3-4. Defendants construe plaintiff's claims as merely challenging the "pat-frisk" procedure, and argue that such a claim would have to be pursued in the inmate grievance process through exhaustion to satisfy the PLRA. Id. at pp. 5-6.

Plaintiff's claims relating to the "credit card check" procedure as set forth in the complaint, however, are presented as sexual assault claims. For example, plaintiff alleges that "Defendant Dunford's sexual abuse cause[d] me pain, suffering and mental distress". Complaint [1], p. 11, ¶ 2. He claims that he complained to defendant Annucci and others regarding the "sexual misconduct of staff-on-inmate sexual abuse". Id. at p. 12, ¶6. Plaintiff characterizes the defendants' conduct as constituting

sexual assault or sexual abuse throughout his complaint. Id. at p. 13, ¶¶10, 13, 14, 15; p. 14, ¶¶ 16, 17, 18, 19, 21; p. 15, ¶¶ 22, 23, 24, 26, 27; p. 16, ¶¶ 29, 30, 31; p. 18, ¶¶ 43, 44, 45, 46. The conduct being challenged involves corrections staff contacting plaintiff's genitals, which, depending upon the manner in which performed, could arguably fall within the scope of conduct that can be construed as "sexual" in nature.

Whether these allegations by plaintiff are sufficient to establish a "sexual assault" or "sexual harassment" under PREA (or the Fourth and Eighth Amendments) is not currently before me. The defendants' motion to dismiss raised solely the issue of whether plaintiff had exhausted the inmate grievance procedure. Defendants' Motion to Dismiss [22]. The defendants did not put plaintiff on notice that their argument in support of dismissal was based upon the fact that plaintiff's allegations were insufficient to constitute sexual conduct under PREA. In any event, while I take no position as to whether the plaintiff's allegations allege sexual conduct sufficient to state a claim under the Fourth or Eighth Amendments, [6] inasmuch as they are presented as "sexual assault" claims, the revised language of Directive 4040 applies. [7] An inmate would be placed in an untenable position if he were required to adjudicate whether his allegations of sexual assault were sufficient under PREA prior to relying upon the language in Directive 4040 alleviating the need to utilize the normal grievance procedure. [8] Here, plaintiff presented his claims as sexual assault claims. Although the sufficiency of those claims is uncertain, the language in Directive 4040 clearly states that an inmate need not utilize the grievance procedure to exhaust such claims prior to bringing a federal court action for redress.

[6]    With respect to the plaintiff's pat-frisk claims, Judge Arcara dismissed the claims to the extent that they were asserted under PREA, but allowed them to proceed as asserted under the Fourth and Eighth Amendments. November 17, 2014 Decision & Order [7], p. 7. The defendants are free to file a motion to dismiss or for summary judgment challenging the sufficiency of the plaintiff's allegations with respect to any surviving Fourth and Eighth Amendment claims.

[7]    Although the revised language in Directive 4040 refers to PREA, assuming notice was provided as set forth in the directive, Directive 4040 states that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment

to satisfy [the PLRA] exhaustion requirement ... before bringing a lawsuit regarding an allegation of sexual abuse". Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Thus, this language applies to sexual assault claims brought by an inmate under the Fourth and Eighth Amendments.

[8]    It is likely that by the time there was a resolution, either administrative or judicial, as to whether the plaintiff's claims qualify as a "sexual assault" under PREA, an inmate's time to commence the typical grievance process would have passed.

**\*6** Directive 4040 was revised with respect to sexual assault claims on May 15, 2014. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Although the defendants note that the amendment has not been incorporated into the New York Code, Rules and Regulations (see 7 N.Y.C.R.R. 701, et seq.), they do not argue that the revision is not in effect. Indeed, defendants acknowledge that if the revised language of Directive 4040 applies, plaintiff's claim against defendant Nabb involving the May 16, 2014 incident has been exhausted. Defendants' Reply in Support of Motion to Dismiss [28], p. 6. Because plaintiff reported the May 16, 2014 incident involving defendant Nabb to the facility staff in a letter dated May 19, 2014 (Complaint [1], Exhibit P), this claim is deemed exhausted pursuant to Directive 4040.

Because the September 10, 2013 and October 22, 2013 incidents preceded the revision of Directive 4040, plaintiff was required to exhaust the typical inmate grievance process with respect to those incidents. [9] Plaintiff makes no attempt to argue that he exhausted the inmate grievance process with respect to his September 10, 2013 claim. That claim against defendant Dunford should be dismissed with prejudice. [10] In his motion to amend the complaint [31], plaintiff asserts that he did, in fact, exhaust the inmate grievance process with respect to his claim relating to the October 22, 2013 involving defendant Hoinski. As discussed below, the plaintiff will be allowed to amend the complaint to assert the exhaustion of that claim.

[9]    The plaintiff argues that the revision of Directive 4040 eliminated the deadline for reporting sexual abuse, and therefore, he can cure the failure to exhaust his claims by reporting the incidents now under the terms of the directive. Plaintiff's Opposition to Motion to Dismiss [27], p.11. As discussed more fully below, plaintiff has presented no authority suggesting that

the revisions in Directive 4040 apply retroactively to incidents prior to the effective date. To the contrary, the case law suggests that Directive 4040 is applied as it was in effect at the time of the incident at issue. *See* Smith v. Kelly, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013) (referring to the version of Directive 4040 that was in effect at the time in question); Goodson v. Silver, 2012 WL 4449937, *8 (N.D.N.Y. 2012) (court decision based upon the version of DOCCS' Directive 4040 in effect during the time in question).

10      Plaintiff asserts, generally, that his failure to exhaust any of his claims can be cured. Plaintiff's Reply in Support of Motion to Amend [37], p. 9. However, plaintiff's time to file a grievance relating to the September 10, 2013 incident has long passed. Although plaintiff cites to Bridgeforth v. Barlett, 686 F. Supp.2d 238 (W.D.N.Y. 2010) in support of his right to cure, that case actually supports the dismissal of plaintiff's claim with prejudice. Bridgeforth, 686 F. Supp.2d, at 240 ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice").

### E. Failure to Exhaust as to Defendants Annucci, Fonda, Bradt and Hughes

Defendants also seek to dismiss the claims against defendants Annucci, Fonda, Bradt and Hughes because plaintiff has not exhausted administrative remedies by naming those defendants in any grievance relating to the "credit card check" incidents. Defendants' Reply in Support of Motion to Dismiss [28], p.8-10. These claims survived the initial screening only to the extent that they alleged that the defendants "were made aware of the sexually assaultive pat-frisks but failed to remedy them or take any corrective action". November 17, 2014 Decision & Order [7], pp. 10, 22. [11]

11      Judge Arcara cited Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995) for the proposition that a prison official who is made aware of a violation but fails to remedy the wrong may be determined to be "personally involved" and subject to § 1983 liability. However, he noted that "[r]eceiving *post hoc* notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member". November 17, 2014 Decision & Order [7], p.10 *citing* Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). Given the preliminary stage of the litigation, Judge Arcara allowed these claims to proceed to service. Id. at p. 11. The plaintiff's exhaustion of these claims was not addressed in that decision.

*7      The plaintiff does not argue that he has exhausted his claims against defendants Annucci, Fonda, Bradt or Hughes by naming them in any grievance. In response to the motion to dismiss, plaintiff asserts generally that, because the revisions to Directive 4040 stated that a "sexual abuse or sexual harassment complaint may be submitted at any time", he can cure any failure to exhaust by now filing a complaint under Directive 4040. Plaintiff's Opposition to Motion to Dismiss [27], p. 11. Initially, it is not clear that the revised procedure set forth in Directive 4040, which eliminates the need to follow the typical inmate grievance procedure with respect to sexual assault and sexual harassment claims, applies to claims against supervisory officials for failing to remedy or take corrective action regarding such a claim.

In any event, as noted above, plaintiff has not cited, and I have not found, any authority supporting the retroactive application of a revised DOCCS directive. Instead, although not discussed in depth, the courts in Smith and Goodson expressly applied the version of Directive 4040 which was in effect at the time of the incidents in question in those cases.

As a general rule, a new statutory provision does not apply retroactively to conduct that occurred prior to the provision's enactment. As the Supreme Court has noted, "the presumption against retroactive legislation is deeply rooted in our jurisprudence" Landgraf v. USI Film Products, 511 U.S. 244, 265, (1994). For example, the revision of § 1997e(a) which instituted the mandatory exhaustion requirement of the PLRA, was not applied retroactively. Shariff v. Coombe, 2002 WL 1392164, *3 (S.D.N.Y. 2002).

This is not a case where the revision of Directive 4040 merely clarified ambiguous language of the prior

regulation. *See* Leshinsky v. Telvent GIT, S.A., 873 F. Supp.2d 582 (S.D.N.Y. 2012). Instead, the revision of Directive 4040 sets forth a new procedure relating to the reporting and processing of sexual abuse and sexual harassment claims. The new procedure bypasses the previously required inmate grievance procedure altogether and institutes an expedited process for the lodging and investigation of a sexual abuse or sexual harassment claim. The revised language does not expressly or indirectly suggest that it is to be applied in a retroactive manner to incidents predating the revision. The parties have submitted no authority suggesting that DOCCS intended the revision to apply retroactively to conduct occurring years earlier.

Since the record does not reflect any intention that the revision of Directive 4040 be applied retroactively, I find that it does not apply to incidents predating the date of the revision. With respect to the post-revision "credit card check" incident of May 16, 2014, the plaintiff's letters dated May 19, 2014 and May 20, 2014 (Complaint [1], Exhibits P and Q) relating to this incident do not name or discuss the conduct of defendants Annucci, Fonda, Bradt or Hughes. Thus, even if the procedure set forth in Directive 4040, as revised, applied to claims against supervisory officials, it was not utilized by plaintiff to complain of conduct by these defendants.

Because plaintiff has failed to exhaust his administrative remedies with respect to defendants Annucci, Fonda, Bradt and Hughes, the claims against these defendants should be dismissed with prejudice.

**F. Motion to Amend Complaint**

Plaintiff moves to amend his complaint, principally to modify the assertion in his original complaint that he did not exhaust his administrative remedies. Plaintiff's Motion to Amend [31], p. 3. He states that because he had been transferred between facilities and or prison cells several times since the underlying incidents, he misplaced or lost various legal documents. Id. at p. 4. Further, he asserts that because he was reprocessed at one point and provided with a new inmate number, some of the documentation related to these claims was filed under a previous inmate number. Id. Thus, plaintiff seeks to amend the complaint to assert that he has administratively exhausted the grievance process with respect to the October 22, 2013 incident and his claim against Hoinski. Id. at pp. 3-4. Attached as exhibits to plaintiff's motion are

documents supporting plaintiff's utilization of the inmate grievance process with respect to the October 22, 2013 incident. Id., Exhibits A-D.

**\*8** Plaintiff's proposed amended complaint is substantively identical to his original complaint except that he has modified his allegations regarding the exhaustion of administrative remedies and has removed some of the allegations and claims previously dismissed by Judge Arcara. [12]

> [12] Plaintiff's proposed amended complaint is type-written, as opposed to the original hand written complaint. Proposed Amended Complaint [37-1]. Under the heading "Defendant's Information", plaintiff did not include information relating to the previously dismissed defendants with the exception of Dale Artus., Id., p.2. The proposed amended complaint eliminated ¶5 of the original complaint, making the paragraph numbers of the proposed amended complaint one off from those in the original complaint. Paragraph numbers between the two documents re-synchronized at ¶42 after plaintiff split the substance of the original ¶40 into two paragraphs (¶¶40-41) of the proposed amended complaint. Plaintiff's amended complaint identified the "John Doe" defendant as Hoinski (¶¶ 10-14, 20, 24, 29, 30, 35-36). Plaintiff's amended complaint also occasionally included expanded or enhanced allegations without changing the substance of his claims (*see* i.e. ¶ 30).

Rule 15(a) provides that leave to amend should be "freely given when justice so requires". New York State National Organization for Women v. Cuomo, 182 F.R.D. 30, 36 (S.D.N.Y. 1998); *see also* Forbes & Wallace, Inc. v. Chase Manhattan Bank, 79 F.R.D. 563, 565 (S.D.N.Y. 1978). It has long been "well-established that 'outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts.' " Harrison v. Enventure Capital Group, Inc., 666 F. Supp. 473, 479 (W.D.N.Y. 1987). For this reason, "dismissals for insufficient pleadings are ordinarily with leave to replead". Stern v. General Electric Co., 924 F.2d 472, 477 (2d Cir. 1991). Leave to amend a pleading need not be granted, however, if it would be futile to do so. *See* O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 69 (2d Cir. 2002).

Defendants oppose the motion to amend on several grounds. Defendants' Opposition to Motion to Amend [34]. First, defendants argue that plaintiff's motion should

be denied because he failed to attach a proposed amended complaint to the motion papers. Defendant's Opposition to Motion to Amend [34] p., 2. "A movant's failure to submit a proposed amended complaint constitutes sufficient grounds to deny a motion to amend". Murray v. New York, 604 F.Supp.2d 581, 588 (W.D.N.Y. 2009) (citing LaBarbara v. Ferran Enterprises Inc., 2009 WL 367611, *3 (E.D.N.Y. 2009) ("In order to meet the requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the court and the opposing party can understand the exact changes sought.")). Where, however, "the movant's papers adequately explain the basis for, and nature of, the proposed amendment, ... the failure to attach a proposed amended complaint to the motion is not necessarily fatal". Murray, 604 F.Supp.2d at 588.

The determination whether to deny a motion to amend based upon such a failure the subject to the discretion of the court. Id. Here, plaintiff's motion papers sufficiently articulated the basis for his motion to amend such that the defendants were able to respond to the substance of the proposed changes. Moreover, plaintiff attached a proposed amended complaint to his Memorandum of Law in reply to defendant's opposition. See Proposed Amended Complaint attached to Plaintiff's Reply in Support of Motion to Amend [37-1]. Under these circumstances, plaintiff's failure to attach a proposed amended complaint to his initial motion papers is not fatal to the motion.

 *9  Defendants also argue that plaintiff's motion to amend the complaint should be denied based upon "futility, bad-faith, undue delay or undue prejudice to the opposing party". Defendants' Opposition to Motion to Amend [34], p. 3.[13] Defendants state that they made the motion to dismiss based upon plaintiff's affirmative statements in the complaint that he had not exhausted the inmate grievance process with respect to his claims. Defendants claim that they would not have filed a motion to dismiss "[h]ad plaintiff not made these affirmative statements in his complaint" and that allowing plaintiff to amend the complaint would prejudice the defendants because they would be required to bring another motion to dismiss. Id. Defendants allege that the "striking reversal" as to exhaustion by the plaintiff "suggests the possibility of bad-faith". Id.

[13]    Although defendants mention "futility" in their opposition, they do not assert the insufficiency of the plaintiff's allegations of sexual assault as a basis to deny the proposed amended complaint. Defendants' Opposition to Motion to Amend [34].

The prejudice alleged by the defendants is insufficient to warrant denial of plaintiff's motion to amend the complaint. Initially, it should be noted that defendants had access to plaintiff's inmate grievance records, and could have checked those records prior to filing any motions regarding exhaustion in this case. The plaintiff has asserted that he had lost or misplaced much of the documentation relating to his claims due to a series of transfers between correctional facilities or jail cells. Defendants have not rebutted this contention, which plaintiff offers as his explanation as to why his original complaint contained an "erroneous statement" regarding exhaustion. Plaintiff's Motion to Amend [31], p. 3-4. Defendants have not articulated a sufficient basis to conclude that the plaintiff's allegations in the original complaint were made in bad faith. Finally, defendants' claim of prejudice is undermined by the fact that this motion to dismiss will result in my recommendation that several of plaintiff's claims be dismissed.

Defendants also argue that plaintiff's motion to amend should not be granted because plaintiff has not alleged that he has received a final decision from the Central Office Review Committee ("CORC") with respect to his grievance relating to the October 22, 2013 incident. Defendants Opposition to Motion to Amend [34], p. 4-5. This argument is also unpersuasive. Plaintiff has submitted documentation from the Director of the Inmate Grievance Program, dated January 24, 2014, stating that his grievance was still pending before CORC. Plaintiff's Motion to Amend [31], Exhibit D. This correspondence was in response to plaintiff's January 20, 2014 letter noting that his grievance had already been pending before CORC for more than 60 days without a decision. Id., Exhibit C.

It appears by this documentation, the validity of which has not been challenged by the defendant, that plaintiff has been waiting for more than *two years* for a decision from CORC with respect to this grievance. Defendants cannot rely upon CORC's refusal to render a decision with respect to plaintiff's grievance for two years as support for an argument that plaintiff has failed to exhaust his administrative remedy because he has not been provided

with a final decision. As discussed in Rossi v. Fishcer, 2015 WL 769551, *4-5 (S.D.N.Y. 2015):

"A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion.... While the Second Circuit has not directly addressed this issue, it has treated [cases holding that such a failure renders the administrative remedy unavailable] favorably. See [Hemphill v. New York],380 F.3d 680, 686 n. 6 (2004) (noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); Giano v. Goord, 380 F.3d 670, 677 (2d Cir 2004) (citing favorably to [Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998)] and [Foulk v. Carrier, 262 F.3d 687, 698 (8th Cir. 2001] with regard to availability of administrative remedies)). The Second Circuit in [Abney v. McGinnis, 380 F.3d 663, 668 (2nd Cir. 2004)] cited to Hemphill for the proposition that 'exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance'. 380 F.3d at 667."

**\*10** See also Peoples v. Fischer, 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination"); Dimick v. Baruffo, 2003 WL 660826, *4 (S.D.N.Y. 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). [14]

[14] But see Bennett v. Wesley, 2013 WL 1798001, *6 (S.D.N.Y. 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates per se unavailability.") (quoting Mateo v. O'Connor., 2012 WL 1075830, *7 (S.D.N.Y. 2012); Rivera v. Anna M. Kross Ctr., 2012 WL 383941, *4–5 (S.D.N.Y. 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response

from prison authorities within the prescribed time limits.). Also, some courts have questioned whether the equitable exclusions from exhaustion set forth in Hemphill remain viable after the Supreme Court's decision in Woodford. The Second Circuit has declined to address this question. See Amador et al. v. Andrews et al., 655 F.3d 89, 102-03 (2nd Cir. 2011). In Woodford, plaintiff's grievance was administratively rejected because it was filed beyond the 15-day limitations period. The district court granted summary judgement on the grounds that plaintiff failed to exhaust his administrative remedies. The Ninth Circuit reversed finding that plaintiff had exhausted his remedies because no such remedies remained available to him. The Supreme Court vacated that decision, holding that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings". Woodford, 548 U.S. at 90-91. Here, unlike Woodford, the failure to achieve complete exhaustion is due to the inaction by the prison grievance officials, not because of any failure on the part of plaintiff. In any event, I do not believe that Woodford stands for the proposition that CORC can frustrate or unduly delay an inmate's ability to bring a federal claim to address an alleged constitutional violation by refusing to issue a final decision for several years so as to preclude exhaustion under the PLRA.

Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA. Plaintiff's motion to amend the complaint is granted to the extent plaintiff seeks to assert allegations that he exhausted his administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski. Plaintiff's motion to amend is denied to the extent the amended complaint seeks to reassert claims against Dale Artus (or any other defendants) which were previously dismissed by Judge Arcara.

In light of the age of this case, and to expedite further proceedings in this matter, I direct that the Clerk of the Court separately file the Proposed Amended Complaint [37-1] as the Amended Complaint in this matter. The Amended Complaint does not add any new claims or parties. All of the defendants in this case are represented

by default. By virtue of its attachment to the plaintiff's motion papers, and by the filing directed above, the defendants will have received a copy of the Amended Complaint. The defendants shall answer, or otherwise respond, to the Amended Complaint within 30 days of the date it is filed by the Clerk of the Court as directed above.

## G. Motion for Appointment of Counsel

 **\*11**  Plaintiff also moves for the appointment of counsel [32]. There is no constitutional right to appointed counsel in civil cases. However, under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988). Assignment of counsel in this matter is clearly within the judge's discretion. *In re Martin-Trigona*, 737 F.2d 1254 (2d Cir. 1984).

The factors to be considered in deciding whether or not to assign counsel include the following: (1) whether the indigent's claims seem likely to be of substance; (2) whether the indigent is able to investigate the crucial facts concerning his claim; (3) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) whether the legal issues involved are complex; and (5) whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination. *Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997).

In considering a motion for the appointment of counsel, the court may also consider the merits of the plaintiff's claim. The Second Circuit has held that "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989). Therefore, the court must first look to the "likelihood of merit" of the underlying dispute, *Cooper*, 877 F.2d at 174, and "even though a claim may not be characterized as frivolous, counsel should not be appointed in a case where the merits of the ... claim are thin and his chances of prevailing are therefore poor." *Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). See also *Smolen v. Corcoran*, 2013 WL 4054596 (W.D.N.Y.,2013) (In deciding whether to grant a request to appoint pro bono counsel, district courts should evaluate several factors, including the merits of the claim, the factual issues

and complexity of the case, plaintiff's ability to present the case, and the plaintiff's inability to obtain counsel.).

I have reviewed the facts presented herein in light of the factors required by law as discussed above. At this time, it does not appear the legal issues presented are unduly complex. Plaintiff's filings in this case reflect that he understands the issues presented and can adequately articulate his factual and legal arguments. Plaintiff's motion for appointment of counsel is denied at this time without prejudice, subject to renewal at a later date. It is plaintiff's responsibility to retain an attorney or press forward with this lawsuit *pro se.* 28 U.S.C. § 1654.

## CONCLUSION

For these reasons, I recommend that defendant's motion to dismiss [22] be granted in part and denied in part as follows: the motion should be granted as to plaintiff's claim against defendant Dunford relating to the September 10, 2013 incident, and plaintiff's supervisory claims against defendants Annucci, Fonda, Bradt and Hughes, but denied as to plaintiff's claims against defendants Nabb and Hoinski. Also, plaintiff's motion [31] to amend the complaint is granted in part and denied in part such that plaintiff may amend the complaint to assert that he has exhausted administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski, but may not reassert previously dismissed claims and is otherwise denied. Plaintiff's motion for appointment of counsel [32] is denied.

 **\*12**  Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 31, 2016 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.*, 838 F. 2d 55, 58 (2d Cir. 1988); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson-Leitch*

Case 9:17-cv-00703-TJM-TWD    Document 51    Filed 12/07/18    Page 136 of 157

Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3039687

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 769551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Randolph ROSSI, Plaintiff,
v.
Brian FISHCER, et al., Defendants.

No. 13–cv–3167 (PKC)(DF).
|
Signed Feb. 24, 2015.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

**\*1** Plaintiff Randolph Rossi, proceeding *pro se,* brings this action against officials of the New York State Department of Corrections and Community Supervision ("DOCCS"). In his Amended Complaint, plaintiff alleges that defendants violated, and continue to violate, his constitutional rights by denying him the right to freely practice his Rastafarian faith while incarcerated. He brings an action asserting violations of the First and Fourteenth Amendments and affirmatively disaffirms any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Defendants move to dismiss the Amended Complaint for failure to exhaust claims under the Prisoner Litigation Reform Act ("PLRA"), failure to state a claim under the Free Exercise Clause, failure to meet the standards for injunctive relief, lack of personal involvement of certain defendants, and qualified immunity.

For the reasons stated below, the motion to dismiss is granted in part and denied in part. Plaintiff exhausted his administrative remedies as to certain claims and exhaustion is excused as to others. Certain allegations state a claim for relief, but plaintiff fails to plausibly allege a violation under the Free Exercise Clause, Establishment Clause, or Equal Protection Clause with regard to other claims. Defendants' motion to dismiss for lack of personal involvement fails. Finally, defendants have not demonstrated entitlement to qualified immunity at the pleading stage.

**BACKGROUND**

Plaintiff Rossi is a practicing Nyahbinghi Rastafarian currently incarcerated at the Woodbourne Correctional Facility, maintained by DOCCS. (*See* Amended Complaint ("Am.Compl."), ¶ 3.) He brings this action against the following employees of DOCCS: Brian Fischer, [1] Commissioner of DOCCS; Catherine Jacobsen, Acting Deputy Commissioner for Program Services; Jeff McKoy, [2] Deputy Commissioner for Program Services; Cheryl Morris, Director for Ministerial, Family, and Volunteer Services; Mark Leonard, Director of Ministerial Family and Volunteer Services; Robert Cunningham, Superintendent for the Woodbourne Correctional Facility; Moses Santiago, Coordinating Chaplain; and Dorothy Davis, Drug Counselor at Woodbourne. (*Id.* ¶ ¶ 4–11.) Plaintiff asserts that defendants Fischer, Jacobsen, McKoy, Morris, Leonard, and Cunningham "are responsible for all rules, policies, regulations, and directives governing the religious rights of prisoners under their care and custody." (*Id* ¶ 13.) He claims that "[d]efendants have denied plaintiff his right to practice his faith in accordance with the traditions, customs, and tenets of Rastafari." (*Id.*)

[1]   The defendant's last name is spelled "Fishcer" on the docket in this case.

[2]   The defendant's last name is spelled "McCoy" on the docket and in the parties' briefs.

First, plaintiff claims that he has been denied his right to celebrate, in a manner consistent with his faith, the holy days of April 21, May 25, August 17, and October 7. (*Id.* ¶ ¶ 15–18.) Specifically, plaintiff requests that these four Rastafari holy days be added to the religious calendar with designations that permit plaintiff to (a) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. [3] (*Id.;* Hearing before Magistrate Judge Debra Freeman, July 8–9, 2014 ("July Tr."), pp. 82–83.) Plaintiff further requests that April 21 and August 17 be designated as "family events." [4] (Am. Compl., ¶ 16; July Tr., p. 82.) During the pendency of plaintiff's motion, DOCCS added all of the holy days at issue to its "Religious Holy Day Calendar," with varying limitations regarding how each day may be observed. (Religious Holy Day Calendar, Revised July 29, 2014 ("Revised Calendar"), p. 25 (Dkt.82–1).) The revised

2015 WL 769551

DOCCS calendar, which was submitted to Magistrate Judge Freeman on the preliminary injunction motion, allows members of the Rastafari faith to be exempt from work and programming, attend a worship service, and share a holy day meal on August 17 and October 7. (*Id.*) For April 21, DOCCS only permits a congregate worship service and for May 25, DOCCS does not authorize any of these three designations. (*Id.*) The revised calendar does not designate any of the four holy days at issue as "family events." (*Id.*)

[3]    Plaintiff's Amended Complaint requests that the holy days at issue be added to the calendar with the designations of "Off Work Program (OWP), Meal Consideration (MC), and Special Consideration (SC)." (Am.Compl., ¶ 16.) In the hearings before Magistrate Judge Debra Freeman, plaintiff clarified that these designations would allow him to (1) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. (July Tr., pp. 82–83.)

[4]    While the plaintiff in his Amended Complaint only requests that August 17 be designated as a "family event," he makes clear in the hearings before Magistrate Judge Freeman that he is asking for this designation to be added to both April 21 and August 17. (July Tr., p. 82.)

**\*2** Second, plaintiff claims that defendants have denied him the right to add food items to the holy day meal menu, giving the "Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community," in violation of the First and Fourteenth Amendments. (*Id.* ¶¶ 27, A.9.)

Third, plaintiff alleges that Rastafarians at Woodbourne are forced to hold congregate worship services on Wednesdays instead of Fridays, the day of worship Rastafarians traditionally observe. (*Id.* ¶ 26.) Defendant Cunningham denied plaintiff's grievance on the basis that "there was no room available for Rastafarians to conduct congregate worship on Fridays." (*Id.*)

Fourth, plaintiff claims that defendants have denied him the right to wear the Rastafarian religious turban brought to him by his wife.[5] (*Id.* ¶¶ 20–22.) After wearing the

turban his wife sent him for two months, a correction sergeant told plaintiff that he was no longer permitted to wear the headgear. (*Id.* ¶ 20.) The sergeant told plaintiff that according to defendant Santiago, the Coordinating Chaplain, the only religious headgear for Rastafarians was a Tsalot Kob. (*Id.* ¶ 21.) Plaintiff asserts that the Tsalot Kob is "restricted to members of the Ba Beta Kristiyan Church of Haile Selassie I (a Christianized House or Mansion within Rastafari)," and does not apply to the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion." (*Id.* ¶ 3; 20–21.) At no time did defendant Santiago speak to plaintiff to determine the religious significance of his turban. (*Id.* ¶ 22.) Plaintiff complied with the sergeant's order to mail home his turban, and subsequently filed a grievance that was denied by defendant Cunningham. (*Id.* ¶¶ 21–22.)

[5]    In the October 2014 declaration of Colonel Dennis W. Bradford, the DOCCS Director of Correction Emergency Response Team Operations, DOCCS consented to alter its policy regarding religious headgear. (Bradford Declaration (Dkt.98).) Colonel Bradford declared that plaintiff would be allowed to wear a turban that conforms to his religious beliefs as long as it complies with mandated color restrictions. (*Id.* ("[A]s long as plaintiff's turban is of an appropriate color DOCCS will accommodate his request to wear it within Woodbourne Correctional Facility.")) Thus, plaintiff's claim regarding the right to wear his turban may be moot. The Court will decide this question at a later stage after the parties have briefed the issue.

Fifth, plaintiff challenges Directive 4760, which requires religious groups engaging in fundraising activities to apply for Special Purpose Organization ("SPO") status. (*Id.* ¶ 23.) He explains that SPO status subjects religious groups to the same mandates as non-religious inmate organizations, including the requirement that each organization surrender half of the funds it raises to the Inmate Occupational Therapy Fund ("IOTF") for the benefit of the general inmate population. (*Id.*) Plaintiff challenges this requirement, as it applies to Rastafarians, because he claims it has "the effect of a tax on religion" and burdens the Rastafarians' ability to purchase necessary materials for congregate services, religious classes, and holy day celebrations. (*Id.* ¶ 24.)

Sixth, plaintiff claims that defendants violated his First and Fourteenth Amendment rights when they denied his request to gain access to spiritual and religious advisers

(*Id.* ¶ ¶ 19, A(7) .) Defendant Morris denied plaintiff's request for advisers on security grounds, and defendant McKoy upheld Morris's determination after plaintiff sent McKoy a letter seeking intervention. (*Id.* ¶ 19.) Plaintiff claims that "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (*Id.*)

**\*3** Finally, plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (*Id.* ¶ 28.) Davis asked plaintiff in an interview about the "ritual use of marijuana within the Rastafarian faith." (*Id.*) "When plaintiff responded to defendant's request, defendant Davis put in her report that plaintiff admitted using marijuana for religious rituals only," despite the fact that plaintiff claims he "denied ever using substances whatsoever," including marijuana. (*Id.*)

Plaintiff seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages. (*Id.* ¶ ¶ A–C.)

### PROCEDURAL HISTORY

Plaintiff commenced this action on May 8, 2013 (Dkt.2), and filed an Amended Complaint on November 19, 2013. (Dkt.11.) Plaintiff moved for a preliminary injunction to enjoin defendants "from continuing to enforce the policies being challenged in this proceeding." (Dkt.17.) Magistrate Judge Debra Freeman, to whom the preliminary injunction motion was referred to hear and report, bifurcated plaintiff's motion on the basis of the temporal proximity of the relief sought. Magistrate Judge Freeman issued a Report and Recommendation ("R & R") as to plaintiff's ability to celebrate April 21 as a holy day (Dkt.27), and a Supplemental R & R, reexamining some of the issues regarding April 21 and addressing the remaining claims raised by plaintiff's motion. (Dkt.89.) The Court adopted both the R & R (Dkt.37) and the Supplemental R & R (Dkt.103.) Plaintiff's motion was granted, to the extent that defendants were mandatorily enjoined, pending judgment on the merits, to: (1) permit plaintiff to wear a Rastafari religious turban; (2) allow plaintiff to observe all four of the Rastafari holy days at issue in his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafarian inmates; and (3) provide space for Rastafari

Sabbath worship services on Friday afternoons, or, at least, pending the final resolution of the case on its merits, to provide an alternative accommodation for such services on Friday evenings. (Order Adopting Supp. R & R.)

Defendants now move to dismiss plaintiff's Amended Complaint in its entirety. (Dkt.56.)

### LEGAL STANDARD FOR MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555). In considering a Rule 12(b) (6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 678–79, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's *pro se* pleadings are given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

### DISCUSSION

#### I. Exhaustion of Administrative Remedies

**\*4** The exhaustion requirement of the Prison Litigation Reform Act ("PLRA") "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is mandatory before an action is commenced. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. The Second Circuit indicated in *Neal,* that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA. *Id.*

While the PLRA's exhaustion requirement is "mandatory," *Woodford v. Ngo,* 548 U.S. 81, 85 (2006), certain caveats apply. *See Hemphill v. N.Y.,*

[380 F.3d 680, 686 (2d Cir.2004)](). A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not available; (2) defendants forfeited their affirmative defense of non-exhaustion by failing to raise or preserve it or are estopped from raising non-exhaustion because their own actions inhibited the inmate from exhausting his claims; or (3) "special circumstances" have been plausibly alleged that justify the prisoner's failure to comply with the exhaustion requirements.[6] *Id.*

[6] The Second Circuit had concluded that "special circumstances" may exist where the plaintiff reasonably misinterprets the prison's grievance regulations. *Hemphill,* 380 F.3d at 690. However, in *Woodford,* the Supreme Court held that untimely or otherwise procedurally defective grievances do not satisfy the PLRA's exhaustion requirement. 548 U.S. at 93. The Second Circuit has not yet determined whether the special circumstances exception to the exhaustion requirement survives *Woodford. See Chavis v. Goord,* 333 F. App'x 641, 643 (2d Cir.2009). The Court need not reach this issue in this case.

"A court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (alterations omitted) (quoting *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999)). Courts must look at the applicable set of grievance procedures when determining the availability of an administrative remedy. *Id.* Plaintiff, as an inmates of a New York State correctional facility, is subject to a three-step, administrative procedure for inmate grievances called the Inmate Grievance Program ("IGP"). *See* 7 N.Y.Codes R. & Reg. ("N.Y.C .R.R.") § 701.5. The first step in the IGP is to file a grievance with the Inmate Grievance Resolution Committee (the "IGRC"). *Id .* § 701.5(b). After receiving a response from the IGRC, an inmate has seven calendar days in which to appeal to the superintendent. *Id.* § 701.5(c). Within seven calendar days of receiving a response from the superintendent, the inmate then must appeal to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The CORC is required to render a decision on each appeal and transmit its decision within 30 calendar days from the time the appeal was received. *Id.*

A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion. *See Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998). While the Second Circuit has not directly addressed this issue, it has treated the decision cited above favorably. *See Hemphill,* 380 F.3d at 686 n. 6 (citing to the cases above and noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004) (citing favorably to *Underwood* and *Foulk* with regard to availability of administrative remedies). The Second Circuit in *Abney* cited to *Hemphill* for the proposition that "exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance ." 380 F.3d at 667.

**\*5** Judges in this district, including the undersigned, have also agreed with the proposition that administrative remedies may be deemed unavailable when the prison fails to timely respond to a grievance. *See Peoples v. Fischer,* 11–cv–2694 (SAS), 2012 WL 1575302, at \*6 (S.D.N.Y. May 3, 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y.2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination." (alterations, internal quotation marks, and citation omitted)); *Manos v. Decker,* 03–cv–2370 (PKC), 2005 WL 545215, at \*4 (S.D.N.Y. Mar. 7, 2005) (asserting that *Abney* "held in part that administrative remedies are unavailable when prison officials fail to respond to grievances within the time period prescribed by regulation"); *Dimick v. Baruffo,* 02–cv–2151 (LMM), 2003 WL 660826, at \*4 (S.D.N.Y. Feb. 28, 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). *But see Bennett v. Wesley,* 11–cv–8715 (JMF), 2013 WL 1798001, at \*6 (S.D.N.Y. Apr. 29, 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability." (alterations omitted) (quoting *Mateo v. O'Connor,* 10–cv–8426 (LAP), 2012 WL 1075830, at \*7 (S.D.N.Y. Mar. 29, 2012)); *Rivera v. Anna M. Kross Ctr.,*

10–cv–8696 (RJH), 2012 WL 383941, at *4–5 (S.D.N.Y. Feb. 7, 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.)

Here, defendants argue that some of plaintiff's claims were not exhausted before plaintiff brought this action. (Def. Memo in Support of Motion to Dismiss ("Def.MTD"), pp. 46.) Defendants show that CORC's decision regarding plaintiff's appeal of his May 2013 grievance was issued after the filing of both the original Compliant and the Amended Complaint. (Id. at 5.) The original Complaint was filed on May 8, 2013, the Amended Complaint was filed on November 19, 2013, and CORC's decision regarding plaintiff's appeal was not issued until December 18, 2013. (Id.) Defendants, however, overlook two important points. First, plaintiff exhausted some of his claims through grievances filed prior to his May 2013 grievance. Second, in regard to the May 2013 grievance, the CORC failed to issue a decision within the 30 day limit set by the IGP, rendering the administrative remedies unavailable to plaintiff.

Plaintiff's original Complaint sought to enjoin defendants from (1) prohibiting the wearing of his religious turban, (2) prohibiting his celebration of certain religious holy days in a manner consistent with his beliefs, and (3) collecting half of the funds raised by the Rastafari inmate organization. Each of these claims was properly raised and exhausted through grievances filed on June 17, 2009, September 12, 2011, and March 14, 2012. (See Hehenberger Decl. Ex. B & D (Dkt.58).) The CORC issued a decision regarding the June 2009 grievance on August 5, 2009, ruled on the September 2011 grievance on January 4, 2012, and rendered a decision on the March 2012 grievance on September 5, 2012. (Id.) The original Complaint was filed eight months after the resolution of the lattermost grievance at issue.

**\*6** Plaintiff's Amended Complaint, filed on November 19, 2013, seeks additional relief, including: (1) the addition of October 7 to the religious calendar with various designations; (2) that Rastafari congregate worship be moved to Fridays; (3) that defendants be prohibited from making the menu for holy day meals mandatory; (4) that defendants' failure to provide plaintiff with access to Rastafarian advisers be deemed a constitutional violation; and (5) for the removal of information

regarding marijuana use from plaintiff's institutional records. Plaintiff filed a grievance that included these additional claims on May 29, 2013. (Id. at Ex. C .) After receiving a response from both the IGRC and the superintendent, plaintiff appealed the superintendent's decision to CORC on July 26, 2013. (Id.) More than four months passed between the appeal and CORC's decision, issued on December 18, 2013, which is far longer than the 30 day deadline explicitly set forth in the IGP process. (Id.) Had the CORC provided a timely response to plaintiff's appeal, plaintiff would have received a response prior to filing the Amended Complaint. Plaintiff "should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief." [7] Peoples, 2012 WL 1575302, at *9 n. 125. Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate. Defendants' motion to dismiss on this ground is denied.

[7]     This case is distinguishable from cases where the CORC never renders a decision on the plaintiff's appeal. Under those circumstances, district courts in this Circuit have tended to hold that a motion to dismiss or for summary judgment for failure to exhaust should be granted without prejudice, allowing the plaintiff to refile his complaint once the CORC responds. See Fuentes v. Furco, 13–cv–6846 (AJN), 2014 WL 4792110, at *3 (S.D.N.Y. Sept. 25, 2014) (collecting cases). This approach "balance[s] the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him." Id. This logic, however, does not extend to the case at bar because the CORC has denied plaintiff's appeal, and thus has already been given the first opportunity to consider the grievance. See Peoples, 2012 WL 1575302, at *9.

## II. The Free Exercise Clause

### 1. Legal Standard

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir.2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)). A prisoner's right to exercise his religion is not absolute and must be balanced

against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)). Accordingly, free exercise claims of prisoners are judged " 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin v. Goord,* 467 F .3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." [8] *Salahuddin,* 467 F.3d at 274–75. "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

[8]     The Second Circuit has noted that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (internal quotation marks omitted). However, the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise. *See Ford,* 352 F.3d at 592 (applying the substantial burden test where the parties did not brief the issue and the plaintiff did not argue otherwise); *see also Salahuddin,* 467 F.3d at 275 n. 5 (declining to decide whether the substantial burden test applied where resolution of the issue was unnecessary for purposes of the appeal); *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (applying the substantial burden test because plaintiff satisfied this threshold step). Here, the Court will apply the substantial burden test as neither party has argued against employing this standard.

**\*7** A substantial burden on religious exercise exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416,

at *4 (S.D.N.Y. Aug. 29, 2014) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)) (alterations and internal quotation marks omitted). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important " to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at *4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Even if a challenged policy substantially burdens the plaintiff's sincerely held religious beliefs, it is nevertheless valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *see also Ford,* 352 F.3d at 595. When evaluating whether a regulation or official action is reasonable, courts are guided by four factors: (1) "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective;" (2) "whether prisoners have alternative means of exercising the burdened right;" (3) "the impact on guards, inmates, and prison resources of accommodating the right;" and (4) "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 89–91).

### 2. Analysis

#### A. Substantial Burden

On this motion, defendants do not challenge that plaintiff has alleged sincerely held religious beliefs; rather defendants argue that plaintiff fails to allege facts that show that his religious beliefs were substantially burdened. (Def.MTD, pp. 6, 9.) The Court concludes that plaintiff has plausibly alleged that defendants have substantially burdened his right to freely exercise his religion as to some but not all of the religious practices he wishes to engage in.

##### i. Claims Involving the Religious Calendar

As noted above, DOCCS has added all of the holy days at issue to the religious calendar, but with varying limitations regarding how each day may be celebrated. (Revised Calendar, p. 25.) The requests that were accommodated are moot. The Court must address whether plaintiff states a claim with respect to those requests which have

not been voluntarily accommodated, which include: (1) exemption from work and the provision of a shared meal on April 21 and May 25; (2) permission for a congregate worship service on May 25; and (3) the designation of April 21 and August 17 as "family events." Plaintiff has plausibly alleged a substantial burden on his free exercise of religion with regard to all of the contested holy day restrictions, with the exception that plaintiff cannot reach this threshold burden on his claim concerning "family events."

**\*8** Plaintiff has shown that celebrating the four holy days at issue by refraining from work and programming, attending a congregate worship service, and sharing a holy day meal is "central or important" to his faith. *See Ford,* 352 F.3d at 593–94. In the telephone conferences and hearings before Magistrate Judge Freeman, plaintiff explained why the holy days are sacred, stating that April 21 is "the day that Emperor Selassie came to Jamaica" (July Tr., p. 13), May 25 is African Liberation Day (Telephone Conference before Magistrate Judge Freeman, March 18, 2014 ("March Tr."), p. 19), August 17 is the birthday of the Rastafari prophet Marcus Mosiah Garvey, (July Tr., p. 24.) and October 7 "respects the day that Emperor Haile Selassie was named heir apparent prior to his coronation." [9] (March Tr., p. 19.) He testified that each holy day at issue should be celebrated in the same manner, by coming together with other Rastafari observers for a congregate service called a "reasoning" and a shared meal, and by refraining from work. (July Tr., pp. 13, 20, 25–26.) The Court concludes that plaintiff has plausibly alleged a substantial burden on his religious beliefs to the extent that plaintiff alleges defendants continue to deny him an exemption from work and provision of a shared meal on April 21 and May 25 and have failed to permit a congregate worship service on May 25. *See Ford,* 352 F.3d at 593–94 (asserting that being denied a holiday meal would be considered a substantial burden on the plaintiff's religious beliefs if participation in the meal was considered central or important to his practice of religion); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services .").

[9]    In the Amended Complaint plaintiff identifies, but does not allege the significance of, certain holy days that defendants have denied him the right to celebrate. In the conferences and hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of each holy day at issue and described how the days must be observed according to his faith. The Court deems these statements to be incorporated into plaintiff's pleadings. Considering these statements on the present motion to dismiss comports with the special solicitude afforded *pro se* litigants.

Plaintiff fails, however, to plausibly allege that his free exercise rights are substantially burdened by the denial of his request to designate April 21 and August 17 as "family events." He asserts, "Rastafari family is the center of Rasta society," (Am. Compl., ¶ 16 n. 1) and that "[d]uring holy days' celebrations, it is necessary for the family to celebrate together, representing the unity established by Emperor Haile Selassie I, Empress Menen, and the Royal Children." (Pl. Objection to Magistrate Judge's R & R ("Pl.Objection"), p. 1.) These conclusory allegations fail to adequately explain the religious significance of the "family event." Nor does plaintiff explain why celebration with family carries religious significance for the holy days of April 21 and August 17, but not for the other holy days at issue. Plaintiff fails to show that celebration with family is "central or important" to his religious beliefs, and thus cannot state a claim under the Free Exercise Clause as to this request.

### ii. Holy Day Menus

It has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *see also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.")

**\*9** Plaintiff has failed to plausibly allege that DOCCS's policy prohibiting inmates from adding items to the holy day menu substantially burdens his religious exercise. (Am.Compl., ¶ 27.) He does not allege that the holy day meals are inconsistent with his religious beliefs nor does he explain how his ability to add certain items to the meals is "central or important" to his religion. *See Kahane,* 527 F.2d at 496 (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left

to the prison's management which can provide from the food supplies available within budgetary limitations"). Accordingly, plaintiff does not plausibly allege a Free Exercise Clause claim as to the so-called "mandatory menu" provided by DOCCS for holy day meals.

### iii. Friday Worship

Plaintiff asserts that he has "been forced to have congregate worship on Wednesdays instead of the traditional Fridays." (Am.Compl., ¶ 26.) Plaintiff has plausibly alleged that this restriction substantially burdens his right to free exercise. "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d at 308; *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) ("Although we recognize that great deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons, we have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."). In *Lloyd v. City of New York,* 12–cv–03303 (CM), 2014 WL 4229936, at *5–6 (S.D.N.Y. Aug. 4, 2014), the court held that Muslim inmates plausibly alleged a substantial burden on their religious exercise where they were unable to conduct religious services in a manner that complied with their religious beliefs. The plaintiffs in *Lloyd,* for example, were forced to conduct religious services in a chapel where the pews prevented them from kneeling for prayer. *Id.* Here, plaintiff has plausibly alleged that defendants have substantially burdened his ability to participate in religious services in a manner consistent with the practices of his religion. Plaintiff alleges that he is forced to conduct services on Wednesdays, but he asserts that Friday is the traditional day of worship. (*See* Am. Compl., ¶ 26.) He explains that the appropriate day for Rastafari congregate worship is Friday because it "carries the Rastafarian Community into the Sabbath," which begins on Friday at sundown. (*Id.*) Plaintiff plausibly alleges that his inability to hold Friday Sabbath services substantially burdens his free exercise of religion.

### iv. Turban

Plaintiff has plausibly alleged that defendants substantially burden his right to free exercise by denying him the right to wear his religious turban. *See Singh v. Goord,* 520 F.Supp.2d 487, 502–03 (S.D.N.Y.2007) (holding that defendants substantially burdened plaintiff's

religious exercise where plaintiff was prohibited from wearing the type of turban required by his religion); *Morgan v. City of New York,* 12–cv–704 (WFK), 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) ("Plaintiff has shown that the removal of his turban substantially burdens his sincerely held religious beliefs.") Plaintiff has explained the significance of wearing a turban in the Rastafari religion, testifying that the "Nya[h]binghi Rastaman's head must be covered" and that wearing a turban represents "the complete discipline of the Rastaman in terms of a priestly life." [10] (July Tr., p. 37–39.) Plaintiff alleges that the only headgear Rastafari males are permitted to wear at Woodbourne is the Tsalot Kob, which is a type of headgear restricted to members of the Ba Beta Kristiyan Church and does not align with plaintiff's sincerely held religious beliefs. (*Id.* at 38–42; Am. Compl., ¶¶ 20–21.) Plaintiff does not provide a full explanation of the how the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion," is distinct from the Ba Beta Kristiyan Church, nor does he elaborate on why wearing a Tsalot Kob does not comport with his religious beliefs. Nevertheless, given the special solicitude afforded to *pro se* plaintiffs, the Court concludes that plaintiff has adequately pled that defendants' prohibition on the wearing of his religious turban substantially burdens his sincerely held religious beliefs. The issue may look different at the summary judgment stage.

[10]     In the Amended Complaint plaintiff alleges that the denial of his religious turban violates his First Amendment rights, but he fails to allege the significance of the turban to his religious beliefs. In the hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of wearing his turban. The Court deems these statements to be incorporated into plaintiff's pleadings.

### v. Fundraising Proceeds

**\*10** Plaintiff challenges defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds; however, he fails to adequately explain how this practice constitutes a substantial burden on his religious beliefs. Plaintiff explains that the collection of half of the organization's funds "creates a burden on [the Rastafari group's] ability to purchase necessary materials for congregate services, religious classes, and religious holy day celebrations." (Am.Compl., ¶ 24.) While forbidding or confiscating religious materials may in some instances support a free exercise claim, *see Breland v. Goord,* 94–

2015 WL 769551

cv–3696 (HB), 1997 WL 139533, at *5–6 (S.D.N.Y. Mar. 27, 1997) (holding a claim regarding the confiscation of a prisoner's religious literature survives summary judgment), plaintiff does not assert that defendants have prohibited him from obtaining religious materials. Nowhere does plaintiff claim he is restricted from either buying the religious materials he desires with the funds the Rastafari group retains or obtaining the materials from another source. Plaintiff does not show how the deprivation of half of the funds constitutes a substantial burden on his religious beliefs. As plaintiff has failed to plausibly allege a substantial burden, his free exercise claim challenging defendants' collection of half of the funds raised by the Rastafari organization is dismissed.

### vi. Rastafarian advisers

Plaintiff alleges that defendants violated his rights when they denied his request to gain access to spiritual and religious advisers. (Am.Compl., ¶ 19.) Plaintiff fails, however, to plausibly allege that defendants' actions substantially burden his free exercise of religion. He makes no showing regarding how contact with advisers is "central or important" to the practice of his faith. Thus, his free exercise claim based on lack of access to advisers is dismissed.

### vi. Reporting of Marijuana Use

Plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (Am.Compl., ¶ 28.) He claims that defendant's false reporting was a result of "unconstitutional stereotyping of plaintiff based on his religious beliefs" and the ritual use of marijuana within the Rastafari faith. (Id.) Plaintiff, however, fails to explain how defendant's purported stereotyping burdened his free exercise of religion, nor does he show how being recommended for a drug treatment program has any effect on his religious practice. Thus, plaintiff does not state a claim under the Free Exercise Clause as to the alleged false reporting of marijuana use.

### B. Penological Interest

With regard to the claims for which plaintiff has plausibly alleged a substantial burden, defendants contend that they have proffered a legitimate penological interest which justifies not allowing the practice in question. (Def.MTD, p. 6.) Defendants cite "safety and security" concerns for their prohibition of plaintiff's turban and identify "spatial restrictions" as the reason for requiring Rastafari Sabbath services to be held on Wednesdays rather than Fridays. (Id. at 11, 13–14.) Defendants do not to offer a justification for their policy regarding plaintiff's religious calendar claims. (Id. at 8–9.)

**\*11** Determining whether a challenged policy is reasonably related to a legitimate penological interest is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. See Ford, 352 F.3d at 596 (refusing to determine whether defendants' conduct was reasonably related to legitimate penological interests because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court cannot assess whether there is a "valid, rational connection" between defendants' actions and their purported concerns. See Turner, 482 U.S. at 89. Defendants state in a conclusory manner that the ban on plaintiff's religious turban is due to safety and security concerns, but fail to explain how plaintiff's turban presents a security problem or why concerns exist with respect to plaintiff's turban but not with the other types of permitted headgear. (See Def. MTD, pp. 13–14.) Next, while defendants explain that there is a lack of available space for Rastafarians to conduct congregate worship on Fridays (Id. at 11), the Court is unable to assess, based on the limited record, the impact accommodation would have on the guards, other inmates, and prison resources and whether there is an "absence of ready alternatives." See Turner, 482 U.S. at 90. The Court will not, at this stage, dismiss any of plaintiff's claims based on defendants' stated penological interests. The Court acknowledges that the case may look very different at the summary judgment stage.

To recap, the following free exercise claims survive defendant's motion to dismiss: (1) the denial of plaintiff's ability to observe all four of the Rastafari holy days at issue on his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafari inmates; (2) the denial of Friday Sabbath services; and (3) the prohibition on plaintiff's religious turban.

### III. The Establishment Clause and the Equal Protection Clause

While plaintiff asserts violations of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause, the parties only briefed the claims under the Free Exercise Clause. Where plaintiff has plausibly alleged a free exercise violation, the Court need not decide at this time whether plaintiff also states a claim under the Establishment Clause or the Equal Protection Clause. Because these claims have survived, the Court can make this determination at a later stage after the parties have briefed the issues. However, where plaintiff fails to state a claim under the Free Exercise Clause, the Court will determine whether the claim can nevertheless survive under the Establishment Clause or the Equal Protection Clause.

Plaintiff fails to plead any facts to support a claim under the Establishment Clause with respect to: (1) the designation of April 21 and August 17 as "family events;" (2) the denial of spiritual and religious advisers; and (3) the false reporting regarding plaintiff's marijuana use. Plaintiff fails to plead any facts to support an Equal Protection Clause claim as to: (1) the designation of "family events;" (2) the policy of collecting half of the Rastafari inmate organization's fundraising proceeds; and (3) the mandatory nature of holy day menus. As such, the claim regarding "family events" is dismissed, *see Iqbal, 556 U.S. at 678,* and the Court will analyze plaintiff's holy day menu and fundraising claims under the Establishment Clause and his religious adviser and false reporting claims under the Equal Protection Clause. For reasons to be explained, the Court dismisses each of these four claims.

#### 1. The Establishment Clause

**\*12** The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion." *U.S. Const. amend. I.* In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman, 403 U.S. 602 (1971). See Bronx Household of Faith v. Bd. of Educ. of City of New York, 650 F.3d 30, 40 n. 9 (2d Cir.2011)* ("Although the Lemon test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."); *see also Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 355 (2d Cir.2007); Kiryas Joel*

*Alliance v. Vill. of Kiryas Joel, 495 F. App'x 183, 190 (2d Cir.2012).* Under *Lemon,* "government action which interacts with religion (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion." *Bronx Household of Faith, 650 F.3d at 40* (alterations and internal quotation marks omitted) (citing *Lemon, 403 U.S. at 612–13*). "Because plaintiff is a prisoner challenging a Department of Corrections directive, the *Lemon* test is tempered by the test laid out by the Supreme Court in *Turner ...* which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh v. Goord, 571 F.Supp.2d 477, 494 (S.D.N.Y.2008)* (quoting *Salahuddin v. Perez,* 99–cv–10431 (LTS), *2006 WL 266574, at \*9 (S.D.N.Y. Feb. 2, 2006)* (internal quotation marks omitted)).

First, plaintiff claims that by denying him the ability to supplement holy day meals with additional food items, defendants have given the "New York State Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community." (*Id.*) Defendants counter that "a perfect accommodation of each inmate's preferential meal choices" would be "prohibitively expensive." (Def.MTD, p. 13.)

Plaintiff fails to state a claim under the Establishment Clause pursuant to the *Lemon* analysis. *See* 403 U.S at 612–13. First, the prison's policy has the permissible purpose of attempting to reasonably accommodate the inmates' religious dietary practices without subjecting the prison "to prohibitively expensive accommodations of religious dietary meal requests." (*Id.*) *See Benjamin v. Coughlin, 905 F.2d 571, 579 (2d Cir.1990)* (asserting that prisoners have a right to receive diets consistent with their religious beliefs but that this right may be limited where accommodation is prohibitively expensive or administratively unfeasible). Second, plaintiff has failed to allege that DOCCS's policy regarding holy day menus has the primary effect of either advancing or inhibiting religion. Plaintiff does not claim that the holy day meals are inconsistent with his religious beliefs. Finally, DOCCS's policy does not foster excessive entanglement of government with religion. "In order to permit inmates

to freely exercise their religion, *some* entanglement is necessary." *Muhammad v. City of New York Dep't of Corr.,* 904 F.Supp. 161, 198 (S.D.N.Y.1995) (emphasis in original) ("[I]n the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." (internal quotation marks omitted)). DOCCS developed a menu for holy day celebrations in order to accommodate inmates' free exercise right to receive a diet consistent with their religious beliefs. This does not constitute excessive government entanglement with religion. As such, plaintiff's claim regarding the holy day menus is dismissed.

**\*13** Next, plaintiff asserts that "the policy of requiring the Rastafarians to surrender 50% of their fundrais[ing proceeds] had the effect of a tax on religion." (Am.Compl., ¶ 24.) This allegation fails to plausibly allege a violation under the Establishment Clause. First, as plaintiff acknowledges, the policy has the secular purpose of providing funds to the Inmate Occupational Therapy Fund ("IOTF"), which is "for the benefit of the general population's use." (*Id.* ¶ 23.) The policy does not have the primary effect of advancing or inhibiting religion. The fundraising requirement is applied equally to religious and non-religious groups, and plaintiff does not adequately allege how the policy inhibits or burdens his religion. (*Id.*) Finally, the policy does not foster excessive government entanglement with religion. Thus, plaintiff's claim as to defendants' policy regarding fundraising proceeds is dismissed.

### 2. The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a claim for an equal protection violation, a plaintiff must plausibly allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Courts in the Second Circuit have emphasized that "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently ." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *see also Bishop v. Best Buy, Co. Inc.,* 08–cv–8427 (LBS), 2010 WL 4159566, at \*11 (S.D.N.Y. Oct. 13, 2010) ("Well-pled facts showing that the plaintiff has been treated differently from others

similarly situated, remains an essential component of [an equal protection] claim." (internal quotation marks omitted)). "While the *Turner* ... standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." (*Id.*)

Plaintiff's claim regarding defendant Davis's alleged false report fails to state a claim under the Equal Protection Clause because plaintiff fails to allege that he was treated differently than others. In *Bishop,* plaintiff's equal protection claim, alleging that he was discriminated against on the basis of his race, was dismissed because the plaintiff "failed 'to allege or identify a single similarly situated [individual] who was treated differently .' " 2010 WL 4159566, at \*12 (quoting *Sweeney v. City of New York,* 03–cv–4410 (JSR)(RLE), 2004 WL 744198, at \*5 (S.D.N.Y. Apr. 2, 2004) subsequently aff'd, 186 F. App'x 84 (2d Cir.2006)); *see also King v. New York State Div. of Parole,* 260 Fed. App'x. 375, 379–80 (2d Cir.2008) (affirming dismissal of equal protection claim where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"). Here, plaintiff makes no claim regarding how others were treated during their interviews for the drug treatment program. Thus, plaintiff's equal protection claim regarding religious stereotyping with regard to the alleged false report of his marijuana use is dismissed. As this is the only claim that implicates defendant Davis, she is dismissed from this case.

**\*14** Next, plaintiff alleges that being denied spiritual advisers for security reasons violates his equal protection rights because "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (Am.Compl., ¶ 19.) This allegation is conclusory and fails to identify any specific religious group that is being treated differently. *See Bishop,* 2010 WL 4159566, at \*11 ("Conclusory allegations of selective treatment are insufficient to state an equal protection claim."). Plaintiff's equal protection claim regarding spiritual advisers is dismissed.

### IV. Injunctive Relief

Defendants seek to dismiss plaintiff's claims for injunctive relief for lack of merit and mootness. (Def.MTD, pp. 17–20.) Defendants have not established that all of plaintiff's holy day claims are moot. Injunctive relief, however, may not be premised upon claims that this Court has dismissed.

Plaintiff asserts six claims for injunctive relief. (Am.Compl., ¶ B) First, plaintiff seeks to enjoin defendants from "continuing to deny plaintiff and other Rastafarians their holy days." (*Id.* ¶ B(1).) Second, plaintiff seeks injunctive relief to allow him to wear his turban. (*Id.* ¶ B(2).) Third, plaintiff seeks to enjoin defendants from enforcing the policy which mandates that the Rastafarian inmate organization surrender half of the funds it raises to the IOTF. (*Id.* ¶ B(3).) Fourth, plaintiff seeks an injunction enjoining defendants from retaliating against him. (*Id.* ¶ B(4).) Fifth, plaintiff seeks to direct defendant Davis to expunge the "stereotyped information from plaintiff's institutional records." (*Id.* ¶ B(5).) Sixth, plaintiff seeks to enjoin all defendants from "continuing to deny him his right to freely practice his faith." (*Id.* ¶ B(6).)

Defendants assert that none of plaintiff's claims for injunctive relief can be sustained as a matter of law. (Def.MTD, p. 17.) "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006) (internal quotation marks omitted). Defendants reason that because "Plaintiff is unable to succeed on the merits of his claims" permanent injunctive relief is not warranted. (Def.MTD, p. 18.) At the pleading stage, defendants are correct only with respect to some of plaintiff's claims. The Court has found that plaintiff has plausibly alleged a constitutional violation with respect to his claims regarding the observance of Rastafari holy days and the wearing of his turban. Accordingly, plaintiff's claims for injunctive relief regarding these rights may not properly be dismissed. However, the Court has determined that plaintiff's claims regarding the purported false report of plaintiff's marijuana use and defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds do not state a claim. Thus, plaintiff's claims to (1) expunge references to marijuana use from his institutional records and (2) enjoin defendants from requiring the Rastafarian organization to surrender half of their funds, are dismissed because the underlying claims upon which they are premised are dismissed.

**\*15** Plaintiff's claim that seeks to prevent future retaliation is also dismissed, as plaintiff fails to plead any facts whatsoever to show that defendants have or would retaliate against plaintiff. *See Iqbal,* 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *see also Reiter v. Metro. Transp. Auth. of N.Y.,* 01–cv–2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (denying plaintiff's request for a permanent injunction to prevent retaliation because there was no showing that plaintiff would be retaliated against in the future).

Next, defendants argue that injunctive relief is not appropriate concerning the religious calendar because "it is quite possible that this litigation could continue after Plaintiff's particular sect of Rastafarianism ceases to have followers that are inmates under DOCCS' supervision or custody" and "[a]s such, Plaintiff's request for injunctive relief would be moot." (Def.MTD, p. 19.) This argument lacks merit, as plaintiff brings his claims individually and he is currently an inmate at Woodbourne. "In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (internal quotation marks omitted). At this time, an actual controversy regarding the religious calendar exists as to the claims that defendants have not voluntarily accommodated. As such, not all of plaintiff's religious calendar claims are moot.

### V. Personal Involvement

Defendants contend that plaintiff has failed to allege the personal involvement of defendants Fischer, Jacobson, and Leonard, and as such, they should be dismissed from this suit. (Def.MTD, pp. 15–17.) The Court holds that plaintiff has plausibly alleged the personal involvement of the three defendants at issue.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Individual liability under section 1983 may not be anchored in a theory of *respondeat superior. Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998) (per curiam). "The bare fact that [a defendant] occupies a high position in

the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Further, "[c]onclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient." *Kee v. Hasty,* 01–cv–2123 (KMW)(DF), 2004 WL 807071, at *12 (S.D.N.Y. Apr. 14, 2004).

In *Colon,* the Second Circuit held that the personal involvement of a supervisory defendant can be shown by evidence that:

> **\*16** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The continuing vitality of the supervisory liability test established in *Colon* has come into question after the Supreme Court's 2009 decision in *Iqbal. See Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012). There, the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676.

The Second Circuit has not yet definitively addressed how *Iqbal* affects the *Colon* factors, nor have the district courts within this Circuit reached a clear consensus. *See Aguilar v. Immigration & Customs Enforcement Div.,* 811 F.Supp.2d 803, 814 (S.D.N.Y.2011). Despite the lack of agreement regarding the *Colon* factors, courts agree that the third factor, that defendant created a policy or custom under which unconstitutional practices occurred, has

survived *Iqbal. Compare Bellamy v. Mount Vernon Hosp.,* 07–cv–1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)* ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd sub nom. Bellamy v. Mount Vernon Hosp.,* 387 F. App'x 55 (2d Cir.2010), *with Hodge v. Sidorowicz,* 10–cv–428 (PAC)(MHD), 2011 WL 6778524, at *16 (S.D.N.Y. Dec. 20, 2011)* ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply."), *report and recommendation adopted sub nom. Hodge v. Wladyslaw,* 10–cv–428 (PAC)(MHD), 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012). It is under this factor that plaintiff claims defendants Fischer, Jacobson, and Leonard were personally involved.

Plaintiff alleges that Brian Fischer, as the Commissioner of DOCCS, "has the statutory authority to promulgate rules, regulations, and policies governing the religious rights of prisoners within the department." (Am.Compl., ¶ 4.) Similarly he alleges that Catherine Jacobsen as Acting Deputy Commissioner for Program Services "had the authority to approve policies governing the religious programs in [DOCCS]," (*Id.* ¶ 5), and that Mark Leonard, as the Director of Ministerial, Family, and Volunteer Services "was responsible for the promulgation of policies affecting the religious rights of all Rastafarian prisoners within [DOCCS]." (*Id.* ¶ 8.) Plaintiff attributes DOCCS's policies on holy days and headgear to Fischer, Jacobsen, and Leonard, along with other defendants. (*Id.* ¶ A(1).) A defendant that creates a policy is considered personally involved in any unconstitutional practices that occur under the policy. *See Colon,* 58 F.3d at 873. In *Pugh v. Goord,* 571 F.Supp.2d 477, 485–86 (S.D.N.Y.2008), the plaintiff argued that certain defendants, by creating and continuing policies regarding the accommodation of Shi'ite Muslims, were personally involved in the deprivation of his right as a Shi'ite inmate to have a separate prayer service from the Sunni Muslims. The court agreed with the plaintiff and found that because plaintiff showed that defendants made "certain contributions to formulation of policy," he had adequately established personal involvement with regard to these defendants. *Id.* at 513 (internal quotation marks omitted). Similarly, plaintiff has plausibly alleged that defendants Fischer, Jacobson, and Leonard were involved in creating policies

under which his right to free exercise was substantially burdened. Thus, these defendants are not properly dismissed from this suit at this juncture.

**\*17** Plaintiff also alleges that defendant Fischer is personally involved in the alleged constitutional violations because he has written letters to defendant Fischer "complaining about the unconstitutional impediments to plaintiff's ability to practice his faith," but Fischer has always referred plaintiff's complaints to subordinates. (Am.Compl., ¶ 25.) Defendants are correct in stating that this allegation cannot demonstrate the requisite personal involvement of Fischer. (*See* Def. MTD, p. 16.) "If the supervisor fails to respond to [a prisoner's] letter or passes the letter on to a subordinate to handle, the general rule is that the supervisor is not personally involved." *Lloyd,* 2014 WL 4229936, at \*9; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the inmate failed to produce sufficient evidence to establish personal involvement of the prison commissioner, where the commissioner referred plaintiff's appeal letter to a subordinate); *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) *on reconsideration in part,* 04–cv–8850 (RWS), 2008 WL 591230 (S.D.N.Y. Mar. 3, 2008) (stating that defendant "cannot be held liable on the sole basis that he did not act in response to letters of protest" sent by inmate). Nevertheless, because plaintiff has plausibly alleged Fischer's personal involvement in creating policies under which unconstitutional practices have occurred, Fischer is not dismissed from this suit.

VI. Qualified Immunity

Defendants argue that qualified immunity shields them from money damages. (Def.MTD, pp. 20–25.) On this motion to dismiss, the Court cannot conclude that defendants are entitled to qualified immunity as a matter of law. The case may look very different at the summary judgment phase.

Qualified immunity protects public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."

*Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *see also Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). In deciding whether defendants are entitled to qualified immunity, courts must look "to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford v. McGinnis,* 352 F.3d 582, 59697 (2d Cir.2003) (quoting *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (per curiam)) (internal quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Coollick v. Hughes,* 699 F.3d 211, 220 (2d Cir.2012) (alterations and citation omitted). While a defendant may assert a qualified immunity defense on a motion to dismiss, "the defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

**\*18** Defendants have failed to show that restricting plaintiff from celebrating certain holy days in a manner consistent with his religious beliefs, requiring Friday Sabbath services to be held on Wednesdays, and prohibiting him from wearing a religious turban do not violate clearly established law. An inmate has a "clearly established right to be free of unjustified burdens upon free exercise rights." *Salahuddin v. Dalsheim,* 94–cv–8730 (RWS), 1996 WL 384898, at \*12 (S.D.N.Y. July 9, 1996) (citations omitted); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). In *Salahuddin v. Goord,* the Second Circuit held that because plaintiff's "free-exercise rights were substantially burdened by a joint-worship policy not justified by a legitimate penological interest," qualified immunity was not appropriate as "it was clearly established at the time of the alleged violation that prison officials may not substantially burden inmates' right to religious exercise without some justification." 467 F.3d 263, 275–76 (2d Cir.2006). Similarly here, because the Court holds that plaintiff has plausibly alleged that defendants substantially burdened his free exercise rights and, at this time, have not established a legitimate penological justification, defendants are not entitled to qualified immunity on the premise that their conduct did not violate clearly established law.

Whether defendants could have reasonably believed that they did not violate an established constitutional right depends, at this stage, "on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that [sic] [their actions] served a legitimate penological interest." *Diggs v. Marikah,* 11–cv–6382 (PAE), 2012 WL 934523, at *5 (S.D.N.Y. Mar. 20, 2012) (denying defendants' motion to dismiss on the basis of qualified immunity, where plaintiff's religious beliefs were substantially burdened and the factual basis for whether defendants' actions were reasonably related to a legitimate penological interest was not yet developed). At this early stage, there is inadequate information to determine whether defendants were objectively reasonable in their beliefs regarding their proffered penological interests. *See Perez v. Westchester Cnty. Dep't of Corr.,* 05–cv–8120 (RMB), 2007 WL 1288579, at *6 (S.D.N.Y. Apr. 30, 2007). This determination is more appropriate for summary judgment. *See id.* at *6 ("It is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to Rule 12(b)(6)." (alterations and citations omitted)). Thus, defendants are not entitled to qualified immunity at this stage.

CONCLUSION

For the reasons outlined above, defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims regarding (1) "family events," (2) holy day menus, (3) spiritual advisers, (4) fundraising proceeds, and (5) the reporting of plaintiff's marijuana use are dismissed in their entirety. Because the only claim plaintiff brought against defendant Davis is dismissed, Davis is also dismissed from this suit. Plaintiff's claims regarding (1) the religious calendar, excluding requests for "family events," (2) Friday worship, and (3) plaintiff's turban survive defendants' motion to dismiss.

**\*19** Counsel for defendants shall provide plaintiff with copies of all unreported decisions cited herein. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and *in forma pauperis* status is denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 769551

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7160117
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jesus RODRIGUEZ, Plaintiff,
v.
David ROSNER, Medical Doctor,
Watertown Correctional Facility, Defendant.

No. 9:12–CV–958 (TJM/ATB).
|
Dec. 5, 2012.

**Attorneys and Law Firms**

Jesus Rodriguez, pro se.

Christopher W. Hall, AAG, for the Defendants.

## ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In this civil rights complaint, plaintiff alleges that defendant Rosner denied plaintiff constitutionally adequate medical care when he refused to prescribe orthopedic boots for plaintiff. (Compl. ¶ 6; Dkt. No. 1). Plaintiff subsequently filed a substantial number of documents in support of his complaint. (Dkt. No. 13). Plaintiff seeks injunctive as well as substantial monetary relief. (Compl.¶ 8).

Presently before the court is defendant's motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16). Plaintiff has responded in opposition to the motion to dismiss and has filed a separate motion for appointment of counsel. (Dkt.Nos.19, 20). For the following reasons this court will recommend granting defendant's motion and dismissing this action without prejudice to plaintiff re-filing the action. The court will also order the denial of plaintiff's motion for appointment of counsel without prejudice.

## DISCUSSION

### I. *Facts*
In his complaint, plaintiff alleges that he is a Type II diabetic, who has had skin grafts taken from the soles of his feet, leaving him with abnormally thin skin on the bottom of his feet. (Compl. Facts ¶¶ 2–3). Plaintiff states that he is in constant discomfort due to his condition, and in May of 2011, while he was incarcerated at Oneida Correctional Facility, he was referred to Dr. Baldauf, a podiatrist, who determined that plaintiff suffered from plantar fascitis. (*Id.* ¶¶ 8–9). Plaintiff states that Dr. Baldauf recommended that plaintiff be fitted for orthopedic boots. (*Id.* ¶ 11). Impressions of plaintiff's feet were taken while he was still at Oneida, and the boots were ordered in July of 2011. (*Id.* ¶ 12).

Prior to receiving his boots, plaintiff was transferred to Watertown Correctional Facility, where he was examined by defendant Dr. Rosner. (*Id.* ¶¶ 13–15). Plaintiff states that he made several requests, but was never given the boots. (*Id.* ¶ 14). Dr. Rosner, who is not a podiatrist, conducted his own examination of plaintiff's feet and determined that plaintiff did not require orthopedic boots. (*Id.* ¶ 16). Plaintiff claims that the medical records supporting Dr. Baldauf's diagnosis and prescription of orthopedic boots was missing from plaintiff's file. (*Id.* ¶ 20). Plaintiff believes that defendant Rosner has intentionally destroyed or hidden these records. (*Id.* ¶ 21).

Plaintiff states that defendant Rosner refused to locate these records, even though plaintiff filed a grievance. (*Id.* ¶ 22). Plaintiff also claims that defendant Rosner "deflects" all investigations by stating that plaintiff refused new state-issued boots, but never mentions that these "new" boots were not the orthopedic boots that plaintiff had been prescribed at Oneida. (*Id.* ¶ 23).

### II. *Motion to Dismiss*

#### A. Legal Standards
**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

2012 WL 7160117

"[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any

documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### B. Application

**\*3** Subsequent to the filing of his complaint, plaintiff submitted documents in support of the complaint, including a substantial number of medical records, many of which address the issue of his request for special boots. (Dkt. No. 13). Among the records submitted by plaintiff are his grievance documents. (Dkt. No. 13 at 34–43). Plaintiff also included a complaint that he made to the New York State Department of Health, Office of Professional Misconduct, [1] regarding defendant's denial of orthopedic boots and a complaint to the New York State Office of the Inspector General. (Dkt. No. 13 at 44–47, 48). On October 25, 2012, plaintiff filed a letter, attaching a copy of the final response to his grievance by the Central Office Review Committee. (Dkt. No. 15). This court may consider all of the documents attached to the complaint, or submitted in conjunction with the complaint in its decision, although it need not consider all of them in order to decide this motion.

[1]   This set of documents includes plaintiff's complaint, the Department's response, plaintiff's letter objecting to the Department's conclusion, and the Department's review of its action. (Dkt. No. 13 at 44–47).

### III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative

remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance prior to filing the federal action.

**\*4** The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law

in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [2] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

[2]  *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming; *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford,* it has applied the three-part inquiry in recent cases. *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009); *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011). [3]

[3]  This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 548 U.S. at 104 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the

2012 WL 7160117

inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates." Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

### 2. Application

Defendant argues that plaintiff has admittedly failed to exhaust his administrative remedies. In his complaint, signed on June 10, 2012, and filed on June 13, 2012, plaintiff states that he filed his grievance on April 2, 2012, received an adverse decision and appealed to the Superintendent on April 26, 2012. (Compl.

¶ 4(b)(i)). Plaintiff states that he appealed the Superintendent's decision to the CORC on May 4, 2012, but that "[n]o decision [was] rendered to date." (*Id.* ¶ 4(b) (ii)). Plaintiff specifically states that the "appeal [is] still pending at CORC in Albany." (*Id.*) Thus, at the time plaintiff filed his complaint, he had not exhausted his administrative remedies.

In the complaint, plaintiff cited no reason for failing to wait for the CORC's decision. The first two *Brownell* factors do not apply to this case. Plaintiff does not claim that the grievance procedure was not "available," nor does he claim that defendant's actions prevented plaintiff from utilizing the available procedures. Thus, the court must consider whether there are "special circumstances" justifying plaintiff's failure to exhaust. Based on the facts in this case, the inquiry will be whether there are special circumstances justifying plaintiff's failure to await the CORC decision.

**\*5** Plaintiff ultimately received a decision by the CORC, dated September 26, 2012, accepting his grievance to the extent that "a referral was submitted for a consult for special boots for the grievant on 9/18/12." (Dkt. No. 15). Plaintiff filed the CORC decision with the court on October 25, 2012. (*Id.*) While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies *before* filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. 267 F.3d at 122–23.

In plaintiff's response to the motion to dismiss, he argues that he did everything he could to exhaust his remedies, and that he should be excused from obtaining the final

decision of the CORC because he had already filed the appeal to the CORC when he filed his federal action, and there were "extenuating medical circumstances." (Dkt. No. 19 at 1–2). The court understands that plaintiff claims he was in pain, however, he received the CORC decision before the court even had an opportunity to rule on any of the merits of his claims. Thus, plaintiff's premature filing of this federal action did not benefit plaintiff or solve his medical problem. The CORC noted that plaintiff was referred for his medical boots in September of 2012. In fact, if plaintiff had waited, he would not have had to request injunctive relief because it appears that he will be afforded his special boots if medically appropriate.

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action for damages because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.* The scenario envisioned by the court in *Neal* occurred in this case, even before the CORC accepted the grievance because plaintiff received the referral to the specialist in September of 2012. This is true, notwithstanding that plaintiff may still file a complaint for damages alone if he chooses to do so.

### IV. *Appointment of Counsel*
Because this court is recommending dismissal without prejudice at this time, plaintiff's motion for appointment of counsel (Dkt. No. 20) is denied as moot. If plaintiff re-files his action, he may request appointment of counsel at the appropriate time.

**WHEREFORE,** based on the findings above, it is

**\*6 RECOMMENDED,** that defendant's motion to dismiss (Dkt. No. 16) be **GRANTED,** and the complaint **DISMISSED WITHOUT PREJUDICE TO REFILING,** and it is further

2012 WL 7160117

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 20) is **DENIED AS MOOT AT THIS TIME.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7160117

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00703-TJM-TWD    Document 51    Filed 12/07/18    Page 157 of 157
Rodriguez v. Rosner, Not Reported in F.Supp.2d (2013)
2013 WL 614360

2013 WL 614360
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jesus RODRIGUEZ, Plaintiff,
v.
David ROSNER, Medical Doctor,
Watertown Correctional Facility, Defendant.

No. 9:12–CV–958.
|
Feb. 19, 2013.

**Attorneys and Law Firms**

Jesus Rodriguez, Wallkill, NY, pro se.

Christopher W. Hall, Office of Attorney General, Albany,
NY, for Defendant.

***DECISION & ORDER***

THOMAS J. McAVOY, District Judge.

**\*1**  This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. Andrew T. Baxter, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the December 5, 2012 Report–
Recommendation were raised by the parties. After
examining the record, the Court determined that the
ReportRecommendation is not subject to attack for
plain error or manifest injustice. Accordingly, the Court
adopts the Report–Recommendation for the reasons
stated therein.

Thus, it is ordered that: (1) Defendant's motion to dismiss
be **GRANTED;** (2) Plaintiff's complaint be **DISMISSED
WITHOUT PREJUDICE**; and (3) Plaintiff's motion for
appointment of counsel be **DENIED** as moot.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 614360

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.